## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Sumner Regional Health Systems, Inc., *et al.*[1] | ) Case No. 10-_____ ( ) |
| | ) |
| | ) Joint Administration Requested |
| Debtors. | ) |
| | ) |
| | ) |
| | ) |

**DEBTORS' MOTION FOR ORDERS:  (I) (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL ASSETS, (B) SCHEDULING AN AUCTION, (C) SCHEDULING A SALE HEARING, (D) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES RELATED TO THE SALE, (E) AUTHORIZING PAYMENT OF A BREAK-UP FEE AND EXPENSE REIMBURSEMENT AND (F) APPROVING THE FORM OF THE SALE NOTICE; AND (II) (A) AUTHORIZING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (B) AUTHORIZING AND APPROVING THE RELATED PURCHASE AGREEMENT, (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO AND (D) GRANTING RELATED RELIEF**

By this motion (the "Bid and Sale Procedures Motion"), the above-captioned debtors and debtors in possession (the "Debtors", or "Seller"), hereby move the Court, pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002, 6004, 6006, and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of orders:   (I) (A) approving the bidding procedures (the "Bidding Procedures"), which are annexed as **Exhibit B** hereto, concerning the sale of substantially all of the Debtors' assets (the "Assets") as described more fully in the Asset Purchase Agreement (the "Stalking Horse APA"), dated April 30, 2010, between and among the Debtors, LifePoint

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Sumner Regional Health Systems, Inc. (3738), Trousdale Medical Center, Inc. (5666), Frank T. Rutherford Memorial Hospital, Inc. (8987), SRHS Holdings, LLC (2680), Sumner Homecare and Hospice, LLC (4324), Family Wellness Group of Middle Tennessee, LLC (1860) and ClinicCare, LLC (6783).

Acquisition Corp. (the "Stalking Horse") and Historic LifePoint Hospitals, Inc., which agreement is annexed as **Exhibit E** hereto, (B) scheduling an auction for the sale of the Assets to be conducted pursuant to the Bidding Procedures (the "Post-Petition Auction"), (C) scheduling a hearing (the "Sale Hearing") to consider the sale of the Assets (the "Sale") to the High Bidder (as defined below) at the Post-Petition Auction, (D) approving the procedures for assumption and assignment of certain executory contracts and unexpired leases of real property annexed as **Exhibit C** hereto (the "Assumption and Assignment Procedures"), (E) authorizing payment of the Break-Up Fee and Expense Reimbursement (each as defined below), pursuant to the Stalking Horse APA and (F) approving the form of the notice regarding the Post-Petition Auction and Sale annexed as **Exhibit D** hereto (the "Sale Notice"); and (II) (A) authorizing the Sale free and clear of liens, claims, encumbrances, and other interests, (B) authorizing and approving the purchase agreement entered into with the High Bidder (as defined in the Bidding Procedures), (C) approving the assumption and assignment of certain executory contracts and unexpired leases related thereto, and (D) granting related relief.  The facts and circumstances supporting this Motion are set forth in the Affidavit of Waite Popejoy, the Chief Restructuring Officer of Sumner Regional Health Systems, Inc., in Support of Chapter 11 Petition and First Day Pleadings filed concurrently herewith (the "Popejoy Affidavit").  In support of this Motion, the Debtors further represent as follows:

## JURISDICTION

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.     This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.     Venue of these cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

7653/69444-001 Current/18532299v23

4.     The statutory bases for the relief requested herein are Sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules  2002, 6004, 6006, 9007 and 9014.

## INTRODUCTION

### I.     General Background

5.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of title 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases (the "Chapter 11 Cases") and, as of the date of the filing of this Motion, no official committees have been appointed or designated.  Concurrently with the filing of this Motion, the Debtors have sought procedural consolidation and joint administration of these Chapter 11 Cases.

### II.     The Debtors' Operations

6.     The Debtor Sumner Regional Health Systems, Inc. ("SRHS"), formed in Tennessee in 1994, is the nonprofit parent corporation of an integrated healthcare system (the "System") headquartered in Gallatin, Tennessee, which provides acute care and skilled nursing services to eleven counties in central Tennessee and southern Kentucky.  Specialty services provided by the System include surgical services, cardiovascular services, cancer services, orthopedic services, emergency medicine, and wound care.  The Debtors own and/or operate, among other businesses and assets, four acute care hospital facilities (collectively, the "Hospitals"), a provider of home health, hospice and palliative care services, a family physician group, and several medical office and outpatient facilities.

7.     SRHS owns and operates Sumner Regional Medical Center ("Sumner Regional"), the System's flagship and largest hospital, which is an acute care facility in Gallatin that provides

7653/69444-001 Current/18532299v23

certain tertiary (i.e., specialized consultative) services. Prior to the Petition Date, the County of Sumner, Tennessee (the "County") and SRHS had entered into a lease agreement (the "County Lease") pursuant to which the County leased the real property upon which Sumner Regional is located. Thereafter, SRHS and the County entered into a Lease Termination Agreement, dated as of January 27, 2004 (the "Termination Agreement"), pursuant to which the County agreed to terminate the County Lease and convey the underlying real property (the "Conveyed Real Property") to SRHS in exchange for the payment of $10,000,000, and SRHS's promise to provide certain medical services to County inmates and residents through at least October 1, 2034 in certain specified amounts (the "Medical Services Obligations").[2] Pursuant to the Termination Agreement, the County transferred the Conveyed Real Property to SRHS under a warranty deed (the "Deed"), which was recorded on January 28, 2004 and which, along with the SRHS's Charter, provides, among other things, that upon dissolution, after paying or making provision for the payment of all liabilities, SRHS shall distribute all of its remaining assets to the County.

8.     SRHS acquired the Debtor Trousdale Medical Center, Inc. ("Trousdale Hospital") in 2000. SRHS acquired the Debtor Frank T. Rutherford Memorial Hospital, Inc., d/b/a Riverview Regional Medical Center South ("Riverview Hospital South"), in 2004. SRHS acquired the Debtor SRHS Holdings, LLC, d/b/a Riverview Regional Medical Center North ("Riverview Hospital North"), in 2006.

9.     SRHS owns and operates Sumner Homecare and Hospice, LLC ("Sumner Homecare") and Family Wellness Group of Middle Tennessee, LLC ("Family Wellness Group"), both of which are Debtors in these cases. Sumner Homecare provides home health,

---

[2]     The Termination Agreement also provides that from and after October 1, 2034, SRHS is obligated to provide Medical Services, and the County is obligated to pay SRHS for its actual costs in providing such care.

hospice and palliative care services in north-central Tennessee. Family Wellness Group, a family practice physician group located in Hendersonville, Tennessee, was purchased by SRHS in December 2008. The Debtor ClinicCare, LLC ("ClinicCare") is a non-operating entity with respect to which activities have been shuttered. SRHS owns a 50% interest in a joint venture with St. Thomas Health Services, named SST Community Health LLC, which owns and operates a cardiac catheterization laboratory and provides diagnostic and interventional cardiology services.

10. The daily operations of the Debtors are delegated by the SRHS Board of Directors (the "System Board") to its executive management team, which is jointly led by interim management personnel from Navigant Consulting, Inc. and Navigant Capital Advisors, LLC (together, "Navigant") and incumbent SRHS management. As discussed below, members of Navigant were appointed to their respective positions by the System Board in June 2009.

11. The Debtors have approximately 1,500 employees (the "Employees") and approximately 328 physicians on staff. There are no unions representing the Employees.

12. As of March 29, 2010, the Debtors had aggregate assets (at book value) and liabilities on a consolidated, unaudited basis of approximately $212,699,000 and approximately $180,749,000, respectively. For the fiscal year ended May 31, 2009, the Debtors had revenues of approximately $138,780,000, and incurred a negative change in net assets of approximately $42,405,000.

### III.     The Debtors' Pre-Petition Debt Structure

13. In or around the Fall of 2007, the System formed an obligated financing group (the "Obligated Group") in order to gain access to the municipal bond market. The Obligated Group is comprised of SRHS, Trousdale Hospital, Riverview Hospital South, Riverview

Hospital North, and Sumner Homecare. The members of the Obligated Group are jointly and severally liable for the obligations in respect of the following series of outstanding tax-exempt revenue bonds: (a) The Health, Educational and Housing Facilities Board of the County of Sumner, Tennessee, $150,000,000 Hospital Revenue Refunding and Improvement Bonds (Sumner Regional Health Systems, Inc.), Series 2007A (the "2007 Bonds") and (b) The Health, Educational and Housing Facilities Board of the County of Sumner, Tennessee, $12,000,000 Hospital Revenue Improvement Bonds (Sumner Regional Health Systems), Series 2008 (the "2008 Bonds" and, together with the 2007 Bonds, the "Bonds"). As set forth more fully in the Popejoy Affidavit, the Bonds are fully secured by senior pledges of gross revenues, mortgages on various properties, security agreements and related UCC-1 financing statements.

## IV. Events and Circumstances Leading to the Chapter 11 Filing

14. As noted, in 2007 and 2008, pursuant to an expansion strategy, the Obligated Group issued the Bonds in the aggregate amount of $162 million, in two separate series, in order to finance certain construction projects, to acquire certain real estate assets in contiguous markets for future development, and to retire existing indebtedness from past acquisitions. After the issuance of the 2008 Bonds, the Debtors determined that operating results had been overstated for fiscal year 2008 because certain methods used to estimate the contractual adjustment and allowance for doubtful accounts were flawed. During the fiscal year beginning June 1, 2008, operating losses continued in substantial part to four factors: lower realization of patient revenues, increased costs of operations associated with new facilities, declining economic environment and reduced rates of return on the investment portfolio, all of which led to negative cash flows. In November 2008, the Debtors implemented a reduction-in-force with the termination of 84 employees.

6

15.     As a result of this decline in operating performance, several members of the Debtors' executive management resigned or were terminated during calendar year 2008 and the first half of calendar year 2009, including the Chief Financial Officer, Vice President of Development, and Sumner Regional Administrator.  For the fiscal years ended May 31, 2008 and May 31, 2009 (unaudited), the Debtors recorded a net negative change in unrestricted net assets of ($22.2) million and ($42.9) million, respectively, resulting from lower realization of patient revenues.  The Debtors also experienced substantial operating losses from weak occupancy of Sumner Station and significant associated legacy occupancy costs at this site and underperformance with its recent acquisition of Family Wellness Group.

16.     On June 10, 2009, Fitch Rating issued a downgrade report of the Debtors to 'B-' from 'BB+' with a "Negative" watch, citing the Debtors' deterioration in operating profitability, accounting problems, a material decline in liquidity, and the Debtors' auditors issuing a going-concern opinion in the 2008 audit.  Two days later, the former Chief Executive Officer of the Debtors resigned, and soon thereafter in June 2009, the System Board retained Navigant, a firm with expertise in both the health care industry as well as in restructuring financially troubled institutions, to serve as its performance improvement consultant and strategic alternative and disposition advisor.  Certain Navigant employees were named to key executive management positions, including Roger Kaiser, M.D as the Debtors' Chief Executive Officer, Mark Brazitis as the Debtors' Chief Implementation Officer, and Waite Popejoy as the Debtors' Chief Restructuring Officer.

## V.     Decision to Pursue the Sale and the Debtors' Marketing Efforts

17.     In connection with Navigant's retention, the Debtors started exploring various restructuring alternatives in June of 2009.  In August, Navigant presented to the System Board

confirmation of the findings of another consultant who had been engaged prior to Navigant. In addition, Navigant provided an overview of the Debtors' capital structure along with the implementation of various financial improvement initiatives. In addition, Navigant gave to the System Board a preliminary review of the Debtors' potential restructuring alternatives, including identification of possible partners, and highlighted that, while the impact of certain of the Debtors' cost-saving initiatives was still unknown, there was a real possibility that a sale process under Section 363 of the Bankruptcy Code (a "363 Sale") would be the most likely option. Thereafter, in September, Navigant prepared an initial timeline and a plan for consideration and pursuit of various restructuring and sale options. In connection therewith, the Debtors, in consultation with Navigant, analyzed extensive restructuring and sale alternatives, and determined that a 363 Sale was the most feasible option, due to the uncertainty and difficulties that would attend any out-of court restructuring of the Debtors. In November, Navigant further refined the timeline to pursue strategic alternatives. Additionally, Navigant culled from market research, certain databases and its transaction experience, a list of potential purchasers and presented the Debtors with an analysis of their strategic profiles. Navigant identified and the Debtors agreed upon 26 entities that operate, or are known to want to operate, an enterprise in the health care industry and that could potentially be interested in purchasing the Assets.[3] Thereafter, on December 16, 2009, the System Board authorized Navigant to solicit offers from such parties. In addition, for use in such solicitations, the System Board approved a form of executive summary, confidential information memorandum and confidentiality agreement. In order to inform the System Board about the mechanics of a 363 Sale process, a draft set of preliminary bidding procedures was delivered as well.

---

[3]     In addition, thereafter, a 27th interested party emerged who initiated contact with the Debtors after learning of the Debtors' difficulties through the press and sought to purchase a single hospital.

18. The next day, Navigant commenced soliciting offers from the 26 parties previously identified. Of these, 15 signed confidentiality agreements and were provided a package containing marketing and due diligence materials. The 27th party later signed a confidentiality agreement after contacting Navigant. The package also included a confidential information memorandum prepared by Navigant and a process letter, which, among other things, set forth the initial bid deadline of January 22, 2010 and disclosed the possibility of a 363 Sale process. This was disclosed to ensure that bidders were informed of all possible sale scenarios and would tailor their bids and expectations accordingly. After being given time to review the confidential information memorandum and preliminary diligence discussions, 10 parties submitted detailed formal bids for the Assets. Of these, two bids were for purchase solely of the Debtors' critical access hospitals at prices that were not competitive considering other bids received. The remaining eight offers were system-wide bids, each of which contemplated a 363 Sale. Navigant presented these bids to the System Board. The System Board then requested that, given the similarity of the purchase prices contained in several of the bids and the administrative difficulty of engaging in extensive negotiations with so many potential purchasers concurrently, bidders revise their offers so as to distinguish themselves and to enable the Debtors to identify the most competitive offers. To that end, Navigant engaged in further discussions with such parties regarding, among other things, refining their offers, additional disclosures and financial capability to complete a transaction. In connection with these additional requests, one bidder disengaged from the process. The remaining seven bidders submitted updated offers on February 3, 2010. After the System Board reviewed these offers with Navigant, the System Board recommended the seven bidders to commence with more in-depth due diligence. These parties were offered access to an online data room for further due diligence and invited to

conduct limited visits with management and to the Debtors' facilities. The Debtors then continued to negotiate with such parties, and, following this additional round of discussions, requested that the remaining bidders submit their final best offers by March 19, 2010.

19. Three bidders submitted revised formal bids: (i) the Stalking Horse submitted an offer with a purchase price of approximately $170,000,000; (ii) another bidder ("Bidder Two") submitted an offer with a purchase price of approximately $125,000,000; and a third bidder ("Bidder Three") submitted an offer with a purchase price of approximately $140,000,000. As the Stalking Horse had submitted the superior bid, the Debtors and Navigant immediately began to work extensively with the Stalking Horse to complete confirmatory due diligence, while then engaging in negotiations with the other bidders to obtain improved bids. These discussions were productive, and on March 31, Bidder Two increased its offer significantly to approximately $171,000,000, while on April 14, Bidder Three increased its bid to approximately $150,000,000 (not subject to any adjustment based upon the Debtors' working capital levels). Bidder Three's offer also required a commitment from the Debtors by April 16, 2010 to engage such bidder as the stalking horse. In light of Bidder Two's substantially increased bid, the Debtors and Navigant intensified negotiations with Bidder Two. On April 15, the Stalking Horse lowered its bid to approximately $140,000,000, subject to adjustment based upon the Debtors working capital levels, which was estimated to result in an increase in the purchase price of approximately $10,000,000, resulting in a total bid of approximately $150,000,000. Shortly thereafter, on April 21, 2010, Bidder Two lowered its bid to approximately $140,000,000. On April 25, 2010, the Stalking Horse increased its bid to $145,000,000, along with a credit for working capital, which is estimated to bring the total purchase price consideration to approximately $155,000,000. At this point, the Bidder Two and Three's bids contained contractual provisions such as those

requiring the escrow of significant amounts for extended periods of time in respect of potential indemnity obligations, as well as extended due diligence periods. The Stalking Horse's bid was estimated to provide the most cash consideration, the greatest certainty of closing, and to present the Debtors with the most favorable terms and conditions in the related agreement, including with respect to the requested stalking horse protections.

20. Accordingly, while continuing to work with Bidders Two and Three, the Debtors and the Stalking Horse worked diligently to finalize and enter into the Stalking Horse APA.[4] The Stalking Horse APA is superior to the last bids submitted by Bidders Two and Three in many respects, including (without limitation): (i) it is estimated to offer approximately $5,000,000 more in cash consideration than the next highest bid; (ii) the Stalking Horse has completed substantially all of its material due diligence and accordingly committed to a shortened closing timeframe; (iii) the Stalking Horse APA requires an aggregate break-up fee and expense reimbursement that is $1,000,000 less than that of Bidder Three; (iv) the Debtors have a high degree of certainty that the Stalking Horse has access to the funds necessary to close the Sale; (v) the Debtors are able to determine the amount of net distributable proceeds with confidence; (vi) the indemnity escrow provided in the Stalking Horse APA can be released after 6 months (as opposed to 18 months for Bidder Three), (vii) the Stalking Horse's deposit is $10,000,000 larger than that of Bidder Three, (viii) the Stalking Horse has agreed to a post-closing capital commitment of $60,000,000 over ten years (as opposed to $20,000,000 over five years for Bidder Three) and (ix) the Stalking Horse has agreed to a merit-based pay increase of 2.5% for all of the Debtors' employees that it retains.

---

[4] To the extent not evident in the above description, the Debtors wish to stress that at no point were negotiations confined exclusively to one bidder, including the Stalking Horse.

7653/69444-001 Current/18532299v23

21.     The Debtors submit that, due to the extensive sale efforts and competitive negotiations described above (the "Pre-Petition Process"), an auction has essentially already taken place.  Nonetheless, the Debtors are prepared to submit the Stalking Horse APA to the further sale process described herein.  Accordingly, the Debtors seek approval of the sale process described herein in order to ensure that the sale process yields the highest and best offer for the Assets and will maximize the value received by the Debtors therefor.  The Debtors estimate that the proceeds from the Sale, which are expected to be approximately $156,000,000, will maximize value for the Debtors' estates, creditors and all stakeholders.  As stated above, if the Debtors were not able to consummate the Sale, their financial limitations would lead to a speedy shut down of all operations and the irreparable loss of value for the Debtors' estates.  For this reason and for the others set forth below, the Debtors submit that approval of the relief requested herein is in the best interests of the Debtors, their estates and creditors.

## VI.     The Chapter 11 Filing

22.     No longer able to sustain viable long-term business operations in light of the Debtors' current financial situation, the System Board and the Debtors' management determined that the Debtors' best option to maximize the value of the Assets for stakeholders and to safeguard the welfare of their patients was to pursue the acquisition transaction with the Stalking Horse in an orderly fashion through these Chapter 11 cases.  Accordingly, the System Board authorized the filing of these Chapter 11 cases and the proposed sale process described herein.

## VII.    The Stalking Horse APA[5]

23.     Set forth in this section are the key terms of the Stalking Horse APA.  This section is intended as a summary of the Stalking Horse APA, which includes, among other

---

[5]     Capitalized terms used in this section but not defined shall have the meanings given to them in the Stalking Horse APA.

things, terms and conditions customary in other stalking horse purchase agreements entered into in connection with sales under Section 363 of the Bankruptcy Code. To the extent that any description of such agreement contained in this Motion conflicts with the Stalking Horse APA, the terms of the Stalking Horse APA shall control.

A. <u>Purchase Price</u>. The purchase price provided under the Stalking Horse APA (the "<u>Purchase Price</u>") is $154,108,687.86, subject to certain adjustments based upon (i) whether capital levels and accounts receivable are larger or smaller than a certain benchmark, (ii) the magnitude of amounts remaining due under certain leases, (iii) whether third parties that co-invested in joint ventures with the Debtors exercise certain call rights, (iv) whether the Stalking Horse is able to obtain a waiver of claims against the Debtors from the Landlord (as defined below) and (v) supplementation or amendment of schedules, in each case as set forth more fully in Section 3.1 of the Stalking Horse APA.

B. <u>Escrowed Deposit</u>. The Stalking Horse has deposited an amount equal to 10% of the cash portion of the Purchase Price (the "<u>SH Deposit</u>") with U.S. Bank, as escrow agent, to be applied to the Purchase Price in the event that the Closing occurs. In the event that the Stalking Horse APA is terminated by the Debtors pursuant to Section 4.4(d) of the Stalking Horse APA, due to the Stalking Horse's failure to satisfy certain closing conditions, the SH Deposit will be returned to the Debtors. If the Stalking Horse APA is otherwise terminated under Section 4.4(d) thereof, the SH Deposit will be returned to the Stalking Horse.

C. <u>Break-Up Fee and Expense Reimbursement</u>. In consideration for Purchaser having expended considerable time and expense in connection with the Stalking Horse APA and the negotiation thereof and the identification and quantification of assets of the Debtors, the Debtors will pay the Stalking Horse (i) a break up fee in an amount equal to $2,500,000 (the "<u>Break-Up Fee</u>") and (ii) reimbursement of actual out-of-pocket expenses incurred in negotiating the Stalking Horse APA and performing due diligence, in an amount not to exceed $1,000,000 (the "<u>Expense Reimbursement</u>"), on the first Business Day following the date of consummation of a transaction pursuant to a Competing Bid if no material breach by the Stalking Horse of the Stalking Horse APA has occurred.

D. <u>Post-Closing Capital Commitment</u>. The Stalking Horse has agreed that over the ten years following the Closing, it will make no less than $60,000,000 of capital expenditures in connection with operation of the Hospitals.

E. <u>Outside Closing Deadline</u>. In the event that the Closing does not occur by July 31, 2010, the Stalking Horse APA is terminable by either Seller or Purchaser (so long as neither has breached the Stalking Horse APA), unless the Closing has not occurred because the Sale Order has not been entered and certain other conditions are met.

F.    <u>Assumption of Liabilities</u>.  The Stalking Horse has agreed to assume, subject to the Excluded Liabilities set forth in Section 2.4 of the Stalking Horse APA, the following of the Debtors' liabilities:  (a) the obligations of Seller arising following the Effective Time pursuant to the Purchased Contracts, Purchased Real Property Leases and Purchased Personal Property Leases, together with those Contracts included in Purchased Intellectual Property; *provided, however*, that all defaults arising prior to the Closing have been cured by Seller and have been assumed by Seller and assigned to Purchaser in accordance with section 365 of the Bankruptcy Code; (b) the current trade accounts payable of Seller that are not due to Affiliates of Seller or incurred by Seller in connection with the Contemplated Transactions; (c) Seller's obligations for the accrued but unused vacation and sick time of Transferred Employees prior to the Effective Time; (d) all Liabilities required to be paid by Purchaser under the Stalking Horse APA; and (e) all Liabilities from or related to patient credits that are included in the calculation of Net Working Capital.

## VIII.   <u>Requested Sale Process Timeline</u>

24.    As set forth in more detail below, the Debtors are seeking: (a) a Bid Deadline (as defined below) to occur prior to the Post-Petition Auction; (b) to hold the Post-Petition Auction in the week of May 31, 2010; (c) to appear before the Bankruptcy Court for the Sale Hearing in the week of May 31, 2010; and (d) to close the Sale on June 30, 2010.

25.    As set forth in more detail below, the Stalking Horse APA requires that the Closing (as defined therein) occur on the final Business Day of the month in which the closing conditions are satisfied, and that the sale order be entered at least 10 days prior to closing.[6] Accordingly, the Debtors have requested that the Sale Hearing occur on or prior to June 11, 2010, in order provide the Stalking Horse with more than 10 days thereafter before the Closing, and to enable the Debtors to close the Sale at the end of the month and avoid any further delay as well as the attendant difficulties and expenses, as set forth more fully below, involved in a mid-

---

[6]    If the Court cannot accommodate this schedule, the Stalking Horse has agreed to a closing on the 15th day of the month following the month in which the Sale Order is entered (pursuant to the Debtors' requested timeline, this closing would take place on July 15, 2010).  The Debtors wish to avoid such a delay, as a significant amount of interest will accrue under the Bonds at the rate of approximately $700,000 per month.

month closing.[7] Given the extensive Pre-Petition Process that the Debtors conducted, the above-requested timeline is reasonable, and, moreover, is in compliance with applicable sections of the Bankruptcy Code as well as the Local and Bankruptcy Rules.

## **RELIEF REQUESTED**

26.     As stated above, the Debtors are hereby requesting, pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9007, entry of (i) an order (the "Bid and Sale Procedures Order"), substantially in the form attached hereto as **Exhibit A**, (A) approving the Bidding Procedures, (B) scheduling the Post-Petition Auction, (C) scheduling the Sale Hearing, (D) approving the Assumption and Assignment Procedures, (E) authorizing payment of the Break-Up Fee and Expense Reimbursement and (F) approving the form of the Sale Notice; and (ii) an order, substantially in the form annexed hereto as **Exhibit F**, (the "Sale Order"), approving (a) the sale of the Assets to the High Bidder (as defined in the Bidding Procedures), free and clear of all liens, claims, encumbrances, and other interests, (b) authorizing and approving the related purchase agreement, (c) approving the assumption and assignment of certain executory contracts and unexpired leases related thereto, and (d) granting related relief.

27.     The Sale to the High Bidder as contemplated herein will maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders and, accordingly, is in the best interests of the Debtors, their creditors, and their other economic stakeholders.  For this reason and for those set forth below, the Debtors respectfully submit that the relief requested in this Bid and Sale Procedures Motion should be granted.

---

[7]     An end-of-month closing saves the parties considerable administrative expense and effort, especially with respect to the pursuit of Medicare and Medicaid reimbursements.

7653/69444-001 Current/18532299v23

# DESCRIPTION OF THE PROPOSED BID AND SALE PROCEDURES

## I.    The Proposed Bidding Procedures

28.    The Debtors believe that the best interests of their estates are served by conducting a public auction to identify the highest or otherwise best offer for the Assets. Accordingly, the Debtors seek the Court's approval of the Bidding Procedures. The following is a summary of the key provisions thereof:[8]

A.    <u>General Process</u>.  The Debtors shall solicit bids from interested parties.  Only Qualified Bids (as defined below) shall be considered by the Debtors.  If the Debtors do not receive a Qualified Bid other than the Stalking Horse APA prior to the Bid Deadline, then the Stalking Horse's offer to acquire the Assets under the Stalking Horse APA shall constitute the highest or otherwise best Qualified Bid (the "<u>High Bid</u>").  If the Debtors receive a Qualified Bid other than the Stalking Horse APA prior to the Bid Deadline, then the Debtors, after consultation with Wells Fargo Bank, as Master Trustee (the "<u>Master Trustee</u>"), and any Official Committee of Unsecured Creditors (the "<u>Committee</u>") appointed in the above-captioned chapter 11 cases, shall select a Qualified Bid as the High Bid after the Debtors have conducted the Post-Petition Auction and considered, among other things, the total net consideration to be received by their estates as well as other financial and contractual terms relevant to the proposed Sale, including those factors affecting the speed and certainty of consummating the proposed Sale.

B.    <u>Payment of the Break-Up Fee and Expense Reimbursement</u>.  In the event that the Bankruptcy Court approves any agreement that contemplates a transaction or series of related transactions, other than the transactions to be consummated under the Stalking Horse APA, pursuant to which a material portion of the Assets will be acquired by, or transferred to a High Bidder other than the Stalking Horse, then upon the Seller's consummation of such a Sale, the Break-Up Fee and Expense Reimbursement shall be immediately paid to the  Stalking Horse.  A Bid submitted by a Qualified Bidder that is approved by the Bankruptcy Court as the winning bid shall be referred to as a "<u>Successful Bid</u>."

C.    <u>Deposits</u>.  The Debtors shall require Bidders to submit Good Faith Deposits (as defined below).  The Good Faith Deposits of the High Bidder and the second highest bidder at the Post-Petition Auction (the "<u>Second Highest Bidder</u>") shall be retained by the Seller and held in escrow in an interest bearing account and all Qualified Bids will remain open, notwithstanding Bankruptcy Court approval of a

---

[8]    To the extent the description of the Bidding Procedures set forth herein differs from those set forth in <u>Exhibit B</u> hereto, the terms of <u>Exhibit B</u> shall control.  Capitalized terms used in this section but not defined shall have the meanings given to them in the Bidding Procedures.

Sale pursuant to the terms of a High Bid by a Qualified Bidder, until the earlier of (1) the closing of the Sale of the Assets, (2) the date that is thirty (30) days after entry of a Sale Order approving a Sale to the High Bidder, or (3) the date that is thirty-five (35) days after the Post-Petition Auction (the "<u>Return Date</u>"). On the Return Date, if the Seller has not completed a Sale to the High Bidder or Second Highest Bidder, so long as the failure to consummate a sale to the Second Highest Bidder is not the result of a breach by the Second Highest Bidder, the Seller shall return the Good Faith Deposit of the Second Highest Bidder, with accrued interest. The Seller shall return the Good Faith Deposits of all bidders other than the High Bidder and the Second Highest Bidder within five (5) business days after the Post-Petition Auction.

D.  <u>Potential Bidders</u>. Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the sale process, each person (a "<u>Potential Bidder</u>") must deliver to the Debtors:

    i.  an executed confidentiality agreement in form and substance satisfactory to the Debtors; and

    ii.  current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements or other financial information of the equity holder(s) of the Potential Bidder, or such other form of financial disclosure acceptable to the Debtors, after consultation with the Master Trustee and the Committee, demonstrating such Potential Bidder's ability to timely close the proposed transaction and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed and assigned.

E.  <u>Qualified Bidders</u>. A "<u>Qualified Bidder</u>" is (1) the Stalking Horse and, if applicable, (2) a Potential Bidder that delivers the documents described in subparagraphs D(i) and D(ii) hereof and that the Debtors, after consultation with the Master Trustee and the Committee, determine is reasonably likely (based on the availability of financing, experience and other considerations) to submit a *bona fide* offer and to be able to consummate the proposed Sale if selected as the High Bidder. Two or more Potential Bidders may be deemed a Qualified Bidder if such Potential Bidders, considered in the aggregate, otherwise meet the foregoing criteria and so long as such bidders bid in good faith and do not violate section 363(n) of the Bankruptcy Code.

F.  <u>Qualified Bids</u>. A "<u>Qualified Bid</u>" is (1) the Stalking Horse's offer to acquire the Assets pursuant to the Stalking Horse APA and, if applicable, (2) another Qualified Bidder's offer to acquire the Assets if such offer was received prior to the Bid Deadline and if such offer included each of the following (collectively, a "<u>Bid Package</u>"):

i.      An executed copy of an asset purchase agreement (including schedules and exhibits, the "Qualified Bidder Purchase Agreement"):  (a) in clean and marked versions to reflect changes to the Stalking Horse APA; (b) irrevocable until the Return Date; and (c) for the purchase of substantially all of the Assets, "as is, where is," in exchange for a cash purchase price (the "Minimum Cash Amount") that exceeds the Purchase Price (as such term is defined in the Stalking Horse APA) by at least $7,000,000 (the maximum Expense Reimbursement plus the Break-Up Fee plus a $3,500,000 initial bid increment) and the assumption or otherwise equivalent value of at least the Assumed Liabilities (as such term is defined in the Stalking Horse APA).  Executed copies of two or more asset purchase agreements may each be deemed a Qualified Bidder Purchase Agreement if, considered in the aggregate, such asset purchase agreements otherwise meet the foregoing criteria.

ii.     Financial and other information setting forth adequate assurance of future performance (a) under section 365 of the Bankruptcy Code, with respect to any contracts the bidder seeks to take assignment of (the "Assumed Contracts"), and (b) of any obligations arising under or in connection with any ERISA qualified plan (an "ERISA Plan") of the Debtors that such bidder seeks to assume, in each case in a form requested by the Debtors to allow the Debtors to serve such information within one (1) business day after such receipt on either counterparties to Assumed Contracts that have requested, in writing, such information or the Pension Benefit Guaranty Corporation, as appropriate, in connection with the proposed transaction.

iii.    A good faith cash deposit (the "Good Faith Deposit") in the amount of 10% of the Minimum Cash Amount with respect to a Bid, in the form of a bank or certified check (or other form acceptable to the Debtors in its sole discretion) payable to such party as the Debtors may determine, which Good Faith Deposit shall be held in escrow or another segregated account, not subject to any security interest or lien, and utilized in accordance with these Bidding Procedures.

iv.    A written statement that the bid is not conditioned on (a) obtaining financing or other financing contingencies or (b) the outcome of unperformed due diligence by the bidder or any other contingencies.

v.     If such information is not set forth in the Qualified Bidder Purchase Agreement, a statement as to whether or not such bidder intends to assume any ERISA Plan or any obligations arising under any ERISA Plan.

G.    Due Diligence.  Subject to the Debtors' receipt of an executed confidentiality agreement in form and substance satisfactory to them (unless already delivered in connection with the Pre-Petition Process), the Debtors shall afford each Potential Bidder access to a data room containing information regarding the Assets and may make reasonable requests for additional information from the Debtors.  The

Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline, except to Qualified Bidders who have submitted Qualified Bids.

H.  <u>Bid Deadline</u>.  In order to be considered, Bid Packages must be received by the parties set forth in the Bidding Procedures by the Bid Deadline.  After the Bid Deadline, the Debtors shall determine which Qualified Bid represents the then highest or otherwise best value to the Debtors (the "<u>Initial Bid</u>").  At least twenty-four (24) hours prior to the Post-Petition Auction, the Debtors shall distribute copies of the Initial Bid to each Qualified Bidder.

I.  <u>Post-Petition Auction</u>.  If the Debtors receive a Qualified Bid other than that of the Stalking Horse, the Debtors will conduct the Post-Petition Auction at which competitive bids can be made by Qualified Bidders in accordance with the terms of the Bidding Procedures.  The Post-Petition Auction shall occur at the time and place set forth in the Bidding Procedures.  Subject to the "Reservation of Rights" set forth in the Bidding Procedures, the Post-Petition Auction shall be governed by the following procedures:

   i.   Only a Qualified Bidder (and the representatives of that Qualified Bidder designated in writing by the Qualified Bidder) who has submitted a Qualified Bid (including the Stalking Horse) shall be eligible to attend and participate at the Post-Petition Auction.

   ii.  The Post-Petition Auction shall begin with the Initial Bid (which, as a Qualified Bid, will provide for at least the Minimum Cash Amount) and proceed in minimum additional increments of $350,000.

   iii. The Post-Petition Auction shall continue until there is only one offer that the Debtors, after consultation with the Master Trustee and the Committee, determine is the High Bid.  In determining which Qualified Bid to select as the High Bid, the Debtors may consider, among other things:  (1) the amount of the purchase price; (2) the form of consideration being offered; (3) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; and (4) the net benefit to the Debtors' estates, their creditors, and the impact of the Sale upon the community served by the Debtors.  Before the conclusion of the Post-Petition Auction, the Debtors shall inform each of the Bidders of the decision regarding designation of the High Bid, and the Qualified Bidder who submitted such High Bid shall be required to execute a definitive asset purchase agreement at such time.  In addition, the Qualified Bidder whose bid is chosen as the High Bid shall be required, within 24 hours of the conclusion of the Post-Petition Auction, to increase its Deposit to an amount equal to 10% of the aggregate amount of the High Bid.  The Debtors shall present the High Bid to the Bankruptcy Court for approval at the Sale Hearing.

J.  <u>Reservations of Rights</u>.  The Debtors, in their reasonable discretion and after consultation with the Master Trustee and the Committee, may adopt rules for the

7653/69444-001 Current/18532299v23

Post-Petition Auction at or prior to the Post-Petition Auction that, in the Debtors' reasonable discretion, will better promote the goals of the Post-Petition Auction and that are not materially inconsistent with any of the provisions of the Bid and Sale Procedures Order. The Debtors may, after consultation with the Master Trustee and the Committee, modify the Bidding Procedures or impose, at or prior to the Post-Petition Auction, additional customary terms and conditions on the proposed Sale of its assets if in their reasonable judgment such modifications would be in the best interests of the Debtors' estates and promote an open and fair sale process, so long as such modifications and/or additional terms are consistent with the provisions of the Stalking Horse APA.

K.  "As Is, Where Is." The sale of the Assets will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents, or estates, except, with respect to the Stalking Horse, to the extent set forth in the Stalking Horse APA and, with respect to a bidder with the High Bid, to the extent set forth in the relevant purchase agreement of such bidder, as approved by the Bankruptcy Court.

## II.   The Proposed Assumption and Assignment Procedures

29.   As part of the Sale, the Debtors seek authorization to assume and assign all of the Debtors' executory contracts and unexpired leases (collectively, the "Potentially Assigned Contracts") to the High Bidder. In order to provide counterparties with adequate notice of such potential assumption and assignment, as well as the proposed cure amounts (the "Cure Amounts"), the Debtors propose the following Assumption and Assignment Procedures:

A.  The Debtors propose to annex to the Assumption and Assignment Procedures a list of all contracts that the Debtors may seek to assume and assign to the High Bidder, as well as the Cure Amount (if any) that the Debtors propose to pay the counterparties to such contracts pursuant to section 365 of the Bankruptcy Code in the event that the Debtors ultimately seek to assume and assign such contract. Notice of this Motion has been served upon the counterparties to the Potentially Assigned Contracts.

B.  Any objections ("Assignment Objections") to the assumption and assignment of any Potentially Assigned Contract, including, but not limited to, objections relating to adequate assurance of future performance or to the cure amount set forth on the list to be attached to the Assumption and Assignment Procedures must be filed with the Bankruptcy Court and served upon the Notice Parties not less than three days prior to the Auction (the "Assignment Objection Deadline").

C.  Within one business day after the completion of the Post-Petition Auction, the Debtors shall file a Notice of Assigned Contracts listing the Potentially Assigned

Contracts that the Debtors actually seek to assume and assign to the High Bidder, and shall serve the Notice of Assigned Contracts on each of the counterparties to the contracts listed thereon. The Notice of Assigned Contracts shall include the following statement:

> Please be advised that upon transfer of a Potentially Assigned Contract, each counterparty to a Potentially Assigned Contract shall be barred, enjoined and prohibited from offsetting, seeking to offset, recoup, deduct or set-off any claims such party may have against the Debtors from any amounts that may be or may become due in the future to the High Bidder.

D.      Any counterparty failing to file an Assignment Objection by the Assignment Objection Deadline shall be forever barred from (1) objecting to the Cure Amount set forth on the list to be annexed to the Assumption and Assignment Procedures with respect to its Potentially Assigned Contract; (2) seeking additional amounts arising under its Potentially Assigned Contract prior to the Closing from the Debtors or the High Bidder; and (3) objecting to the assumption and assignment of its contract to the High Bidder.

E.      Any Assignment Objections not consensually resolved prior to the Sale Hearing shall be heard at the Sale Hearing with any related Cure Amounts or adequate assurance of future performance being fixed by the Bankruptcy Court. All other objections to the proposed assumption and assignment of the Potentially Assigned Contracts will be heard at the Sale Hearing.

F.      Except as may otherwise be agreed to by all parties to a Potentially Assigned Contract, on or before the Closing, the cure of any defaults under Potentially Assigned Contracts necessary to permit assumption and assignment thereof in accordance with Bankruptcy Code section 365(b), shall be by (i) payment of the undisputed Cure Amount, (ii) payment of the Cure Amount judicially determined by the Bankruptcy Court to be the correct amount, and/or (iii) establishment of a reserve with respect to any disputed Cure Amount. The party responsible for paying Cure Amounts shall be as set forth in the purchase agreement entered into between the Debtors and the High Bidder.

30.     The Debtors believe that the proposed Assumption and Assignment Procedures will provide the counterparties to the Potentially Assigned Contracts a full and fair opportunity to be heard with respect to issues concerning the proposed assumption and assignment of the Potentially Assigned Contracts, and respectfully request that they be approved. Moreover, other cases in this District have approved assumption and assignment procedures in connection with a

7653/69444-001 Current/18532299v23

sale process concerning substantially all of a debtor's assets. *See, e.g. In re New Day Pharmacy Corp.*, Case No. 09-01947, Doc. 38 (GCP) (Bankr. M.D. Tenn. Mar. 5, 2009).

## ARGUMENT

### I. The Bidding Procedures Are Appropriate

31.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See Sugarloaf Indus. & Mktg. Co. v. Quaker City Castings, Inc. (In re Quaker City Castings, Inc.)*, 2005 Bankr. LEXIS 2211, at \*23 (B.A.P. 6th Cir. Nov. 18, 2005); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate."), *quoting Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc*.), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).

32.     Courts regularly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See*, *e.g.*, *Integrated Res.*, 147 B.R. at 659 (such procedures "encourage bidding and maximize … the value of the debtor's assets"). Indeed, as one court has stated, "[T]he purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate. To accomplish that goal, bankruptcy courts are necessarily given discretion and latitude in conducting the sale." *See In re Nashville Senior Living*, 2008 Bankr. LEXIS 3197, at \*4-5 (Bankr. M.D. Tenn. Oct. 22, 2008), appeal dismissed by, as moot, *Official Comm. of Unsecured Creditors v. Anderson Senior Living Prop., LLC (In re Nashville Senior Living, LLC)*, 407 B.R. 222 (B.A.P. 6th Cir. 2009), *quoting In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998).

33.     As set forth above, the Debtors have already conducted an extensive competitive process to produce the best bid for purchase of the Assets.  Now, the Debtors only seek to pursue the sale process described herein to provide the unsuccessful bidders with a final chance to bid upon the assets.  The Debtors believe that the Bidding Procedures establish the parameters under which the value of the Assets may be maximized through the Post-Petition Auction and ensuing Sale Hearing.  Such procedures unquestionably will increase the likelihood that the Debtors will receive the greatest possible consideration for such assets because they will ensure a competitive and fair bidding process.  Moreover, auction procedures have been approved in other cases in this District.  *See, e.g. In re New Day Pharmacy Corp.*, Case No. 09-01947, Docs. 37, 38 (GCP) (Bankr. M.D. Tenn. Mar. 5, 2009).

### A.      The Initial And Subsequent Overbids Are Appropriate

34.     One important component of the Bidding Procedures is the "overbid" provision, pursuant to which any initial offer for the Assets must be in an amount of at least $7 million (the "Initial Bid Increment") more than the purchase price offered by the Stalking Horse.  A minimum initial overbid is necessary not only to compensate the Debtors for the risk that they assume in foregoing a known, willing, and able purchaser for a new potential acquirer, but also to ensure that there is an increase in the net proceeds received by the estates, after deducting the Break-Up Fee and Expense Reimbursement to be paid to the Stalking Horse in the event of a prevailing overbid.  Moreover, the magnitude of the Initial Bid Increment is warranted in these cases because a closing with a party other than the Stalking Horse will require that regulatory approval be obtained which could take more than an additional 45 days after the conclusion of the Post-Petition Auction.  During this period of delay, the Debtors would incur heavy expenses and risks.  First, the Debtors would incur the full costs of continued operations, which are burdensome and will quickly deplete the limited resources of the Debtors.  Second, there is the

23

7653/69444-001 Current/18532299v23

risk that while regulatory applications are pending, a material adverse event could occur with respect to the Assets, potentially leading a purchaser not to close the transaction. Third, interest will accrue on the Bonds at the rate of approximately $700,000 per month. Accordingly, because there are significant risks and costs associated with the Debtors' pursuit of a Sale with a party other than the Stalking Horse, the Initial Bid Increment is justified.

35. Case law also supports minimum overbids that are up to 10% of the initial purchase price as fair and reasonable. As the court stated in *In re Wintex, Inc.*, 158 B.R. 540 (Bankr. D. Mass. 1992):

> A debtor may avoid the increased cost and complexity associated with considering additional bids unless the additional bids are high enough to justify their pursuit. The 10% increase requirement is one example of a reasonable litmus test.

*Id*. at 543. *See also In re New Day Pharmacy Corp.*, Case No. 09-01947, Doc. 38 (GCP) (Bankr. M.D. Tenn. Mar. 5, 2009) (requiring an initial overbid to exceed a purchase price of $2 million by at least $275,000 (13.75%)); *In re Fin. News Network, Inc.*, 126 B.R. 152, 154, 156-57 (Bankr. S.D.N.Y. 1991) (requiring minimum overbids to exceed purchaser's offer of $105 million by at least $10 million (9.5%)); *Kabro Assocs., LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 275-77 (2d Cir. 1997) (requiring minimum overbids to exceed purchaser's initial offer of $7.5 million by at least $650,000 (8.6%)).

36. Here, the Initial Bid Increment is less than approximately 5% of the amount of the Stalking Horse's bid – well within the range of overbids approved in the cases cited above. The Debtors submit that, given the risks and costs associated with selection of a bid other than the Stalking Horse's, the Initial Bid Increment is reasonable.

7653/69444-001 Current/18532299v23

**B.**     **The Post-Petition Auction, Hearing And Notice Procedures Are Appropriate**

37.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with twenty one (21) days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), the Debtors are required to notify their creditors of the proposed sale of the Debtors' assets, including a disclosure of the time and place of the Sale Hearing, the terms and conditions of the Sale, and the deadline for filing any objections.

38.     The Debtors propose that within five (5) business days following entry of the Bid and Sale Procedures Order, the Debtors will send copies of such order, the Sale Notice, the Bidding Procedures, and the Assumption and Assignment Procedures to: (a) the United States Trustee for the Middle District of Tennessee; (b) the Debtors' 20 largest unsecured creditors; (c) the Internal Revenue Service; (d) all parties known or reasonably believed to have asserted an encumbrance on any of the Assets; (e) the counterparties to each of the Potentially Assigned Contracts; (f) all persons or entities known or reasonably believed to have expressed an interest in acquiring the Assets; (g) all taxing and regulatory authorities having jurisdiction over any of the Assets, including the Tennessee Department of Health, the Tennessee Board of Pharmacy, the Tennessee Department of Mental Health and Developmental Disabilities, the Secretary of the United States Department of Health and Human Services, the Tennessee Department of Environment and Conversation, Tennessee Department of Finance and Administration (Bureau of TennCare), the Federal Communications Commission, the United States Environmental Protection Agency, the United States Department of Health and Human Services - the Centers for Medicare and Medicaid Services and the United States Drug Enforcement Administration, Tennessee Health Service & Development Agency, Kentucky Department of Medicaid Services, Indiana Family and Social Services Administration, Tennessee Department of Labor and Welfare

Development; (h) the Attorney General for the State of Tennessee; and (i) all parties that have requested personal notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").

39.     Further, if the Bankruptcy Court believes it is appropriate, the Debtors will publish an abbreviated version of the Sale Notice at least once in (i) a local newspaper, (ii) a local business publication, (iii) a national healthcare publication, if an appropriate publication is available and (iv) a national newspaper at least twenty-one days prior to the Post-Petition Auction. Moreover, the Debtors have issued a press release to a number of press outlets regarding the Sale process. The Debtors contend that such notice of the Post-Petition Auction and the Sale Hearing is good and sufficient notice and that no other or further notice is required.

### C.     The Sale Of The Debtors' Assets To The High Bidder Should be Approved

40.     Section 363 of the Bankruptcy Code ("Section 363") provides, in relevant part, "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although Section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of substantially all of a debtor's assets, the Sixth Circuit and other Circuit Courts of Appeal, in applying this section, have required that such a sale be based upon a "sound business purpose." *See Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (holding that it was not abuse of discretion for a bankruptcy court to approve a sale of substantially all of a debtor's assets); s*ee also Comm. of Equity Sec. Holders* v. *Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Nicole Energy Servs.*, 385 B.R. 201, 210 (Bankr. S.D. Ohio 2008).

41.     The Sale is justified by a sound business purpose, and is the best option available to maximize the value of the Debtors' estates. A going concern sale will generate the greatest possible recovery to the Debtors' estates, creditors and other stakeholders. If the Debtors'

facilities were to shut down, the attendant loss of value of such assets would be significant and irreparable. The Post-Petition Auction and Sale process set forth herein, on the other hand, will allow the Debtors to maximize the value of their assets by selling their operations as going concerns, as opposed to recognizing lesser value through alternative restructuring strategies. Thus, there is a sound business purpose that justifies the Sale.

42. It is apparent to the Debtors that they could not continue operations and continue to make debt service payments on their obligations to their bondholders without running out of cash in short order. Accordingly, before the day of reckoning, the Debtors seek the sale of the Assets as a going concern without interruption to their patients and the Sumner County community.

43. The "sound business purpose" test is often formulated to require consideration of the following factors: "1) [a] sound business reason; 2) accurate and reasonable notice; 3) [an] adequate price; and 4) good faith." *See, e.g., In re Nicole Energy Servs.*, 385 B.R. 201, 231 (Bankr. S.D. Ohio 2008) (citation omitted).. The Sale satisfies these factors. First, according to the timing of the Post-Petition Auction and Sale Hearing that the Debtors have requested herein, the Sale Notice, as well as this motion, is being served more than 21 days in advance of the Post-Petition Auction and Sale Hearing upon the Notice Parties. The Sale Notice contains all information referenced in Bankruptcy Rule 2002(c)(1).[9] *See WBQ Ptnr. v. Virginia Dep't of Med. Assistance Servs. (In re WBQ Ptnr.)*, 189 B.R. 97, 103 (Bankr. E.D. Va. 1995) ("In [the]

---

[9] Bankruptcy Rule 2002(c)(1) provides, in relevant part, that:

[T]he notice of a proposed use, sale, or lease of property required by subdivision (a)(2) of this rule shall include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections. The notice of a proposed use, sale, or lease of property, including real estate, is sufficient if it generally describes the property. The notice of a proposed sale or lease of personally identifiable information under § 363(b)(1) of the Code shall state whether the sale is consistent with any policy prohibiting the transfer of the information.

context [of a sale under Section 363], 'notice is sufficient if it includes the terms and conditions of the sale, if it states the time for filing objections, and if the estate is selling real estate, it generally describes the property.'"), *quoting In re Karpe*, 84 Bankr. 926, 929 (Bankr. M.D. Pa. 1988). Therefore, the Debtors submit that notice is sufficient. Second, the Stalking Horse APA was negotiated in good faith, at arm's-length, between the parties thereto over several weeks, and was chosen after the lengthy and exhaustive Pre-Petition Process. Accordingly, the Debtors respectfully submit that a finding that the Sale has been pursued, negotiated and proposed in good faith is appropriate. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) ("[T]ypically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"). Lastly, the Sale process subjects the Stalking Horse APA to competitive bidding by a wide variety of potentially interested parties, which the Debtors submit is the best method to ensure that the Debtors receive a fair and reasonable price for the Assets. Accordingly, the proposed Sale is proper under Section 363 and should be approved.

D. <u>**The Break-Up Fee and Expense Reimbursement Should be Approved**</u>

44. "Break-up" or termination fees must be considered in light of the totality of the circumstances. *In re Nashville Senior Living*, 2008 Bankr. LEXIS 3197, at *6-7 (Bankr. M.D. Tenn. Oct. 22, 2008). Factors considered by courts include: "1) Whether the fee requested correlates with a maximization of value to the debtor's estate; 2) Whether the underlying negotiated agreement is an arm's-length transaction between the debtor's estate and the negotiating acquirer; 3) Whether the principal secured creditors and the official creditors committee are supportive of the concession; 4) Whether the subject break-up fee constitutes a fair and reasonable percentage of the proposed purchase price; 5) Whether the dollar amount of

the break-up fee is so substantial that it provides a "chilling effect" on other potential bidders; 6) The existence of available safeguards beneficial to the debtor's estate; 7) Whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the break-up fee." *Id.* at *6-7.

45.     The Debtors have agreed in the Stalking Horse APA that, in the event that the Sale is consummated with a High Bidder other than the Stalking Horse, the Debtors will pay the Stalking Horse the Break-Up Fee of $2,500,000, and will reimburse the Stalking Horse for expenses incurred in connection with negotiating the Stalking Horse APA and performing due diligence in connection therewith (up to a maximum amount of $1,000,000).[10] The Debtors submit that analysis of the above factors demonstrates that the Break-Up Fee and Expense Reimbursement are appropriate. The Break-Up Fee and Expense Reimbursement are intended to facilitate the Post-Petition Auction, reimburse the Stalking Horse for certain of the expenses it has incurred and will continue to incur in connection with the proposed transaction, and to compensate the Stalking Horse for the substantial time and effort it has expended to date and will continue to expend as a stalking horse for competing bids. The Debtors submit that notwithstanding the Break-Up Fee and Expense Reimbursement, use of the Stalking Horse APA will protect the Debtors' creditors and facilitate discussions with other interested parties, rather than chill bidding, and will establish a floor with respect to the Post-Petition Auction. The Debtors believe that without the Stalking Horse APA, which the Debtors were unable to attain without the inclusion of a Break-Up Fee and Expense Reimbursement, the ultimate proceeds obtained for the Assets would not be maximized. Moreover, the Break-Up Fee and Expense Reimbursement were negotiated in good faith at arm's-length by unrelated parties. Thus, the use

---

[10]     As set forth above, payment of the Break-Up Fee and Expense Reimbursement is also contingent upon the Stalking Horse not breaching the Stalking Horse APA.

7653/69444-001 Current/18532299v23

of the Stalking Horse APA will ensure that competing bids will be higher and better, providing a significant benefit to the Debtors' estates and creditors. Lastly, the amounts of the Break-Up Fee and Expense Reimbursement are fair and reasonable in light of similar fees approved in other cases in this and other Districts. *See, e.g., In re New Day Pharmacy Corp.*, Case No. 09-01947, Doc. 38 (GCP) (Bankr. M.D. Tenn. Mar. 5, 2009) (approving a break-up fee of approximately 2.5% of the purchase price); *In re Nashville Senior Living*, 2008 Bankr. LEXIS 3197, at *3, *9 (approving a break-up fee of approximately 1% of the purchase price); *In re Chi-Chi's, Inc.*, Case No. 03-13063, Doc. 143 (Bankr. D. Del. November 4, 2003) (fee of 5.1% permitted); *In re Great N. Paper, Inc.*, Case No. 03-10048, Docs. 217, 194 (Bankr. D. Me. February 18, 2003) (fee of 5.4% plus reimbursement of expenses upheld).

### E. A Sale Free And Clear Of Liens, Claims, Encumbrances, And Interests Is Appropriate

46. It is appropriate for the Debtors' assets to be sold to the High Bidder free and clear of liens, claims, encumbrances, and interests pursuant to Section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances, or interests to attach to the net sale proceeds of such assets. *See MacArthur Co.* v. *Johns-Manville Corp.,* 837 F.2d 89, 93-94 (2d Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition); *see also In re Riverside Inv. P'ship,* 674 F.2d 634, 640 (7th Cir. 1982) ("Generally, in a 'free and clear' sale, the liens are impressed on the proceeds of the sale and discharged at the time of sale ....").

47. Any lien, claim, encumbrance, or interest in the Debtors' assets will be adequately protected by attachment to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto. Moreover, each of the parties that may hold liens on

the assets sold could be compelled to accept a monetary satisfaction of such interests, satisfying section 363(f)(5) of the Bankruptcy Code. Thus, sale of the Debtors' assets free and clear of liens, claims, encumbrances, and interests will satisfy one or more of the statutory prerequisites of section 363(f) of the Bankruptcy Code. Accordingly, the Debtors' request that their assets be transferred to the High Bidder free and clear of all liens, claims, encumbrances, and interests, with any such liens, claims, encumbrances, and interests to attach to the net sale proceeds realized from the sale.

**F.    Assumption And Assignment Of Contracts Satisfies Section 365**

48.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its best "business judgment" in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.),* 78 F.3d 18, 25-26 (2d Cir. 1996); *Orion Pictures Corp.* v. *Showtime Networks, Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1099 (2d Cir. 1993).

49.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor in possession may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease." 11 U.S.C. § 365(f)(2)(B). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given practical, pragmatic construction. *See In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."); *see also In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985)

31

(adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).

50.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

51.     First, the assumption and assignment of contracts and leases to the High Bidder is in the best interests of the Debtors' estates and a proper exercise of the Debtors' business judgment.  In addition to maximizing the consideration received in exchange for the Sale, it also allows the Debtors to avoid rejection damages that otherwise would accrue if those contracts or leases were to be rejected.  The Debtors will agree that all undisputed cure amounts associated with assumption and assignment of the leases and contracts shall be paid in connection with the consummation of the Sale.

52.     At the Sale Hearing, the Debtors and the High Bidder will be prepared to proffer testimony or present evidence to demonstrate the financial credibility, willingness, and ability of the High Bidder to perform under the contracts and leases to be assumed and assigned.  The Sale Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the ability of the High Bidder to provide adequate assurance of future performance under the contracts and leases to be assumed and assigned, as required by section 365(b)(1)(C) of the Bankruptcy Code.  Accordingly, the Debtors respectfully request that at the conclusion of the

Sale Hearing, the Court approve the assumption and assignment of certain contracts and leases, to be effective upon entry of the Sale Order.

53.     Notwithstanding any anti-assignment language in any contract or lease to be assumed and assigned, the Debtors seek permission to assign such agreement, provided that the Debtors first assume the contract or lease and then provide adequate assurance of future performance by the High Bidder.  To facilitate the assumption and assignment of the contracts and leases to be assumed and assigned, the Debtors will request at the Sale Hearing that the Court find any anti-assignment provisions of the contracts and leases to be assumed and assigned to be unenforceable under section 365(f) of the Bankruptcy Code.[11]

54.     Section 365(k) of the Bankruptcy Code provides that assignment by the debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k).  Pursuant to section 365(k), the Debtors and their estates shall be relieved from any liability for any breach of any assumed and assigned lease or contract after such assignment to and assumption by the High Bidder upon entry of the Sale Order.

### G.     Sale of Personally Identifiable Information

55.     Among the Assets the Debtors seek to sell pursuant to the Stalking Horse APA are all Documents (as defined therein) relating to the Debtors' operations, which include (without limitation) patient records that contain "personally identifiable information," as that

---

[11]     Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease ... " 11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

7653/69444-001 Current/18532299v23

term is defined in Section 101(41)(A) of the Bankruptcy Code (the "PII"). Pursuant to Section 363(b)(1), because the Debtors have a policy prohibiting the transfer of the PII, the Debtors may not transfer the PII unless:

(A) such sale or such lease is consistent with such policy; or

(B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease —

(i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

(ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

The Debtors' responsibilities with respect to disclosure and maintenance of the patient records are set forth in various comprehensive statutes and regulations. The Stalking Horse or the High Bidder, if different, must comply with such statutes, regulations and any privacy policies the Debtors may have in place. Therefore, the Debtors submit that 11 U.S.C. § 363(b)(1)(A) is satisfied. Accordingly, the Debtors submit that the Sale, insofar as it involves a transfer of patient records into the custody of a new owner, should be approved.

## H. Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate

56. Bankruptcy Rule 6004(h) provides an "order authorizing the use, sale, or lease of property … is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors respectfully request that in light of their limited liquidity and their corresponding need to consummate the sale, the order approving the sale of the Assets and assumption and assignment of the Potentially Assigned Contracts, if granted, be effective immediately upon entry.

7653/69444-001 Current/18532299v23

## NOTICE

57.     Notice of this Motion has been given to: (a) the United States Trustee for the Middle District of Tennessee; (b) the Debtors' 20 largest unsecured creditors; (c) the Internal Revenue Service; (d) all parties known or reasonably believed to have asserted an encumbrance on any of the Assets; (e) the counterparties to each of the Potentially Assigned Contracts; (f) all persons or entities known or reasonably believed to have expressed an interest in acquiring the Assets; (g) all taxing and regulatory authorities having jurisdiction over any of the Assets, including the Tennessee Department of Health, the Tennessee Board of Pharmacy, the Tennessee Department of Mental Health and Developmental Disabilities, the Secretary of the United States Department of Health and Human Services, the Tennessee Department of Environment and Conversation, Tennessee Department of Finance and Administration (Bureau of TennCare), the Federal Communications Commission, the United States Environmental Protection Agency, the United States Department of Health and Human Services - the Centers for Medicare and Medicaid Services and the United States Drug Enforcement Administration, Tennessee Health Service & Development Agency, Kentucky Department of Medicaid Services, Indiana Family and Social Services Administration, Tennessee Department of Labor and Welfare Development; (h) the Attorney General for the State of Tennessee; (i) the United States Attorney General; (j) the Internal Revenue Service; (k) Wells Fargo Bank, National Association, as Trustee, and (k) all parties that have requested personal notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

35

WHEREFORE, the Debtors respectfully request (A) entry of the Bid and Sale Procedures Order, substantially in the form attached hereto as **<u>Exhibit A</u>**, and (B) such other and further relief as the Court deems just and proper.

7653/69444-001 Current/18532299v23

Dated:  April 30, 2010

    */s/ Robert A. Guy, Jr.*

FROST BROWN TODD LLC
Robert A. Guy, Jr., Esq.
424 Church Street, Suite 1600
Nashville, Tennessee 37219
Telephone: 615.251.5550
Facsimile: 615.251.5551
E-mail: bguy@fbtlaw.com

   *- and -*

Ronald E. Gold, Esq.*
Joseph B. Wells, Esq.*
201 East Fifth Street, Suite 2200
Cincinnati, Ohio 45202
Telephone: 513.651.6800
Facsimile: 513.651.6981
E-mail: rgold@fbtlaw.com
E-mail: jbwells@fbtlaw.com

   *- and -*

PROSKAUER ROSE LLP
Jeff J. Marwil, Esq.*
Three First National Plaza
70 West Madison, Suite 3800
Chicago, IL 60602-4342
Telephone:  312-962-3550

   *- and -*

Jeffrey W. Levitan, Esq.*
Adam T. Berkowitz, Esq.*
1585 Broadway
New York, NY  10036-8299
Telephone:  212-969-3000

**Pro Hac Vice* Motion Pending

Proposed Counsel for Debtors and Debtors in Possession

7653/69444-001 Current/18532299v23

**EXHIBIT A**

**PROPOSED BID AND SALE PROCEDURES ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Sumner Regional Health Systems, Inc., *et al.*[1] | ) Case No. 10-_____ ( ) |
| | ) |
| | ) Joint Administration Requested |
| Debtors. | ) |
| | ) |
| | ) |

**ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF
SUBSTANTIALLY ALL THE DEBTORS' ASSETS, (B) SCHEDULING
THE AUCTION, (C) SCHEDULING THE SALE HEARING, (D) APPROVING
THE ASSUMPTION AND ASSIGNMENT PROCEDURES RELATED TO THE SALE,
(E) AUTHORIZING PAYMENT OF THE BREAK-UP FEE AND EXPENSE
REIMBURSEMENT AND (F) APPROVING THE FORM OF THE SALE NOTICE**

Upon the motion (the "Motion")[2] of Sumner Regional Health Systems, Inc. and the other

above-captioned debtors and debtors-in-possession (the "Debtors"), dated _____, 2010,

requesting, among other relief, entry of an order (A) approving the Bidding Procedures,

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Sumner Regional Health Systems, Inc. (3738), Trousdale Medical Center, Inc. (5666), Frank T. Rutherford Memorial Hospital, Inc. (8987), SRHS Holdings, LLC (2680), Sumner Homecare and Hospice, LLC (4324), Family Wellness Group of Middle Tennessee, LLC (1860) and ClinicCare, LLC (6783).

[2]  Each capitalized term used but not defined herein shall have the meaning ascribed thereto in the Motion.

(B) scheduling the Post-Petition Auction, (C) scheduling the Sale Hearing, (D) approving the Assumption and Assignment Procedures, (E) authorizing payment of the Break-Up Fee and Expense Reimbursement pursuant to the Stalking Horse APA and (F) approving the form of the Sale Notice; and notice of the Motion being proper and sufficient and all interested parties having been afforded an opportunity to be heard with respect to the Motion; and upon review and consideration of (i) the Motion, (ii) the arguments of counsel and evidence proffered or adduced at the hearing thereon (the "Bidding Procedures Hearing"), and (iii) the docket and proceedings in the above-captioned cases (the "Chapter 11 Cases"); and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and other parties in interest:

**THE COURT FINDS THAT:**[3]

A.       This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these Chapter 11 Cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.       The statutory and rule-based predicates for the relief sought in the Motion are sections 105, 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014.

C.       Notice of the Motion, Bidding Procedures Hearing and Sale Hearing having been given to the following parties is sufficient in light of the circumstances and the nature of the relief requested in the Motion: (a) the United States Trustee for the Middle District of Tennessee; (b) the Debtors' 20 largest unsecured creditors; (c) the Internal Revenue Service; (d)

---

[3]       Regardless of the heading under which they appear, any (1) findings of fact that constitute conclusions of law shall be conclusions of law and (2) conclusions of law that constitute findings of fact shall be findings of fact.  All findings of fact and conclusions of law announced by the Court at the Hearing in relation to the Motion are incorporated herein to the extent not inconsistent herewith.

all parties known or reasonably believed to have asserted an encumbrance on any of the Assets; (e) the counterparties to each of the Potentially Assigned Contracts; (f) all persons or entities known or reasonably believed to have expressed an interest in acquiring the Assets; (g) all taxing and regulatory authorities having jurisdiction over any of the Assets, including the Tennessee Department of Health, the Tennessee Board of Pharmacy, the Tennessee Department of Mental Health and Developmental Disabilities, the Secretary of the United States Department of Health and Human Services, the Tennessee Department of Environment and Conversation, Tennessee Department of Finance and Administration (Bureau of TennCare), the Federal Communications Commission, the United States Environmental Protection Agency, the United States Department of Health and Human Services - the Centers for Medicare and Medicaid Services and the United States Drug Enforcement Administration, Tennessee Health Service & Development Agency, Kentucky Department of Medicaid Services, Indiana Family and Social Services Administration, Tennessee Department of Labor and Welfare Development; (h) the Attorney General for the State of Tennessee; and (i) all parties that have requested personal notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").

D.      The form of Sale Notice attached to the Motion as **Exhibit D** is reasonably calculated to provide all interested parties with timely and proper notice of the Sale, Sale Hearing and Post-Petition Auction.

E.      The notice to counterparties to Potentially Assigned Contracts provided in accordance with the Assumption and Assignment Procedures is reasonably calculated to provide all counterparties to the Potentially Assigned Contracts with proper notice of the potential assumption and assignment of their executory contract or unexpired lease and any Cure Amounts associated therewith.

41

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is approved in its entirety.

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived or settled as announced to the Court at the Bidding Procedures Hearing or by stipulation filed with the Court, are overruled.

3.      The Bidding Procedures, substantially in the form attached to the Motion as **Exhibit B**, are approved and the Debtors are authorized to take any and all actions necessary and/or appropriate to implement the Bidding Procedures.

4.      As provided in the Bidding Procedures, the Debtors shall conduct the Post-Petition Auction on _____, 2010 at _____.m. at _____.

5.      In the event of a competing bid for the Assets, the Purchaser will be entitled to credit bid the amount of the Break-Up Fee and Expense Reimbursement to its increased bids in accordance with the terms of the Bidding Procedures.

6.      The Assumption and Assignment Procedures, substantially in the form attached to the Motion as **Exhibit C**, are approved and the Debtors are authorized to take any and all actions necessary and/or appropriate to implement such procedures.

7.      The form of Sale Notice attached to the Motion as **Exhibit D** is hereby approved as sufficient.

8.      If the Stalking Horse is not the High Bidder, then pursuant to the Stalking Horse APA, the Debtors are authorized to pay the Stalking Horse the Break-Up Fee and the Expense Reimbursement from the proceeds of the sale to the High Bidder.

9.      Within five (5) business days after entry of this Order, the Debtors: (a) shall publish notice of the Sale, the time and place of the proposed Post-Petition Auction, and the time

7653/69444-001 Current/18532299v23

and place of the Sale Hearing in (i) a local newspaper, (ii) a local business publication, (iii) a national healthcare publication, if an appropriate publication is available and (iv) a national newspaper; and (b) shall send copies of this Order, the Sale Notice, the Bidding Procedures, and the Assumption and Assignment Procedures to the Notice Parties listed in paragraph C of this Order.

10.     The Sale Hearing shall be conducted on _____, 2010 at _____.m, prevailing Central time.  The Debtors shall seek entry of an order at the Sale Hearing approving and authorizing the proposed Sale to the High Bidder on terms and conditions substantially consistent with the Stalking Horse APA, as amended or modified.  If approved, the bid submitted by such bidder will be referred to as the "Successful Bid.".  The Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing.

11.     Objections to the relief requested in the Motion, other than the relief granted herein, must:  (i) be in writing and filed on the docket in the Chapter 11 Cases; (ii) comply with the Bankruptcy Rules; and (iii) be served upon the Debtors and Notice Parties so as to be received on or before 4:00 p.m., prevailing Central time, on _____, 2010.

12.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

13.     Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062, 9014 or any other Bankruptcy Rule, the terms and conditions of this Order shall be immediately effective and enforceable.

14.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

7653/69444-001 Current/18532299v23

15.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11 Cases, the terms of this Order shall govern.

This Court shall retain jurisdiction to resolve any dispute relating to the interpretation of the terms and conditions of the Stalking Horse APA and this Order.  To the extent any provisions of this Order shall be inconsistent with the Motion, the terms of this Order shall control.

**THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY
AS INDICATED AT THE TOP OF THE FIRST PAGE.**

7653/69444-001 Current/18532299v23

Prepared by:


  */s/ Robert A. Guy, Jr.*
FROST BROWN TODD LLC
Robert A. Guy, Jr., Esq., TN # 16715
424 Church Street, Suite 1600
Nashville, Tennessee 37219
Telephone: 615.251.5550
Facsimile: 615.251.5551
E-mail: bguy@fbtlaw.com

   *- and -*

Ronald E. Gold, Esq.*
Joseph B. Wells, Esq.*
201 East Fifth Street, Suite 2200
Cincinnati, Ohio 45202
Telephone: 513.651.6800
Facsimile: 513.651.6981
E-mail: rgold@fbtlaw.com
E-mail: jbwells@fbtlaw.com

   *- and -*

PROSKAUER ROSE LLP
Jeff J. Marwil, Esq.*
Three First National Plaza
70 West Madison, Suite 3800
Chicago, IL 60602-4342
Telephone:  312-962-3550

   *- and -*

Jeffrey W. Levitan, Esq.*
Adam T. Berkowitz, Esq.*
1585 Broadway
New York, NY  10036-8299
Telephone:  212-969-3000

*Proposed Counsel for the Debtors*

**Pro Hac Vice* Motion Pending

**EXHIBIT B**

**BIDDING PROCEDURES**

7653/69444-001 Current/18532299v23

# BIDDING PROCEDURES

Set forth below is the general process to be employed by the Seller (as defined below) with respect to the proposed sale (a "Sale") of all or substantially all of the assets of the above-referenced debtors and debtors-in-possession (the "Assets"), pursuant to the asset purchase agreement (the "Stalking Horse APA") dated as of April 30, 2010, by and among Sumner Regional Health Systems, Inc. ("SRHS"), Trousdale Medical Center, Inc. ("Trousdale"), Frank T. Rutherford Memorial Hospital, Inc. ("Rutherford"), SRHS Holdings, LLC ("Holdings"), Sumner Homecare and Hospice, LLC ("Homecare"), Sumner Regional EMS, LLC ("EMS"), Family Wellness Group of Middle Tennessee, LLC ("Wellness"), ClinicCare, LLC ("ClinicCare", and together with SRHS, Trousdale, Rutherford, Holdings, Homecare, EMS and Wellness collectively, the "Debtors" or "Seller"), LifePoint Acquisition Corp. (the "Stalking Horse") and Historic LifePoint Hospitals, Inc., or pursuant to a Qualified Bidder Purchase Agreement (as defined below), in accordance with the Debtors' Motion for Orders: (I) (A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Scheduling an Auction, (C) Authorizing Payment of the Break-Up Fee and Expense Reimbursement, (D) Scheduling the Sale Hearing, (E) Approving the Assumption and Assignment Procedures Related to the Sale, and (F) Approving the Form of the Sale Notice; and (II) (A) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (B) Authorizing and Approving Purchase Agreement, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (D) Granting Related Relief (the "Bid and Sale Procedures Motion").[1]

## I.    The Bidding Process

Set forth below is the general process to be employed by the Seller with respect to the proposed Sale of the Assets:

A.    Any person interested in making an offer to purchase the Assets shall comply with these procedures.

B.    Only Qualified Bids (as defined below) shall be considered by the Debtors.

C.    If the Debtors do not receive a Qualified Bid other than the Stalking Horse APA prior to the Bid Deadline (as defined below), then the Stalking Horse's offer to acquire the Assets under the Stalking Horse APA shall constitute the highest or otherwise best Qualified Bid (the "High Bid").

D.    If the Debtors receive a Qualified Bid other than the Stalking Horse APA prior to the Bid Deadline, then the Debtors, after consultation with Wells Fargo Bank, as Master Trustee (the "Master Trustee"), and any Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned chapter 11 cases, shall select a Qualified Bid as the High Bid after the Debtors have conducted the Post-Petition Auction (as defined below) and considered, among other things, the

---

[1]    Each capitalized term used but not otherwise defined herein shall have the meaning ascribed thereto in the Bid and Sale Procedures Motion.

total net consideration to be received by their estates as well as other financial and contractual terms relevant to the proposed Sale, including those factors affecting the speed and certainty of consummating the proposed Sale.

E.    If any High Bidder fails to consummate the Sale, and such failure is the result of a breach by the High Bidder, except to the extent provided in such bidders' marked agreement (or the Stalking Horse APA), the Seller specifically reserves the right to seek all available damages from such person. Upon failure to consummate the proposed Sale because of a breach on the part of the High Bidder after an order entered at the Sale Hearing (defined below), the Debtors shall be permitted to select the next highest or otherwise best bid to be the High Bid and to consummate such transaction without further order of the Bankruptcy Court.

F.    In the event that the Bankruptcy Court approves any agreement that contemplates a transaction or series of related transactions, other than the transactions to be consummated under the Stalking Horse APA, pursuant to which a material portion of the Assets will be acquired by, or transferred to a High Bidder other than the Stalking Horse, then upon Seller's consummation of such a Sale, the Break-Up Fee and Expense Reimbursement shall be immediately paid to the Stalking Horse.

G.    The Good Faith Deposits of the High Bidder and the second highest bidder at the Post-Petition Auction (the "Second Highest Bidder") shall be retained by the Seller and held in escrow in an interest bearing account and all Qualified Bids will remain open, notwithstanding Bankruptcy Court approval of a Sale pursuant to the terms of a High Bid by a Qualified Bidder, until the earlier of (1) the closing of the Sale of the Assets, (2) the date that is thirty (30) days after entry of a Sale Order approving a Sale to the High Bidder, or (3) the date that is thirty-five (35) days after the Post-Petition Auction (the "Return Date"). On the Return Date, if the Seller has not completed a Sale to the High Bidder or Second Highest Bidder, so long as the failure to consummate a sale to the Second Highest Bidder is not the result of a breach by the Second Highest Bidder, the Seller shall return the Good Faith Deposit of the Second Highest Bidder, with accrued interest. The Seller shall return the Good Faith Deposits of all bidders other than the High Bidder and the Second Highest Bidder within five (5) business days after the Post-Petition Auction.

H.    By submitting a Bid, each Bidder shall be deemed to acknowledge: (i) that it is bound by these Bidding Procedures; (ii) that it had an opportunity to inspect and examine the Assets and all other pertinent information with respect to the Assets before submitting such Bid and that each such Bid is based solely on that review and upon each Bidder's own investigation and inspection; (iii) that is has consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Post-Petition Auction and the construction and enforcement of any transaction documents relating to the Bidder's Bid; and (iv) in making its Bid, such Bidder is not relying upon any

written or oral statements, representations or warranties of the Debtors, their agents or representatives.

## II. Participation Requirements

A.  Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the sale process, each person (a "Potential Bidder") must deliver to the Debtors:

    i.  an executed confidentiality agreement in form and substance satisfactory to the Debtors; and

    ii.  current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements or other financial information of the equity holder(s) of the Potential Bidder, or such other form of financial disclosure acceptable to the Debtors, after consultation with the Master Trustee and the Committee, demonstrating such Potential Bidder's ability to timely close the proposed transaction and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed and assigned.

B.  A "Qualified Bidder" is (1) the Stalking Horse and, if applicable, (2) a Potential Bidder that delivers the documents described in subparagraphs A(i) and A(ii) above and that the Debtors, after consultation with the Master Trustee and the Committee, determine is reasonably likely (based on the availability of financing, experience and other considerations) to submit a *bona fide* offer and to be able to consummate the proposed Sale if selected as the High Bidder.  Two or more Potential Bidders may be deemed a Qualified Bidder if such Potential Bidders, considered in the aggregate, otherwise meet the foregoing criteria and so long as such bidders bid in good faith and do not violate section 363(n) of the Bankruptcy Code.

C.  The Debtors shall determine whether a Potential Bidder is a Qualified Bidder and shall provide written notice of their determination to such Potential Bidder and to each Qualified Bidder at least twenty-four (24) hours prior to the Auction, when copies of the Initial Bid are circulated in accordance with paragraph IV.D. below.

D.  Each Potential Bidder shall comply with all reasonable requests for additional information by the Debtors or their advisors regarding such Potential Bidder's financial wherewithal to consummate and perform obligations in connection with a Sale.  Failure by a Potential Bidder to comply with requests for additional information may be a basis for the Debtors to determine that such Bidder is not a Qualified Bidder.

7653/69444-001 Current/18532299v23

49

III.    **Due Diligence**

Subject to the Debtors' receipt of an executed confidentiality agreement in form and substance satisfactory to them (unless already delivered in connection with the Pre-Petition Process), the Debtors shall afford each Potential Bidder access to a data room containing information regarding the Assets and may make reasonable requests for additional information from the Debtors.  The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline, except to Qualified Bidders who have submitted Qualified Bids.

IV.    **Bid Deadline and Requirements**

A.    A "Qualified Bid" is (1) the Stalking Horse's offer to acquire the Assets pursuant to the Stalking Horse APA and, if applicable, (2) another Qualified Bidder's offer to acquire the Assets if such offer was received prior to the Bid Deadline and if such offer included each of the following (collectively, a "Bid Package"):

i.    An executed copy of an asset purchase agreement (including schedules and exhibits, the "Qualified Bidder Purchase Agreement"):  (a) in clean and marked versions to reflect changes to the Stalking Horse APA; (b) irrevocable until the Return Date; and (c) for the purchase of substantially all of the Assets, "as is, where is," in exchange for a cash purchase price (the "Minimum Cash Amount") that exceeds the Purchase Price (as such term is defined in the Stalking Horse APA) by at least $7,000,000 (the maximum Expense Reimbursement plus the Break-Up Fee plus a $3,500,000 initial bid increment) and the assumption or otherwise equivalent value of at least the Assumed Liabilities (as such term is defined in the Stalking Horse APA).  Executed copies of two or more asset purchase agreements may each be deemed a Qualified Bidder Purchase Agreement if, considered in the aggregate, such asset purchase agreements otherwise meet the foregoing criteria.

ii.    Financial and other information setting forth adequate assurance of future performance (a) under section 365 of the Bankruptcy Code, with respect to any contracts that the bidder seeks to take assignment of (the "Assumed Contracts"), and (b) of any obligations arising under or in connection with any ERISA qualified plan (an "ERISA Plan") of the Debtors that such bidder seeks to assume, in each case in a form requested by the Debtors to allow the Debtors to serve such information within one (1) business day after such receipt on either counterparties to Assumed Contracts that have requested, in writing, such information or the Pension Benefit Guaranty Corporation, as appropriate, in connection with the proposed transaction.

iii.    A good faith cash deposit (the "Good Faith Deposit") in the amount of 10% of the Minimum Cash Amount with respect to a Bid, in the form of a bank or certified check (or other form acceptable to the Debtors in its sole discretion) payable to such party as the Debtors may determine, which Good Faith Deposit shall be held in escrow or another segregated account,

not subject to any security interest or lien, and utilized in accordance with these Bidding Procedures.

iv.    A written statement that the bid is not conditioned on (a) obtaining financing or other financing contingencies or (b) the outcome of unperformed due diligence by the bidder or any other contingencies.

v.    If such information is not set forth in the Qualified Bidder Purchase Agreement, a statement as to whether or not such bidder intends to assume any ERISA Plan or any obligations arising under any ERISA Plan.

B.    In order to be considered, Bid Packages must be received on or before 4:00 p.m., prevailing Central time, on [_____ ___], 2009 (the "<u>Bid Deadline</u>") and, except as may be instructed otherwise with respect to the Good Faith Deposit, should be delivered to:

> Proskauer Rose LLP
> Attn: Monte Dube and Jeff Marwil
> 70 West Madison, Suite 3800
> Chicago, Illinois 60602
> Telephone: (312) 962-3550
> Facsimile: (312) 962-3551
>
> and
>
> Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
> Attn: William W. Kannel
> One Financial Center
> Boston, MA 02111
> Telephone: (617) 348-1665
> Facsimile: (617) 542-2241
>
> and
>
> **[Committee Counsel]**

C.    The Debtors, upon receipt of each Bid Package, shall distribute a copy of such Bid Package by electronic mail to counsel for the Stalking Horse, counsel for Wells Fargo Bank as Master Trustee and counsel to the Committee.

D.    After the Bid Deadline, the Debtors shall determine which Qualified Bid represents the then highest or otherwise best value to the Debtors (the "<u>Initial Bid</u>"). At least twenty-four (24) hours prior to the Post-Petition Auction, the Debtors shall distribute copies of the Initial Bid to each Qualified Bidder.

# V.    Post-Petition Auction

If the Debtors receive a Qualified Bid other than that of the Stalking Horse, the Debtors will conduct an auction at which competitive bids can be made by Qualified Bidders in accordance with the terms of these Bidding Procedures (the "Post-Petition Auction").  The Post-Petition Auction shall take place at [_____], on [_____ ___], 2010, commencing at 11:00 a.m. prevailing Central time.  Subject to the "Reservation of Rights" set forth below, the Post-Petition Auction shall be governed by the following procedures:

A.    Only a Qualified Bidder (and the representatives of that Qualified Bidder designated in writing by the Qualified Bidder) who has submitted a Qualified Bid (including the Stalking Horse) shall be eligible to attend and participate at the Post-Petition Auction.

B.    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the proposed Sale and is not in violation of section 363(n) of the Bankruptcy Code.

C.    The Post-Petition Auction shall begin with the Initial Bid (which, as a Qualified Bid, will provide for at least the Minimum Cash Amount) and proceed in minimum additional increments of $350,000.

D.    Each bid at the auction must meet each of the criteria of a Qualified Bid, other than the requirement that it be received prior to the Bid Deadline.

E.    The amount of the Expense Reimbursement and Break-Up Fee may be added to and deemed a part of any bid of the Stalking Horse.

F.    All bids shall be placed on the record, which shall either be transcribed or videotaped, and each Qualified Bidder shall be informed of the terms of the previous bid.

G.    The Post-Petition Auction shall continue until there is only one offer that the Debtors, after consultation with the Master Trustee and the Committee, determine is the High Bid.  In determining which Qualified Bid to select as the High Bid, the Debtors may consider, among other things:  (1) the amount of the purchase price; (2) the form of consideration being offered; (3) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; and (4) the net benefit to the Debtors' estates, their creditors, and the impact of the Sale upon the community served by the Debtors.  Before the conclusion of the Post-Petition Auction, the Debtors shall inform each of the Bidders of the decision regarding designation of the High Bid, and the Qualified Bidder who submitted such High Bid shall be required to execute a definitive asset purchase agreement at such time.  In addition, the Qualified Bidder whose bid is chosen as the High Bid shall be required, within 24 hours of the conclusion of the Post-Petition Auction, to increase its Deposit to an amount equal to 10% of the aggregate amount of the

7653/69444-001 Current/18532299v23

High Bid.  The Debtors shall present the High Bid to the Bankruptcy Court for approval at the Sale Hearing.

H.     The Debtors, in their reasonable discretion and after consultation with the Master Trustee and the Committee, may adopt rules for the Post-Petition Auction at or prior to the Post-Petition Auction that, in the Debtors' reasonable discretion, will better promote the goals of the Post-Petition Auction and that are not materially inconsistent with any of the provisions of the Bid and Sale Procedures Order.

## VI.     <u>Sale Hearing</u>

The Sale Hearing shall take place in the courtroom of Honorable [_____] in the United States Bankruptcy Court for the Middle District of Tennessee, United States Customs House, 701 Broadway, Courtroom [___], [___] Floor, Nashville, Tennessee on [_____ ___], 2010 at [___:___ _].m. prevailing Central time.  With the consent of the High Bidder, the Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of the adjourned date at the Sale Hearing or otherwise.  At such Sale Hearing, the Debtors shall present the High Bid to the Bankruptcy Court for approval.  A bid submitted by a Qualified Bidder that is approved by the Bankruptcy Court as the winning bid shall be referred to as the "<u>Successful Bid</u>."

## VII.     <u>"As Is, Where Is"</u>

The sale of the Assets will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents, or estates, except, with respect to the Stalking Horse, to the extent set forth in the Stalking Horse APA and, with respect to a bidder with the High Bid, to the extent set forth in the relevant purchase agreement of such bidder, as approved by the Bankruptcy Court.

## VIII.     <u>Reservation of Rights</u>

In addition to the rights set forth in section V.H., the Debtors may, after consultation with the Master Trustee and the Committee, modify these Bidding Procedures or impose, at or prior to the Post-Petition Auction, additional customary terms and conditions on the proposed Sale of its assets if in its reasonable judgment such modifications would be in the best interests of the Debtors' estates and promote an open and fair sale process, so long as such modifications and/or additional terms are consistent with the provisions of the Stalking Horse APA.

# EXHIBIT C

## ASSUMPTION AND ASSIGNMENT PROCEDURES

7653/69444-001 Current/18532299v23

# ASSUMPTION AND ASSIGNMENT PROCEDURES

Set forth below are the assumption and assignment procedures (the "Assumption and Assignment Procedures") to be employed with respect to the proposed Sale of the Assets contemplated by the Debtors as contained in the Debtors' Motion for Orders: (I) (A) Approving Bidding Procedures for the Sale of Substantially All Assets, (B) Scheduling an Auction, (C) Scheduling a Sale Hearing, (D) Approving Assumption and Assignment Procedures Related to the Sale, (E) Authorizing Payment of a Break-Up Fee and Expense Reimbursement and (F) Approving the Form of the Sale Notice; and (II) (A) Authorizing the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Authorizing and Approving the Related Purchase Agreement, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (D) Granting Related Relief, dated _____, 2010 [Docket No.___] (the "Motion")[1].

Pursuant to the Motion and section 365 of the Bankruptcy Code, the Debtors have requested authority to assume and assign executory contracts and unexpired leases to the High Bidder, and upon such assumption and assignment, to be relieved of any liability under such Potentially Assigned Contracts arising after the closing of the Sale.

A. Annexed hereto as Annex 1 is a listing of all contracts that the Debtors may seek to assume and assign to the High Bidder, as well as the Cure Amount (if any) that the Debtors propose to pay the counterparties to such contracts pursuant to section 365 of the Bankruptcy Code in the event that the Debtors ultimately seek to assume and assign such contract. Notice of this Motion has been served upon the counterparties to the Potentially Assigned Contracts.

B. Any objections ("Assignment Objections") to the assumption and assignment of any Potentially Assigned Contract, including, but not limited to, objections relating to adequate assurance of future performance or to the cure amount set forth on the annexed list of contracts must be filed with the Bankruptcy Court and served upon the Notice Parties no less than three days prior to the Post-Petition Auction (the "Assignment Objection Deadline").

C. Within one business day after the completion of the Post-Petition Auction, the Debtors shall file a Notice of Assigned Contracts listing the Potentially Assigned Contracts that the Debtors actually seek to assume and assign to the High Bidder, and shall serve the Notice of Assigned Contracts on each of the counterparties to the contracts listed thereon. The Notice of Assigned Contracts shall include the following statement:

> Please be advised that upon transfer of a Potentially Assigned Contract, each counterparty to a Potentially Assigned Contract shall be barred, enjoined and prohibited from offsetting, seeking to offset, recoup, deduct or set-off any claims such party may have

---

[1] Each capitalized term used but not defined herein shall have the meaning ascribed thereto in the Motion.

against the Debtors from any amounts that may be or may become due in the future to the High Bidder.

D.      Any counterparty failing to file an Assignment Objection by the Assignment Objection Deadline shall be forever barred from (1) objecting to the Cure Amount set forth on the annexed list of contracts with respect to its Potentially Assigned Contract; (2) seeking additional amounts arising under its Potentially Assigned Contract prior to the Closing from the Debtors or the High Bidder; and (3) objecting to the assumption and assignment of its contract to the High Bidder.

E.      Any Assignment Objections not consensually resolved prior to the Sale Hearing shall be heard at the Sale Hearing with any related Cure Amounts or adequate assurance of future performance being fixed by the Bankruptcy Court. All other objections to the proposed assumption and assignment of the Potentially Assigned Contracts will be heard at the Sale Hearing.

F.      Except as may otherwise be agreed to by all parties to a Potentially Assigned Contract, on or before the Closing, the cure of any defaults under Potentially Assigned Contracts necessary to permit assumption and assignment thereof in accordance with Bankruptcy Code section 365(b), shall be by (i) payment of the undisputed Cure Amount, (ii) payment of the Cure Amount judicially determined by the Bankruptcy Court to be the correct amount and/or (iii) establishment of a reserve with respect to any disputed Cure Amount. The party responsible for paying Cure Amounts shall be as set forth in the purchase agreement entered into between the Debtors and the High Bidder.

7653/69444-001 Current/18532299v23

# **ANNEX 1 TO ASSUMPTION AND ASSIGNMENT PROCEDURES**

## **POTENTIALLY ASSIGNED CONTRACTS**

**[TO BE SUPPLIED]**

7653/69444-001 Current/18532299v23

**EXHIBIT D**

**NOTICE OF AUCTION AND SALE HEARING**

7653/69444-001 Current/18532299v23

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Sumner Regional Health Systems, Inc., *et al.*[1] | ) Case No. 10-_____ ( ) |
| | ) |
| | ) Joint Administration Requested |
| Debtors. | ) |
| | ) |
| | ) |

## NOTICE OF BID DEADLINE, AUCTION, AND
## SALE HEARING IN CONNECTION WITH THE SALE
## OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

      **PLEASE TAKE NOTICE** that on _____, 2010, the above-captioned debtors and debtors in possession (the "Debtors") filed a motion (the "Bid and Sale Procedures Motion") [Docket No. ___] seeking approval of, among other things (1) auction and bidding procedures (the "Bidding Procedures") in connection with the sale of substantially all of their assets (the "Assets")[2]; (2) procedures to determine cure amounts and deadlines for objections to certain contracts and leases proposed to be assumed and assigned by the Debtors; and (3) related relief with the United States Bankruptcy Court for the Middle District of Tennessee (the "Bankruptcy Court").  By order dated _____, 2010 (the "Bid and Sale Procedures Order") [Docket No. ___], the Bankruptcy Court approved the Bidding Procedures attached as Exhibit B to the Bid and Sale Procedures Motion.

      **PLEASE TAKE FURTHER NOTICE** that all interested parties are invited to submit a Qualified Bid and to make offers to purchase the Assets in accordance with the terms of the Bidding Procedures and the Bid and Sale Procedures Order, copies of which are included herewith.  The deadline to submit bids (the "Bid Deadline") is **_____, 2010 at 4:00 p.m. (CST).**

      **PLEASE TAKE FURTHER NOTICE** that pursuant to the Bid and Sale Procedures Order, the Debtors intend to conduct an auction (the "Post-Petition Auction") for the sale of the Assets at the offices of _____ on _____, 2010 beginning at

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Sumner Regional Health Systems, Inc. (3738), Trousdale Medical Center, Inc. (5666), Frank T. Rutherford Memorial Hospital, Inc. (8987), SRHS Holdings, LLC (2680), Sumner Homecare and Hospice, LLC (4324), Family Wellness Group of Middle Tennessee, LLC (1860) and ClinicCare, LLC (6783).

[2]    A listing of the Assets to be sold, including reference to descriptions of the real estate to be sold, is set forth in Article II of the Asset Purchase Agreement annexed as Exhibit E to the Bid and Sale Procedures Motion.

7653/69444-001 Current/18532299v23

_____.m. (CST), or at such other place and time as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids.

**PLEASE TAKE FURTHER NOTICE** that at a hearing on **_____, 2010 at _____.m. (CST)**, or such other time as the Bankruptcy Court shall determine (the "Sale Hearing"), the Debtors intend to seek the Bankruptcy Court's approval of the sale of the Assets to the bidder submitting the highest, best or otherwise financially superior offer at the Post-Petition Auction as determined by the Debtors (collectively, the "High Bidder"). The Sale Hearing will be held before the Honorable [_____], at the United States Bankruptcy Court for the Middle District of Tennessee, 801 Broadway, Suite ____, Nashville, Tennessee 37203.

**PLEASE TAKE FURTHER NOTICE** that at the Sale Hearing, the Bankruptcy Court may enter such orders as it deems appropriate under applicable law and as required by the circumstances and equities of these chapter 11 cases. Objections, if any, to the sale of the Assets pursuant to the terms of the agreement reached between the Debtors and the High Bidder shall: (1) be in writing; (2) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of Court for the United States Bankruptcy Court for the Middle District of Tennessee; (3) set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against the Debtors' estates or properties, the basis for the objection and the specific grounds therefor; (4) shall be filed with the Clerk of the United States Bankruptcy Court for the Middle District of Tennessee on or before **4:00 p.m. (CST) on _____, 2010**, or such later date and time as the Debtors may agree; and (5) be served so as to be received no later than 4:00 p.m. (CST) on the same day upon (a) the Debtors, at _____; (b) counsel to the Debtors, at Proskauer Rose LLP _____ and Frost Brown Todd LLC, 424 Church Street, Suite 1600, Nashville, TN 37219-2308 (Attn: Bobby Guy and Ron Gold); (c) counsel to the Official Committee of Unsecured Creditors appointed in these chapter 11 cases, at _____; (d) counsel to Wells Fargo Bank, National Association as Trustee, at _____; and (e) counsel to LifePoint Acquisition Corp., at _____.

**PLEASE TAKE FURTHER NOTICE** that this Notice is subject to the fuller terms and conditions of the Bid and Sale Procedures Motion, the Bidding Procedures and the Bid and Sale Procedures Order, which shall control in the event of any conflict, and the Debtors encourage parties in interest to review such documents in their entirety. Copies of these pleadings may be obtained by written request to counsel to the Debtors, c/o Frost Brown Todd LLC, 424 Church Street, Suite 1600, Nashville, TN 37219-2308 (Attn: Bobby Guy and Ron Gold). In addition, copies of the aforementioned pleadings may be found on the Bankruptcy Court's website, https://ecf.tnmd.uscourts.gov, and are on file with the Bankruptcy Court and available for inspection during regular business hours at the office of the Clerk of the Bankruptcy Court. Copies of these pleadings can also be viewed on the website of the Debtors' claims agent, Epiq Bankruptcy Solutions, LLC, at [_____].

[SIGNATURE PAGE FOLLOWS]

7653/69444-001 Current/18532299v23

Dated: _____, 2010

_____

FROST BROWN TODD LLC
Robert A. Guy, Jr., Esq.
424 Church Street, Suite 1600
Nashville, Tennessee 37219
Telephone: 615.251.5550
Facsimile: 615.251.5551
E-mail: bguy@fbtlaw.com

*- and -*

Ronald E. Gold, Esq.*
Joseph B. Wells, Esq.*
201 East Fifth Street, Suite 2200
Cincinnati, Ohio 45202
Telephone: 513.651.6800
Facsimile: 513.651.6981
E-mail: rgold@fbtlaw.com
E-mail: jbwells@fbtlaw.com

*- and -*

PROSKAUER ROSE LLP
Jeff J. Marwil, Esq.*
Three First National Plaza
70 West Madison, Suite 3800
Chicago, IL 60602-4342
Telephone: 312-962-3550

*- and -*

Jeffrey W. Levitan, Esq.*
Adam T. Berkowitz, Esq.*
1585 Broadway
New York, NY 10036-8299
Telephone: 212-969-3000

*Pro Hac Vice* Motion Pending

Proposed Counsel for Debtors and Debtors in Possession

7653/69444-001 Current/18532299v23

**EXHIBIT E**

**STALKING HORSE ASSET PURCHASE AGREEMENT**

7653/69444-001 Current/18532299v23

Asset Purchase Agreement

by and among

Sumner Regional Health Systems, Inc.
Trousdale Medical Center, Inc.
Frank T. Rutherford Memorial Hospital, Inc.
SRHS Holdings, LLC
Sumner Homecare and Hospice, LLC
Family Wellness Group of Middle Tennessee, LLC
ClinicCare, LLC

and

LifePoint Acquisition Corp.

and

Historic LifePoint Hospitals, Inc.

**Dated as of April 30, 2010**

# TABLE OF CONTENTS

**ARTICLE I       DEFINITIONS** .................................................................**2**

    1.1      Certain Definitions. ..................................................................... 2

    1.2      Terms Defined Elsewhere in this Agreement ................................... 14

    1.3      Other Definitional and Interpretive Matters. .................................... 14

**ARTICLE II      PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES** ...............................................................**16**

    2.1      Purchase and Sale of Assets.......................................................... 16

    2.2      Excluded Assets .......................................................................... 18

    2.3      Assumption of Liabilities............................................................. 19

    2.4      Excluded Liabilities .................................................................... 20

    2.5      Cure Amounts ............................................................................ 21

    2.6      Further Conveyances and Assumptions............................................ 22

    2.7      Bulk Sales Laws......................................................................... 22

    2.8      Contingent Purchased Contract...................................................... 22

    2.9      Contracts; Adjustments. ............................................................... 22

**ARTICLE III     CONSIDERATION** ........................................................**23**

    3.1      Consideration ............................................................................. 23

    3.2      Purchase Price Deposit ................................................................ 23

    3.3      Payment of Purchase Price............................................................ 24

    3.4      Casualty Loss Provision............................................................... 24

    3.5      Estimated Net Working Capital and Estimated Accounts Receivable.25

    3.6      Post-Closing Purchase Price Adjustment......................................... 26

    3.7      Proration................................................................................... 27

    3.8      Indemnity Escrow Agreement ....................................................... 28

    3.9      Lock Box .................................................................................. 28

    3.10     Transition Patient Payments ......................................................... 28

**ARTICLE IV      CLOSING AND TERMINATION**.....................................**30**

    4.1      Closing Date.............................................................................. 30

    4.2      Deliveries by Seller..................................................................... 30

    4.3      Deliveries by Purchaser ............................................................... 32

    4.4      Termination of Agreement............................................................ 33

    4.5      Procedure For Termination ........................................................... 35

    4.6      Effect of Termination................................................................... 35

**ARTICLE V       REPRESENTATIONS AND WARRANTIES OF SELLER**.........**36**

    5.1      Organization and Good Standing.................................................... 36

    5.2      Authorization of Agreement ......................................................... 36

i

| | | |
|---|---|---|
| 5.3 | Consents of Third Parties; Contractual Consents. | 36 |
| 5.4 | Title to Purchased Assets | 37 |
| 5.5 | Taxes. | 37 |
| 5.6 | Real Property. | 37 |
| 5.7 | Tangible Personal Property | 38 |
| 5.8 | Intellectual Property | 38 |
| 5.9 | Material Contracts | 38 |
| 5.10 | Employees; Employee Benefits. | 38 |
| 5.11 | Labor | 39 |
| 5.12 | Compliance with Laws; Permits. | 39 |
| 5.13 | Litigation | 40 |
| 5.14 | Financial Statements | 40 |
| 5.15 | Post Balance Sheet Results | 40 |
| 5.16 | Financial Advisors | 41 |
| 5.17 | Environmental Matters | 41 |
| 5.18 | Medical Staff Matters | 41 |
| 5.19 | No Exclusion | 41 |
| 5.20 | Third Party Payor Cost Reports | 42 |
| 5.21 | JV Interests. | 42 |
| 5.22 | No Other Representations or Warranties; Schedules | 42 |
| **ARTICLE VI** | **REPRESENTATIONS AND WARRANTIES OF PURCHASER** | **43** |
| 6.1 | Organization and Good Standing | 43 |
| 6.2 | Authorization of Agreement | 43 |
| 6.3 | Conflicts; Consents of Third Parties. | 43 |
| 6.4 | Litigation | 44 |
| 6.5 | Financial Advisors | 44 |
| 6.6 | Financial Capability | 44 |
| 6.7 | Healthcare Regulatory Compliance Status. | 44 |
| 6.8 | Acknowledgement Regarding Condition of the Business | 44 |
| **ARTICLE VII** | **BANKRUPTCY COURT MATTERS** | **46** |
| 7.1 | Approval of Break-Up Fee and Expense Reimbursement | 46 |
| 7.2 | Competing Transaction. | 46 |
| 7.3 | Bankruptcy Court Filings. | 47 |
| **ARTICLE VIII** | **COVENANTS** | **48** |
| 8.1 | Access to Information | 48 |
| 8.2 | Conduct of the Business Pending the Closing | 48 |
| 8.3 | Seller's Negative Covenants | 49 |

| | | |
|---|---|---|
| 8.4 | Consents. | 49 |
| 8.5 | Insurance | 50 |
| 8.6 | Regulatory Approvals. | 50 |
| 8.7 | Phase I. | 52 |
| 8.8 | Financial Information | 53 |
| 8.9 | Further Assurances | 53 |
| 8.10 | Confidentiality | 53 |
| 8.11 | Preservation of Records | 54 |
| 8.12 | Post-Closing Access to Information. | 54 |
| 8.13 | Cost Reports | 55 |
| 8.14 | Publicity | 55 |
| 8.15 | Supplementation and Amendment of Schedules | 55 |
| 8.16 | Title Commitment and Survey. | 56 |
| **ARTICLE IX** | **EMPLOYEES AND EMPLOYEE BENEFITS** | **58** |
| 9.1 | Offers of Employment | 58 |
| 9.2 | Employment Terms; Employee Benefits. | 59 |
| 9.3 | Board of Trustees | 60 |
| 9.4 | Capital Fund | 60 |
| 9.5 | Capital Commitment | 60 |
| **ARTICLE X** | **CONDITIONS TO CLOSING** | **60** |
| 10.1 | Conditions Precedent to Obligations of Purchaser | 60 |
| 10.2 | Conditions Precedent to Obligations of Seller | 61 |
| 10.3 | Conditions Precedent to Obligations of Purchaser and Seller | 62 |
| 10.4 | Frustration of Closing Conditions | 62 |
| **ARTICLE XI** | **INDEMNIFICATION** | **62** |
| 11.1 | Survival of Representations and Warranties | 62 |
| 11.2 | Indemnification. | 63 |
| 11.3 | Indemnification Procedures. | 64 |
| 11.4 | Calculation of Losses | 66 |
| 11.5 | Tax Treatment of Indemnity Payments | 66 |
| 11.6 | No Consequential Damages | 66 |
| **ARTICLE XII** | **TAXES** | **66** |
| 12.1 | Transfer Taxes | 66 |
| 12.2 | Taxes | 67 |
| 12.3 | Purchase Price Allocation | 67 |
| 12.4 | Pre-Closing Taxes | 67 |

4348/69444-001 Current/16419511v19

**ARTICLE XIII**     **MISCELLANEOUS** ........................................................................**67**

      13.1       Expenses ............................................................... 67

      13.2       Injunctive Relief.................................................... 67

      13.3       Submission to Jurisdiction; Consent to Service of Process ............... 68

      13.4       Waiver of Right to Trial by Jury............................ 68

      13.5       Entire Agreement; Amendments and Waivers ................................. 68

      13.6       Governing Law ..................................................... 68

      13.7       Notices ................................................................. 69

      13.8       Severability ......................................................... 70

      13.9       Binding Effect; Assignment.................................. 70

      13.10     No Personal Liability ......................................... 70

      13.11     Counterparts ........................................................ 1

## ANNEX

1      Other Businesses

## EXHIBITS

A      Indemnity Escrow Agreement
B      Special Warranty Deed
C      Bill of Sale
D      Assignment and Assumption
E      Non-Compete Agreement
F      Transition Services Agreement
G      Non-Foreign Affidavit
H      Power of Attorney

## SCHEDULES

Schedule 1.1(a) Knowledge of Seller
Schedule 1.1(b) Indentures
Schedule 1.1(c) Seller Marks
Schedule 2.1(b) Included Real Property
Schedule 2.1(c)(iii) Purchased Vehicles
Schedule 2.1(c)(iv) Purchased Personal Property Leases
Schedule 2.1(c)(v)(A) Purchased Real Property Leases
Schedule 2.1(e) Purchased Contracts
Schedule 2.1(h) Provider Numbers
Schedule 2.2(a) Excluded Real Property
Schedule 2.2(d) Excluded Other Businesses' Assets
Schedule 2.2(g) Excluded Sumner Station Leases
Schedule 2.2(h) Excluded Contracts

4348/69444-001 Current/16419511v19

TABLE OF CONTENTS

Schedule 2.2(q) Excluded Charitable Gifts
Schedule 2.2(v) Excluded Personal Property
Schedule 2.8 Contingent Purchased Contract
Schedule 3.1(d) Capital Leases
Schedule 3.5 Estimated Net Working Capital and Accounts Receivable Calculations
Schedule 5.3(a) Consents
Schedule 5.3(b) Conflicts
Schedule 5.4 Liens
Schedule 5.5(a) Tax Exemption
Schedule 5.5(b) Tax Returns
Schedule 5.6(a) Owned Properties
Schedule 5.6(b) Real Estate; Real Property Leases
Schedule 5.7 Personal Property Leases
Schedule 5.8 Purchased Intellectual Property
Schedule 5.9 Material Contracts
Schedule 5.10(a) Collective Bargaining Agreements; Employee Benefit Plans
Schedule 5.10(b) COBRA
Schedule 5.11 Labor
Schedule 5.12(a) Material Licenses
Schedule 5.12(b) Certificate of Need or Exemption Certificate Applications
Schedule 5.12(c) Program Agreements; Accreditation
Schedule 5.12(d) Compliance With Applicable Healthcare Laws
Schedule 5.13 Legal Proceedings; Orders
Schedule 5.14 Financial Statements
Schedule 5.15 Post Balance Sheet Results
Schedule 5.16 Financial Advisors
Schedule 5.17 Environmental Matters
Schedule 5.18 Medical Staff Matters
Schedule 5.19 Exclusion from Federal Health Care Program
Schedule 5.20 Third Party Payor Cost Reports
Schedule 5.21 JV Interests
Schedule 6.3(a) Consents
Schedule 6.3(b) Conflicts
Schedule 6.7 Healthcare Regulatory Compliance
Schedule 8.2 Conduct of the Business Pending the Closing
Schedule 8.3 Seller's Negative Covenants
Schedule 9.1 Offers of Employment
Schedule 10.1(d) Conditions Precedent to Obligations of Purchaser
Schedule 10.3(d) Conditions Precedent to Obligations of Purchaser and Seller
Schedule 12.3 Purchase Price Allocation

4348/69444-001 Current/16419511v19

# ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of April 30, 2010 (this "Agreement"), between Sumner Regional Health Systems, Inc., a Tennessee nonprofit corporation ("SRHS"), Trousdale Medical Center, Inc., a Tennessee nonprofit corporation ("Trousdale"), Frank T. Rutherford Memorial Hospital, Inc., a Tennessee nonprofit corporation ("Rutherford"), SRHS Holdings, LLC, a Tennessee limited liability company ("Holdings"), Sumner Homecare and Hospice, LLC, a Tennessee limited liability company ("Homecare"), Family Wellness Group of Middle Tennessee, LLC, a Tennessee limited liability company ("Wellness") and ClinicCare, LLC, a Tennessee limited liability company ("ClinicCare", and together with SRHS, Trousdale, Rutherford, Holdings, Homecare and Wellness collectively, the "Seller"), and LifePoint Acquisition Corp., a Delaware corporation ("Purchaser") and is joined for specified purposes by Historic LifePoint Hospitals, Inc., a Delaware corporation ("Affiliate Indemnitor").

WHEREAS, each Seller will be a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and will file a voluntary petition for relief under chapter 11 of the Bankruptcy Code (such date being referred to herein as the "Petition Date"), in the United States Bankruptcy Court for the Middle District of Tennessee (the "Bankruptcy Court") (the "Bankruptcy Case"); and

WHEREAS, SRHS owns and operates a hospital located in Gallatin, Tennessee, known as Sumner Regional Medical Center ("SRMC"); and

WHEREAS, SRHS also controls Trousdale, Rutherford, Holdings and Homecare; and

WHEREAS, Trousdale owns and operates a hospital located in Trousdale, Tennessee, known as Trousdale Medical Center ("TMC"); and

WHEREAS, Rutherford owns and operates a hospital located in Carthage, Tennessee, known as Riverview Regional Medical Center South ("RRMC South"); and

WHEREAS, Holdings owns and operates a hospital located in Carthage, Tennessee, known as Riverview Regional Medical Center North ("RRMC North" and together with SRMC, TMC and RRMC South collectively, the "Hospitals"); and

WHEREAS, Homecare owns and operates a homecare and hospice business located in Gallatin, Tennessee, known as Sumner Homecare and Hospice (the "Homecare and Hospice"); and

WHEREAS, Wellness operates physician practice groups in Sumner County, Tennessee (the "Physician Practices"); and

WHEREAS, ClinicCare operated primary care medical clinics for the uninsured in Sumner County, Tennessee (the "Medical Clinics", and together with the Hospitals, Homecare and Hospice and Physician Practices, collectively the "Business"); and

WHEREAS, Seller presently also owns an interest in the other businesses identified in Annex 1 (collectively, the "Other Businesses"); and

WHEREAS, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller, pursuant to sections 363 and 365 of the Bankruptcy Code, all of the Purchased Assets and Assumed Liabilities, all as more specifically provided herein; and

WHEREAS, Purchaser is an indirect wholly owned subsidiary of Affiliate Indemnitor and will benefit substantially from the consummation of the transactions contemplated by this Agreement; and

WHEREAS, Seller would not enter into the Agreement without Affiliate Indemnitor agreeing to indemnify certain obligations of Purchaser; and

WHEREAS, Affiliate Indemnitor is willing to indemnify certain obligations of Purchaser.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1     Certain Definitions.

For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Accountants" has the meaning set forth in Section 3.6.

"Accounts Receivable" has the meaning set forth in Section 3.5(b).

"Additional Environmental Due Diligence" has the meaning set forth in Section 8.7(b)

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.  Without limiting the generality of the foregoing, the members of Seller and any Person under common control with a member shall be considered an Affiliate of Seller.  Under no circumstances shall Navigant Consulting, Inc. (or its Affiliates) be considered an Affiliate of Seller hereunder.

"Affiliate Indemnitor" has the meaning set froth in the Recitals.

"Agency Settlements" has the meaning set forth in Section 2.2(e).

"Agreement" has the meaning set forth in the Recitals.

"Antitrust Bureau" has the meaning set forth in Section 8.6(b).

"Antitrust Division" has the meaning set forth in Section 8.6(b).

"Antitrust Laws" means the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, the Donnelly Act and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"Applications" has the meaning set forth in Section 5.12(b).

"Asset Acquisition" has the meaning set forth in Section 12.3.

"Assignment and Assumption" has the meaning set forth in Section 4.2(c).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Balance Sheet Date" has the meaning set forth in Section 5.14.

"Bankruptcy Case" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bidding Procedures Order" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser and Seller, that, among other things, (i) establishes procedures for the submission of Competing Bids, (ii) approves the Break-Up Fee and Expense Reimbursement on the terms and conditions set forth in Section 7.1 hereof and (iii) authorizes and schedules a public auction for the sale of the Purchased Assets and establishes procedures with respect to such auction.

"Bill of Sale" has the meaning set forth in Section 4.2(b).

"Board of Trustees" has the meaning set forth in Section 9.3.

"Break-Up Fee" has the meaning set forth in Section 7.1.

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day of the year, other than Saturdays, on which national banking institutions in Tennessee are open to the public for conducting business and are not required or authorized to close.

3

"CHAMPUS" has the meaning set forth in Section 2.1(l).

"Claims" has the meaning set forth in Section 11.3.

"Closing" has the meaning set forth in Section 4.1.

"Closing Accounts Receivable" has the meaning set forth in Section 3.6(b).

"Closing Date" has the meaning set forth in Section 4.1.

"Closing Net Working Capital" has the meaning set forth in Section 3.6.

"CMS" means the Centers for Medicare and Medicaid Services of the U.S. Department of Health and Human Services.

"COBRA" has the meaning set forth in Section 5.10(b).

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" has the meaning set forth in Section 8.10.

"Confidential Information" has the meaning set forth in Section 8.10.

"Contemplated Transactions" has the meaning set forth in Section 2.1.

"Contract" means any written contract, indenture, note, bond, lease, license, commitment or other agreement, other than a real property lease, a personal property lease or an intellectual property license.

"Conversion Act" has the meaning set forth in Section 5.3(a).

"Copyrights" means all copyrights and registrations and applications therefor and works of authorship, and mask work rights that are used by Seller in connection with the Business as of the date hereof.

"Creditors' Committee" means the official committee of unsecured creditors of Seller, if any, appointed in connection with the Bankruptcy Case.

"Cure Period" has the meaning set forth in Section 8.16(e).

"DEA" has the meaning set forth in Section 4.2(n).

"Deposit Escrow Agent" has the meaning set forth in Section 3.2.

"Deposit Escrow Agreement" has the meaning set forth in Section 3.2.

"Deposit Escrowed Funds" has the meaning set forth in Section 3.2.

4348/69444-001 CURRENT/16419511V19

"DFA" means the Department of Finance and Administration of the State of Tennessee.

"DMHDD" means the Department of Mental Health and Developmental Disabilities of the State of Tennessee.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related primarily to the Business and the Purchased Assets in each case whether or not in electronic form.

"DOH" means the Department of Health of the State of Tennessee.

"DRG Transition Patients" has the meaning set forth in Section 3.10(a).

"Employee Benefit Plans" has the meaning set forth in Section 5.10(a).

"Employees" means all individuals, as of the date hereof, whether or not actively at work as of the date hereof, who are employed by Seller in the conduct of the Business, together with individuals who are hired in respect of the conduct of the Business after the date hereof and prior to the Closing, except that "Employees" shall not include individuals who regularly perform administrative functions for Seller relating to both the Business and in any material respect any of the Other Businesses, and shall not include any employees of Navigant Consulting, Inc.

"Environmental Claim" means any claim, action, cause of action, investigation or notice by any person alleging potential liability (including potential liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries or penalties) arising out of, based on or resulting from the presence, or release or threat of release into the environment, of any Materials of Environmental Concern from or at the Business.

"Environmental Consultant" has the meaning set forth in Section 8.7.

"Environmental Law" means any federal, state or local statute, regulation, ordinance, or rule of common law relating to the protection of human health and safety or the environment or natural resources including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and the regulations promulgated pursuant thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Estimated Accounts Receivable" has the meaning set forth in Section 3.5(b).

"Estimated Net Working Capital" has the meaning set forth in Section 3.5(a).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Choice" has the meaning set forth in Section 8.7(d)(ii).

"Excluded Contracts" means any Contract relating to the Business that is not a Purchased Contract, Purchased Real Property Lease, Purchased Personal Property Lease or a Contract included in Purchased Intellectual Property.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Real Property" has the meaning set forth in Section 2.2(a).

"Excluded Sumner Station Leases" has the meaning set forth in Section 2.2(g).

"Expense Reimbursement" has the meaning set forth in Section 7.1.

"Financial Statements" has the meaning set forth in Section 5.14.

"Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment and leasehold improvements owned by Seller, used by Seller in the conduct of the Business and located in the Ordinary Course of Business at the Real Estate, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by Seller, the telephone numbers associated therewith used in the Ordinary Course of Business), cubicles and miscellaneous office furnishings.

"GAAP" means generally accepted accounting principles in the United States in effect as of the date hereof or in effect at the applicable time.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Government Patient Receivables" has the meaning set forth in Section 2.1(l).

"Government Programs" has the meaning set forth in Section 2.1(l).

"Hardware" means any and all computer and computer-related hardware, including, but not limited to, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Healthcare Applications" has the meaning set forth in Section 8.6(a).

"Healthcare Programs" has the meaning set forth in Section 5.12(b).

"Healthcare Regulatory Consents" means in respect of Seller or Purchaser, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body as shall be required to be obtained and such notifications to any Governmental Body as shall be required to be given by such party in order for it to consummate the Contemplated Transactions in compliance with all applicable Law relating to health care or healthcare services of any kind and shall include, without limitation, obtaining any such consents, approvals, authorizations, waivers, Orders, licenses or Permits, or notices to, the DOH, DMHDD, DFA, TennCare, HSDA, CMS or other Governmental Body needed for Purchaser to consummate the Contemplated Transactions and to operate the Business.

"Home Health PPS" has the meaning set forth in Section 3.10(b).

"Homecare" has the meaning set forth in the Recitals.

"Homecare and Hospice" has the meaning set forth in the Recitals.

"Homecare Transition Patients" has the meaning set forth in Section 3.10(b).

"Hospitals" has the meaning set forth in the Recitals.

"HSDA" means the Health Services and Development Agency of the State of Tennessee.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Included Real Property" has the meaning set forth in Section 2.1(b).

"Indebtedness" of any Person means, without duplication, (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Indemnification Claim" has the meaning set forth in Section 11.3.

"Indemnified Parties" has the meaning set forth in Section 11.2(b).

"<u>Indemnity Escrow Account</u>" has the meaning set forth in Section 3.8.

"<u>Indemnity Escrow Agent</u>" has the meaning set forth in Section 3.8.

"<u>Indemnity Escrow Agreement</u>" has the meaning set forth in Section 3.8.

"<u>Indemnity Escrowed Funds</u>" has the meaning set forth in Section 3.8.

"<u>Intellectual Property Licenses</u>" means (i) any grant by Seller to a third Person of any right to use any of the Purchased Intellectual Property owned by Seller and (ii) any grant to Seller of a right to use in connection with the Business any intellectual property rights owned by any other Person, to the extent, and only to the extent, such right is transferable by Seller (taking into consideration the provisions of <u>Section 8.3</u>).

"<u>Inventory</u>" means inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables existing on the Closing Date and located at the Real Estate, or purchased by Seller for use in connection with the operation of the Business.

"<u>IRS</u>" means the Internal Revenue Service.

"<u>Joint Ventures</u>" has the meaning set forth in Section 3.1.

"<u>JV Interests</u>" has the meaning set forth in Section 2.1(a).

"<u>Knowledge of Seller</u>" (and "<u>Seller's Knowledge</u>") means the actual knowledge of each person identified on <u>Schedule 1.1(a)</u>   Each such person shall be deemed to have knowledge of facts or other information or matters which are matters with respect to which such person has received written notice on or before the Closing.

"<u>Law</u>" means any Order or federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

"<u>Legal Proceeding</u>" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"<u>Liability</u>" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"<u>Lien</u>" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, put, call, easement, servitude, proxy, voting trust or agreement and transfer restriction under any agreement.

"<u>Mandatory Cure Issues</u>" has the meaning set forth in Section 8.16(d).

"<u>Marks</u>" means all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general

intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof.

"Material Adverse Effect" means (i) a material adverse effect on the assets, properties, operations or financial condition of the Business (taken as a whole), or (ii) a material adverse effect on the ability of Seller to consummate the Contemplated Transactions or to perform its obligations under this Agreement, (iii) a monetary event of default under the indentures set forth on Schedule 1.1(b), or (iv) a termination of the Medicare provider agreement of either SRMC or RRMC North, in each case other than an effect resulting from an Excluded Matter. "Excluded Matter" means any one or more of the following: (A) the effect of any change in the United States or foreign economies or securities or financial markets in general, unless such change disproportionately affects Seller as compared to similarly situated general acute care hospitals; (B) the effect of any change that generally affects any industry in which Seller operates (including a general adverse change in medical reimbursement rates); (C) the effect of any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (D) the effect of any action taken by Purchaser or its Affiliates with respect to the Contemplated Transactions; (E) the effect of any changes in applicable Laws, unless such change disproportionately affects Seller as compared to similarly situated general acute care hospitals; (F) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the Contemplated Transactions in accordance with the terms hereof; (G) any effect resulting directly from the filing of the Bankruptcy Case and reasonably anticipated effects thereof or Seller's compliance with the Bankruptcy Code; or (H) any effect resulting directly from the Purchased Real Property Leases not including the Excluded Sumner Station Leases or potential litigation relating thereto.

"Material Licenses" has the meaning set forth in Section 5.12(a).

"Materials of Environmental Concern" means chemicals, pollutants, contaminants, hazardous materials, hazardous substances and hazardous wastes, toxic substances, petroleum and petroleum products and by-products, asbestos-containing materials, PCBs, and any other chemicals, pollutants, substances or wastes, in each case regulated under any Environmental Law.

"Medicaid" means the healthcare assistance program established by Title XIX of the Social Security Act (42 U.S.C. sections 1396 et seq., as amended) and applicable Tennessee Laws.

"Medical Clinics" has the meaning set forth in the Recitals.

"Medical Waste" includes (i) pathological waste, (ii) blood, (iii) sharps, (iv) wastes from surgery or autopsy, (v) dialysis waste, including contaminated disposable equipment and supplies, (vi) cultures and stocks of infectious agents and associated biological agents, (vii) contaminated animals, (viii) isolation wastes, (ix) laboratory waste and (x) various other biological waste and discarded materials contaminated with or exposed to blood, excretion or secretions from human beings or animals. "Medical Waste" also includes any substance,

pollutant, material or contaminant listed or regulated as "Medical Waste," "Infectious Waste," or other similar terms by applicable federal, state, regional, county, municipal, or other local laws, regulations and ordinances insofar as they purport to regulate Medical Waste, or impose requirements relating to Medical Waste (collectively, "Medical Waste Laws"), and includes "Regulated Waste" governed by the Occupational Safety and Health Act, 29 USCA § 651 et seq.

"Medicare" means the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. sections 1395 et seq., as amended) and administered by CMS.

"Net Working Capital" has the meaning set forth in Section 3.5(a).

"Non-Compete Agreement" has the meaning set forth in Section 4.2(d).

"Non-Governmental Receivables" has the meaning set forth in Section 2.1(k).

"Notice of Update Claims" has the meaning set forth in Section 8.15.

"Order" means any order, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of the Bankruptcy Court or other Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice, subject, however, in respect of the period after the Petition Date, to those actions necessary and incident to the Bankruptcy Case and to comply with the Bankruptcy Code.

"Other Businesses" has the meaning set forth in the Recitals.

"Owned Properties" has the meaning set forth in Section 5.6(a).

"Patents" means all patents and applications therefor owned by the Seller, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon.

"Patient Records" means any Documents containing information concerning medical or behavioral health services provided to, or the medical or behavioral health of any individual, or that are otherwise subject to regulation under the Health Insurance Portability and Accountability Act of 1996 and all regulations promulgated pursuant thereto, including the Transaction Code Set Standards, the Privacy Rules and the Security Rules set forth at 45 C.F.R. Parts 160 and 164.

"PCBs" has the meaning set forth in Section 5.17(d).

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of or issued by a Governmental Body or other regulatory entity.

"Permitted Exceptions" means, subject to the provisions of <u>Section 8.16(k)</u>, (i) all defects, exceptions, restrictions, easements, encroachments, covenants, reservations, declarations, state of facts depicted in surveys, rights of way and encumbrances disclosed in policies of title insurance, surveys and other related documentation that have been made available to Purchaser ("<u>Real Estate Due Diligence</u>") which is not reasonably expected to materially and adversely affect the title to the Included Real Property or the operation of the Hospitals or any of them; (ii) statutory liens for current Taxes, assessments or other governmental charges (other than those related to Medicaid, Medicare, Tricare or other governmental programs) not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings but only to the extent an appropriate cash reserve is established therefor and utilized by Seller to resolve any adverse determination with respect thereto; (iii) zoning, entitlement and other land use Laws and Environmental Laws or designations by any Governmental Body; (iv) such other imperfections in title, charges, easements, restrictions, encroachments, covenants, reservations, declarations, state of facts or physical condition which a current accurate survey would disclose, and encumbrances which are not reasonably expected to materially and adversely affect the title to the Included Real Property or the operation of the Hospitals or any of them; (v) title of a lessor under a Purchased Real Property Leases or Purchased Personal Property Lease; and (vi) such other matters determined to be permitted exceptions in accordance with <u>Section 8.16</u>.

"<u>Person</u>" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"<u>Personal Property Leases</u>" means any lease by Seller of personal property, including Equipment used primarily in connection with the Business.

"<u>Petition Date</u>" has the meaning set forth in the Recitals.

"<u>Phase I</u>" has the meaning set forth in Section 8.7.

"<u>Physician Practices</u>" has the meaning set forth in the Recitals.

"<u>Power of Attorney</u>" has the meaning set forth in Section 4.2(n).

"<u>Prepaid Expenses</u>" has the meaning set forth in Section 2.1(m).

"<u>Program Agreements</u>" has the meaning set forth in Section 5.12(b).

"<u>PTO</u>" has the meaning set forth in Section 2.3(c).

"<u>Purchase Price</u>" has the meaning set forth in Section 3.1.

"<u>Purchased Assets</u>" has the meaning set forth in Section 2.1.

"<u>Purchased Contracts</u>" has the meaning set forth in Section 2.1(e).

"Purchased Intellectual Property" means all intellectual property rights, including Intellectual Property Licenses, Patents, Marks, Copyrights, Software and Technology, owned or licensed by Seller and used in the Ordinary Course of Business primarily in connection with the Business, except for any that is an Excluded Asset. Such intellectual property also shall include the trademarks, servicemarks and names set forth on Schedule 1.1(c) (the "Seller Marks") and any variations thereof, the goodwill associated therewith, and the following to the extent used primarily in connection with the Business: telephone, facsimile and e-mail addresses (or numbers) and listings, internet websites and internet domain names.

"Purchased Personal Property Leases" has the meaning set forth in Section 2.1(c).

"Purchased Real Property Leases" has the meaning set forth in Section 2.1(c).

"Purchaser Deductible" has the meaning set forth in Section 11.2(d).

"Purchaser Documents" has the meaning set forth in Section 6.2.

"Purchaser Employer" has the meaning set forth in Section 9.1.

"Purchaser Indemnified Parties" has the meaning set forth in Section 11.2(b).

"Purchaser Plans" has the meaning set forth in Section 9.2(b).

"Purchaser's Limit" has the meaning set forth in Section 11.2(d).

"Purchaser's Objections" has the meaning set forth in Section 8.16(e).

"Real Estate" has the meaning set forth in Section 2.1(b).

"Real Property Leases" has the meaning set forth in Section 5.6(a).

"Remediation Costs" has the meaning set forth in Section 8.7(c).

"Revised Statements" has the meaning set forth in Section 12.3.

"RRMC Election" has the meaning set forth in Section 8.7(d).

"RRMC North" has the meaning set forth in the Recitals.

"RRMC South" has the meaning set forth in the Recitals.

"Sale Motion" means the motion or motions of Seller, in form and substance reasonably acceptable to Purchaser and Seller, seeking approval and entry of the Bidding Procedures Order and the Sale Order.

"Sale Order" shall be an order or orders of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Seller to consummate the Contemplated Transactions. Without limiting the generality of the foregoing, such order shall

4348/69444-001 CURRENT/16419511V19

find and provide, among other things, that (i) the Purchased Assets sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Liens (other than Liens created by Purchaser and Permitted Exceptions) and claims, such Liens and claims to attach to the Purchase Price; (ii) Purchaser and Seller have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (iv) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 13.3 hereof; and (v) this Agreement and the Contemplated Transactions may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, Seller or any chapter 7 or chapter 11 trustee of Seller.

"Seller Deductible" has the meaning set forth in Section 11.2(c).

"Seller Documents" has the meaning set forth in Section 5.2.

"Seller Indemnified Parties" has the meaning set forth in Section 11.2(a).

"Seller Properties" has the meaning set forth in Section 5.6(a).

"Seller's Deductible" has the meaning set forth in Section 11.2(c).

"Seller's Limit" has the meaning set forth in Section 11.2(c).

"Software" means, except to the extent generally available for purchase "off the shelf" from a third Person such as OfficeMax, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all documentation including user manuals and other training documentation related to any of the foregoing.

"SRMC" has the meaning set forth in the Recitals.

"Survey" has the meaning set forth in Section 8.16(d).

"Tax Authority" means any state or local government, or agency, instrumentality charged with the administration of any Law or regulation relating to Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clause (i).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business, other than any in the form of Software.

"TennCare" means Tennessee's Medicaid program.

"Termination Date" has the meaning set forth in Section 4.4(a)(i).

"Termination Period" has the meaning set forth in Section 8.16(e).

"Title Commitment" has the meaning set forth in Section 8.16(a).

"Title Company" has the meaning set forth in Section 8.16(a).

"Title Policy" has the meaning set forth in Section 8.16(a).

"Title/Survey Review Period" has the meaning set forth in Section 8.16(e).

"TMC" has the meaning set forth in the Recitals.

"Trade Payables" has the meaning set forth in Section 2.3(b).

"Transactional Patient Services" has the meaning set forth in Section 3.10.

"Transferred Employees" has the meaning set forth in Section 9.1.

"Transfer Taxes" has the meaning set forth in Section 12.1.

"Transition Patients" has the meaning set forth in Section 3.10.

"Transition Services Agreement" has the meaning set forth in Section 4.2(f).

"Update Costs" has the meaning set forth in Section 8.15.

"401(k) Plan" has the meaning set forth in Section 9.2(a).

    1.2    **Terms Defined Elsewhere in this Agreement.**  Other terms used in this Agreement have meanings set forth in the Sections where such terms are defined.

    1.3    **Other Definitional and Interpretive Matters.**

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     <u>Calculation of Time Periods</u>.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     <u>Dollars</u>.  Any reference in this Agreement to $ means U.S. dollars.

(iii)     <u>Exhibits/Schedules</u>.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one <u>Article V Schedule</u> (or any Schedule item cross-referenced in any <u>Article V Schedule</u>) shall be deemed to have been disclosed on each other <u>Article V Schedule</u> (or any Schedule item cross-referenced in any <u>Article V Schedule</u>) to the extent it reasonably relates to the subject matter of such other <u>Article V Schedule</u> (or any Schedule item cross-referenced in any <u>Article V Schedule</u>).  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)     <u>Gender and Number</u>.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)     <u>Headings</u>.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi)     <u>Herein</u>.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)     <u>Including</u>.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

4348/69444-001 CURRENT/16419511V19

(b)     The parties hereto have been advised by counsel, and have participated jointly, in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Purchaser shall purchase, acquire and accept from each Seller, and each Seller shall sell, transfer, assign, convey and deliver to Purchaser (the "Contemplated Transactions"), all of such Seller's respective right, title and interest in, to and under the Purchased Assets, free and clear of any and all Liens or adverse claims other than Permitted Exceptions.  "Purchased Assets" mean substantially all of the assets of Seller used primarily in connection with the Business, including the following assets of Seller (but excluding Excluded Assets):

(a)     all of Seller's ownership or equity interest in or issued by the Joint Ventures (collectively, "JV Interests");

(b)     the real property referred to on Schedule 2.1(b) (the "Included Real Property" and, together with the property subject to the Purchased Real Property Leases, the "Real Estate"), together with the improvements thereon and fixtures related thereto and all of Seller's right, title and interest in all easements and appurtenants benefiting or serving the Included Real Property;

(c)      (i) the Furniture and Equipment, (ii) the tools, spare parts and inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables and other tangible personal property owned by Seller and used by Seller in the conduct of the Business and located in the Ordinary Course of Business at the Real Estate on the Closing Date, or purchased by Seller for use in connection with the Business, (iii) the vehicles identified on Schedule 2.1(c)(iii) (the "Purchased Vehicles"), (iv) subject to Section 2.5, those Personal Property Leases identified in Schedule 2.1(c)(iv) (the "Purchased Personal Property Leases"), and (v) subject to Section 2.5, the Real Property Leases identified on Schedule 2.1(c)(v)(A) (the "Purchased Real Property Leases");

(d)     (i) the Purchased Intellectual Property, and (ii) any right or interest of Seller in the Seller Marks;

(e)     subject to Section 2.5, all of the rights and interests of Seller in, or pursuant to, the Contracts set forth on Schedule 2.1(e) (the "Purchased Contracts");

(f)     to the extent allowable by applicable Law, subject to the provisions of Section 8.11, all Documents, that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to the services provided by the Business, the marketing of the Business's services (including advertising and promotional

16

materials), Patient Records, Purchased Intellectual Property, personnel files for Transferred Employees and files including credit information and supplier lists, to the extent physically located on any of the premises referred to in clause (b) above, but excluding (i) personnel files for Employees of Seller who are not Transferred Employees, and (ii) any Documents primarily related to or required to realize the benefits of any Excluded Assets;

(g)     all Permits used by Seller in the Business to the extent assignable;

(h)     all of Seller's Medicare or Medicaid and other payor provider numbers and agreements to the extent assignable, including those items set forth on Schedule 2.1(h);

(i)     to the extent transferable to Purchaser, all rights of Seller under nondisclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(j)     all rights of Seller, to the extent transferable, under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent affecting any other Purchased Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(k)     to the extent legally transferable, all notes, accounts receivable and other rights to receive payment for goods and services provided by Seller in connection with the Business prior to the Closing, including any such accounts receivable that have been charged off as bad debt ("Non-Governmental Receivables");

(l)     the right to receive an amount equal to all accounts receivable from the rendering of services and provision of medicine, drugs and supplies to patients by Seller arising pursuant to the United States government programs, pursuant to the terms of the Medicare program or TRICARE (formerly the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS")) or arising under the Medicaid program of the State of Tennessee or other states (collectively, the "Government Programs"), and other claims of Seller for the provision of goods or services to patients due from governmental or third party payors ("Governmental Patient Receivables");

(m)     any deposits, other current assets, escrows, prepaid taxes or other advance payments relating to any expenses of the Business that are usable by Purchaser following the Closing (collectively, "Prepaid Expenses");

(n)     any rights, claims, counterclaims, demands or causes of action of Seller against third parties relating to the assets, properties, Business or operations of Seller, arising out of events occurring prior to the Closing Date;

(o)     pursuant to Section 3.4, all benefits, proceeds or any other amounts payable under any policy of insurance maintained by, or rights to indemnification of, Seller with respect to the Purchased Assets; and

(p)     all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property.

2.2     Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and each Seller shall retain all of its respective right, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean the following assets:

(a)     the real property referenced on Schedule 2.2(a) (the "Excluded Real Property"), together with the improvements thereon and fixtures related thereto;

(b)     all cash, cash equivalents, bank deposits or similar cash items of Seller and, except as set forth in Section 2.1(a), all securities owned by Seller;

(c)     the Excluded Contracts;

(d)     all assets located at or used primarily in the operation of the Other Businesses, substantially all of which assets are set forth on Schedule 2.2(d);

(e)     any rights to settlement and retroactive adjustments, if any, for periods ending on or before the Effective Time arising from or against the federal government under the terms of the Government Programs or any other third-party payor program ("Agency Settlements");

(f)     the Government Patient Receivables;

(g)     those Contracts set forth on Schedule 2.2(g) (the "Excluded Sumner Station Leases"), provided, however, that Purchaser may, in its sole discretion, negotiate directly with the landlord regarding the Excluded Sumner Station Leases;

(h)     any other Contract to which Seller is a party or under which it has rights that is not a Purchased Contract, Purchased Real Property Lease, Purchased Personal Property Lease or otherwise included in Purchased Intellectual Property, including those contracts set forth on Schedule 2.2(h);

(i)     any intellectual property rights of Seller other than the Purchased Intellectual Property;

(j)     any books and records that Seller is required by applicable Law to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Business as conducted before the Closing (except as prohibited by Law) or that relate to any of the Purchased Assets;

(k)     any books and records related exclusively to any Excluded Assets or Excluded Liabilities (as hereinafter defined);

(l)     any information management systems of Seller not used primarily in the conduct of the Business;

(m)     any documents relating to proposals to acquire the Business by Persons other than Purchaser;

(n)     any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof);

(o)     except as set forth in Section 2.1(o), all insurance policies or rights to proceeds thereof relating to the Business or the Purchased Assets;

(p)     all of Seller's deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(q)     any rights, claims, counterclaims, demands or causes of action of Seller against third parties relating to assets, properties, Business or operations of Seller, arising out of events occurring prior to the Closing Date or arising out of the Closing, other than any arising under or pursuant to any Purchased Contract, Purchased Real Property Lease or Purchased Personal Property Lease;

(r)     any right to retain or receive the charitable gifts and bequests described on Schedule 2.2(r) together with those gifts and bequests that are intended for Seller as determined in accordance with Section 8.9;

(s)     all rights of each Seller under this Agreement, the Seller Documents and the Contemplated Transactions;

(t)     the name "Sumner Regional Health Systems Foundation, Inc." or any variations thereof;

(u)     all Employee Benefit Plans and any Contracts related thereto and all funds and accounts held thereunder; and

(v)     any and all of the personal, tangible and intangible property of Seller set forth on Schedule 2.2(v).

2.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, as of the Effective Time and in accordance with sections 363 and 365 of the Bankruptcy Code, Purchaser shall assume, effective as of the Effective Time, and shall timely pay, perform and discharge in accordance with their respective terms only the following Liabilities of Seller (collectively, the "Assumed Liabilities"):

(a)     the obligations of Seller arising following the Effective Time pursuant to the Purchased Contracts, Purchased Real Property Leases and Purchased Personal Property Leases, together with those Contracts included in Purchased Intellectual Property; *provided, however*, that all defaults arising prior to the Closing have been cured by Seller and have been

19

assumed by Seller and assigned to Purchaser in accordance with section 365 of the Bankruptcy Code;

(b)       the current trade accounts payable of Seller that are not due to Affiliates of Seller or incurred by Seller in connection with the Contemplated Transactions (the "Trade Payables");

(c)       Seller's obligations for the accrued but unused vacation and sick time of Transferred Employees prior to the Effective Time (the "PTO");

(d)       all Liabilities required to be paid by Purchaser hereunder; and

(e)       all Liabilities from or related to patient credits that are included in the calculation of Net Working Capital.

2.4       Excluded Liabilities.  Except for the Assumed Liabilities, Purchaser will not assume or be liable for and under no circumstances shall Purchaser be obligated to pay or assume and none of the Purchased Assets shall become subject to any other Liability of Seller, including the following Liabilities of Seller (collectively, the "Excluded Liabilities"); *provided, however*, that such Liability of Seller is not included in the determination of Estimated Net Working Capital, Estimated Accounts Receivable, Closing Net Working Capital or Closing Accounts Receivable:

(a)       any Liability arising out of or relating to the conduct or operation of the Business prior to the Effective Time, whether or not described on the Article V Schedules;

(b)       any Liability arising out of or relating to the ownership or use of the Purchased Assets prior to the Effective Time, whether or not described in the Article V Schedules;

(c)       any Indebtedness, debt of or claim against Seller or any one or more of its Affiliates, or any obligation of Seller or any one or more of its Affiliates to repay borrowed money;

(d)       all Liabilities arising out of or related to the Excluded Assets, including Contracts to which Seller is a party or by which it is bound that are not Purchased Contracts, Purchased Real Property Leases or Purchased Personal Property Leases or included in the Purchased Intellectual Property;

(e)       all Liabilities for Taxes, whether or not accrued, assessed or currently due and payable, (i) of Seller, whether or not it relates to the Business, or (ii) relating to the Business, the Purchased Assets or the Business for any Tax periods (or portion thereof) ending on or before the Effective Time;

(f)       all Liabilities relating to amounts required to be paid by Seller hereunder;

(g)       any Liability under any Employee Benefit Plan and all administrative costs associated therewith;

(h)     any Liability relating to Seller's Cost Reports, including terminating cost reports, or other Government Program claims with respect to periods ending prior to the Effective Time;

(i)     any Liability arising from or in connection with a violation of Law by Seller, its employees or affiliates, including those pertaining to Medicare and Medicaid fraud or abuse and federal and state physician anti-self-referral laws;

(j)     any Liability arising from or in connection with Seller's provider agreements with Governmental Programs or other third party payors with respect to periods prior to the Effective Time, including any recoupment rights of the Health Care Financing Administration or the DOH, and any liability arising pursuant to any third-party payor program or Government Programs as a result of the consummation of the Contemplated Transactions, including recapture of previously reimbursed expenses; and

(k)     any Liability arising out of or in connection with claims for acts, omissions and professional malpractice relating to the ownership or operation of the Business or Purchased Assets which allegedly occurred prior to the Closing.

2.5     Cure Amounts.  Except as otherwise provided in this Section 2.5, at the Closing and pursuant to section 365 of the Bankruptcy Code, Seller shall assume and assign to Purchaser, and Purchaser shall assume from Seller, the Purchased Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property.  The amounts, if any, as determined by the Bankruptcy Court, necessary to cure all defaults and to pay all actual pecuniary losses that have resulted from any defaults on the part of Seller under the Purchased Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property shall be set forth in the final assumption and cure notice and Seller shall pay or escrow any cure amounts set forth therein at the Closing, such that all Purchased Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and Purchased Intellectual Property may be assumed by Seller and assigned to Purchaser in accordance with section 365 of the Bankruptcy Code.  Any cure amounts paid by Purchaser shall, on a dollar for dollar basis, reduce the cash portion of the Purchase Price.  This Agreement shall not constitute an agreement to assign any Purchased Contracts, Purchased Personal Property Leases, Purchased Real Property Leases or Purchased Intellectual Property if the Bankruptcy Court determines, after notice and a hearing and giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, that an attempted assignment thereof, without obtaining a consent from any applicable third party, would constitute a breach thereof or in any way negatively affect the rights of Seller or Purchaser, as the assignee, and no breach of this Agreement shall have occurred by virtue of such nonassignment.  If the Bankruptcy Court determines, after notice and a hearing and giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, that such third party consent is required, then Purchaser shall have the option of not taking such assignment, or seeking the consent of such third party.  At Purchaser's option, if such consent is sought but not obtained, Seller shall, at Purchaser's sole cost and expense, cooperate with Purchaser in any reasonable arrangement, including Purchaser's provision of credit support, designed to provide Purchaser the benefits and obligations of or under any such Purchased Contract, Personal Property Lease, Real Property Lease, and Purchased Intellectual Property;

provided, however, that nothing in this Section 2.5 shall prohibit Seller from ceasing operations or winding up its affairs following the Closing.

2.6    Further Conveyances and Assumptions.

(a)    From time to time following the Closing, Seller and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the Assumed Liabilities, and to otherwise make effective the Contemplated Transactions; provided, however, that nothing set forth in this Section 2.6(a) shall prevent or prohibit Seller from ceasing operations or winding up its affairs after the Closing.

(b)    In the event that Purchaser or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Purchaser shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to SRHS.

2.7    Bulk Sales Laws.    Purchaser hereby waives compliance by Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

2.8    Contingent Purchased Contract.    Purchaser reserves the right to designate any of the Contracts set forth on Schedule 2.8 as Purchased Contracts through the date that is five (5) Business Days prior to the date set for the auction pursuant to the Bid Procedures Order.  In connection therewith, Seller shall provide notice (using customary language, including reference to the potential rejection of the Contract, reasonably acceptable to Purchaser) to the other parties to such Contract as if such Contact were included in the Purchased Assets; provided, however, that notwithstanding such notice given by Seller, no Contract set forth on Schedule 2.8 shall be deemed a Purchased Contract, Purchased Real Property Lease, Purchased Personal Property Lease or a Contract included in Purchased Intellectual Property unless and until Purchaser so designates in writing.  In the event that Purchaser does not so designate in writing a Contract set forth on Schedule 2.8 as a Purchased Contract, Purchased Real Property Lease, Purchased Personal Property Lease or Contract included in the Purchased Intellectual Property, then such Contract shall remain an Excluded Asset.

2.9    Contracts; Adjustments.

(a)    With respect to the Excluded Contracts, Purchaser shall be obligated to pay Seller, solely to the extent that the sum of the Update Costs, plus the Remediation Costs do not exceed $1,000,000, an amount equal to the rejection damages set forth in the applicable Order of the Bankruptcy Court and paid by Seller as a result of the rejection of such Contract ("Rejection Damages"); provided that in no event shall the Purchaser be obligated to pay

Rejection Damages such that the sum of the Update Costs, plus the Remediation Costs plus the Rejection Damages would exceed $1,000,000 in the aggregate.

(b)     In the event that, between the date of this Agreement and one hundred and eighty (180) days following the Purchaser's acquisition of the Purchased Assets, Purchaser enters into any contractual arrangement or understanding with a party to a Contract that is listed on Schedule 2.8 for the provision of substantially the same goods or services such party previously provided to Seller, then Purchaser shall either (i) deliver to Seller, a Stipulation duly executed by the other party to the Contract and filed with the Bankruptcy Court that waives and releases all claims against the Seller related to the Contract that is part of the Excluded Assets (that is, all amounts owing under the Contract that is the Excluded Asset, all amounts owing under the Contract that is the Excluded Asset from the Petition Date through the effective date of rejection, and all rejection damages claims), which Stipulation shall be and reasonably acceptable to Seller or (ii) pay the rejection damages with respect to the Contract; provided that in no event shall the Purchaser be obligated to pay Rejection Damages such that the sum of the Update Costs, plus the Remediation Costs plus the Rejection Damages would exceed $1,000,000 in the aggregate.

## ARTICLE III

## CONSIDERATION

3.1     Consideration.     Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of Seller set forth herein, the aggregate consideration for the Purchased Assets shall be (a) an amount in cash equal to $154,108,687.86, plus (b) the amount, if any, by which the Estimated Net Working Capital and the Estimated Accounts Receivable (each as hereinafter defined) in the aggregate exceeds $9,108,687.86, (c) minus the amount, if any, by which the Estimated Net Working Capital and the Estimated Accounts Receivable in the aggregate is less than $9,108,687.86 and (d) minus the aggregate remaining amounts due pursuant to the capital leases set forth on Schedule 3.1(d) (collectively, the "Purchase Price"); provided that, the Purchase Price will be reduced by $91,929.00, $669,389.41 and/or $1.00 respectively, in the event that Patient Partners, LLC, SST Community Health, L.L.C. or Wellness, Inc. (collectively, the "Joint Ventures") members or shareholders, as applicable, exercise their respective rights, if any, to purchase Seller's interest in the respective Joint Venture; and provided further that, the Purchase Price will be reduced by $5,000,000 in the event that Purchaser delivers the Stipulation described in Section 4.3(l); and provided further that, the Purchase Price may be subject to adjustment in accordance with Section 8.15.

3.2     Purchase Price Deposit.     On May 3, 2010, Purchaser shall deposit with U.S. Bank, in its capacity as escrow agent (the "Deposit Escrow Agent"), pursuant to that certain Deposit Escrow Agreement, to be dated as of May 3, 2010, by and among Purchaser, SRHS and the Deposit Escrow Agent (the "Deposit Escrow Agreement"), an amount equal to 10% of the cash portion of the Purchase Price by wire transfer of immediately available funds (the "Deposit Escrowed Funds"), to be released by the Deposit Escrow Agent and delivered to either Purchaser or SRHS, in accordance with the provisions of the Deposit Escrow Agreement. Pursuant to the Deposit Escrow Agreement, the Deposit Escrowed Funds (together with all accrued investment income thereon) shall be distributed as follows:

(a)     if the Closing shall occur, the Deposit Escrowed Funds shall be applied towards the Purchase Price payable by Purchaser to Seller under Section 3.3 and all accrued investment income thereon shall be delivered to Purchaser at Closing;

(b)     if this Agreement is terminated by Seller pursuant to Section 4.4(d)(i) or Section 4.4(d)(ii), the Deposit Escrowed Funds, together with all accrued investment income thereon, shall be delivered to SRHS; or

(c)     if this Agreement is terminated pursuant to Section 4.4, other than by Seller pursuant to Section 4.4(d)(i) or Section 4.4(d)(ii), the Deposit Escrowed Funds, together with all accrued investment income thereon, shall in each case be returned to Purchaser.

3.3     Payment of Purchase Price.   On the Closing Date, Purchaser shall pay the Purchase Price less the Deposit Escrowed Funds (provided that the Deposit Escrowed Funds are delivered to Seller at Closing by the Deposit Escrow Agent) and the Indemnity Escrowed Funds (hereinafter defined) to Seller, which shall be paid by wire transfer of immediately available funds into an account designated by Seller.

3.4     Casualty Loss Provision.

(a)     The risk of loss or damage to any of the Purchased Assets shall remain with Seller until the Effective Time and Seller shall maintain its insurance policies covering the Purchased Assets and all other property through the Effective Time.  If any material part or portion of the Purchased Assets is damaged, condemned, lost or destroyed (whether by fire, theft or other casualty event) prior to the Effective Time, Seller shall notify Purchaser ("Casualty Notice") as soon as possible of such damage, loss or destruction.  The Casualty Notice shall set forth Seller's good faith, reasonable estimate (the "Estimate") of the fair market value of the cost to repair, replace or restore (as applicable) such damage, loss or destruction (the "Aggregate Damage").

(b)     In the event that there is damage, loss or destruction to SRMC, RRMC North or the Purchased Assets related thereto (collectively, the "Casualty Assets") and the Estimate of the cost to repair, replace or restore (as applicable) such damage, loss or destruction to the Casualty Assets is greater than $20,000,000 (a "Material Loss"), Purchaser may, within 10 days after receipt of the Casualty Notice, by written notice to Seller, terminate this Agreement.

(c)     In the event that the Estimate is less than a Material Loss with respect to the Casualty Assets or otherwise and Purchaser objects to the Estimate, Purchaser shall notify Seller of such objection (the "Purchaser Notice") within 5 days after receipt of the Casualty Notice.  The Purchaser Notice shall indicate whether Purchaser objects to the Estimate and whether Purchaser believes that the value of the Aggregate Damage is in excess of a Material Loss with respect to the Casualty Assets or otherwise.  If the parties are unable to resolve their disagreement concerning the value of the Aggregate Damage within 3 Business Days after Seller's receipt of the Purchaser Notice, then PricewaterhouseCoopers (the "Loss Consultant") as promptly as possible shall determine the Aggregate Damage and confirm in writing either that the Aggregate Damage is less than a Material Loss with respect to the Casualty Assets or otherwise or exceeds a Material Loss with respect to the Casualty Assets or otherwise.  If the

24

Loss Consultant's report indicates a Material Loss with respect to the Casualty Assets, Purchaser may submit a termination notice within five (5) Business Days after the receipt of the Loss Consultant's report. The Loss Consultant's determination shall be final and binding on the parties. The fees and costs of the Loss Consultant shall be shared equally by Purchaser and Seller.

(d)     If, prior to the Effective Time, any part or portion of the Purchased Assets is destroyed, lost or damaged, (i) to an extent that does not result in a Material Loss with respect to the Casualty Assets, or (ii) to an extent that would be a Material Loss with respect to the Casualty Assets and Purchaser fails to terminate this Agreement, Purchaser and Seller shall consummate the transactions contemplated in this Agreement, subject to the other terms and conditions of this Agreement, and, at the Effective Time, Seller shall deliver possession of the Purchased Assets to Purchaser in such physical condition as the same may then exist; provided that, in such event, Seller will assign to Purchaser the right to receive any net insurance proceeds received for the property loss or damage to the Purchased Assets and reduce the cash portion of the Purchase Price by an amount equal to any deductible in connection therewith. For purposes of effecting this Section 3.4(d), Purchaser will be a named additional insured on Seller's property insurance.

3.5     Estimated Net Working Capital and Estimated Accounts Receivable.

(a)     At least five (5) Business Days prior to Closing, Seller shall deliver to Purchaser a determination of the Estimated Net Working Capital (excluding the Estimated Accounts Receivable determined pursuant to Section 3.5(b)) as of the last day of the most recently ended calendar month prior to the Closing Date for which financial statements are available. Such determination shall be made in accordance with GAAP, shall be consistent with the calculations set forth in Schedule 3.5 and shall contain reasonable detail and supporting documentation therefor. Such Net Working Capital determined in accordance with this Section 3.5(a) (the "Estimated Net Working Capital") shall be used for purposes of calculating the Purchase Price as of Closing. "Net Working Capital" shall be calculated in the manner set forth on Schedule 3.5 and shall include, as applicable: (i) the aggregate current assets of Seller transferred as Purchased Assets to Purchaser, expressly including for such purpose an amount equal to the value of prepaid expenses and deposits (but only to the extent the same are assumable by Purchaser and will accrue to the benefit of Purchaser after the Effective Time), and the Inventory; minus (ii) the aggregate current liabilities of Seller assumed by Purchaser, expressly including for such purposes the PTO and Trade Payables. The determination of Net Working Capital shall not include clause (d) in Section 3.1.

(b)     At least five (5) Business Days prior to Closing, Seller shall deliver to Purchaser a determination of the Estimated Accounts Receivable (excluding the Estimated Net Working Capital determined pursuant to Section 3.5(a)) as of the last day of the most recently ended calendar month prior to the Closing Date for which financial statements are available. Such determination shall be made in accordance with GAAP, shall be consistent with the calculations set forth in Schedule 3.5 and shall contain reasonable detail and supporting documentation therefor. Such Accounts Receivable determined in accordance with this Section 3.5(b) (the "Estimated Accounts Receivable") shall be used for purposes of calculating the Purchase Price as of Closing. "Accounts Receivable" shall be calculated in the manner set forth

25

on Schedule 3.5 and shall include, as applicable, the aggregate current accounts receivable of Seller transferred as Purchased Assets to Purchaser, expressly including for such purpose an amount equal to the value of the Governmental Patient Receivables, the Non-Governmental Receivables and accounts receivable related items (but only to the extent the same are assumable by Purchaser and will accrue to the benefit of Purchaser after the Effective Time). The determination of Accounts Receivable shall not include clause (d) in Section 3.1.

(c)     At the request of Purchaser and at Purchaser's cost, Seller shall arrange for a physical count of the Inventory which shall be taken and valued in accordance with the policies and procedures set forth in Schedule 3.5, as near in time as possible prior to the Closing Date and with the results extended and adjusted through the Closing Date; provided that (i) all Inventory items shall be valued at the lesser of cost or current market value; and (ii) the value of the Inventory shall include only those items that are not damaged, that are currently dated and that are of a quantity and quality that may be used by Purchaser following the Closing. Representatives of Purchaser shall be permitted to observe such inventory process. The parties acknowledge that the inventory to be taken pursuant to this Section 3.5(c) will not be conducted until immediately prior to the Closing Date and, as such, the results of such inventory will not be available until some time after the Closing Date. Accordingly, the parties agree that for purposes of calculating the Estimated Net Working Capital, the value of the Inventory shall equal the book value of the Inventory as reflected on the unaudited balance sheet of Seller as of the end of the most recently ended calendar month prior to the Closing Date.

3.6     Post-Closing Purchase Price Adjustment.

(a)     Not more than 75 days after the Closing Date, Purchaser shall deliver to Seller a determination of the Net Working Capital (excluding the Closing Accounts Receivable) as of the Effective Time (the "Closing Net Working Capital"). Such determination shall be made in accordance with GAAP, shall use the same methodology used to calculate the Estimated Net Working Capital, and shall contain reasonable detail and supporting documentation therefor. Should Seller disagree with Purchaser's calculation of the Closing Net Working Capital, it shall notify Purchaser within 10 Business Days after Purchaser's delivery of such calculation, at which time Seller and Purchaser shall cooperate in good faith in an effort to reach mutual agreement on the calculation of the Closing Net Working Capital. If Seller and Purchaser fail to reach mutual agreement on the calculation of Closing Net Working Capital within 15 days after Seller's delivery of notice of disagreement on the calculation of the Closing Net Working Capital by Seller, then such disagreement may be submitted for resolution, by either party, to PricewaterhouseCoopers or such other independent accounting firm reasonably acceptable to Seller and Purchaser (the "Accountants"); provided, however, that if, for whatever reason, the calculation of the Closing Net Working Capital is not finalized within 115 days after Closing, then such disagreement may be submitted for resolution, by either party, to the Bankruptcy Court. Upon agreement on (or other final resolution of) the calculation of the Closing Net Working Capital, the Purchase Price shall be adjusted as follows: (i) in the event that the Closing Net Working Capital is less than the Estimated Net Working Capital, Seller shall, within 10 Business Days after such agreement or determination, pay to Purchaser the difference between (A) the Closing Net Working Capital and (B) the Estimated Net Working Capital; and (ii) in the event that the Closing Net Working Capital is greater than the Estimated Net Working Capital, Purchaser shall, within 10 Business Days after such agreement or determination, pay to

26

Seller the difference between (A) the Closing Net Working Capital and (B) the Estimated Net Working Capital.

(b)     Not more than 140 days after the Closing Date, Purchaser shall deliver to Seller a determination of the Accounts Receivable (excluding the Closing Net Working Capital) as of the Effective Time (the "Closing Accounts Receivable"), which will be based upon a minimum of 135 days of collection activity.  Such determination shall be made in accordance with GAAP, shall use the same methodology used to calculate the Estimated Accounts Receivable, and shall contain reasonable detail and supporting documentation therefor.  Should Seller disagree with Purchaser's calculation of the Closing Accounts Receivable, it shall notify Purchaser within 10 Business Days after Purchaser's delivery of such calculation, at which time Seller and Purchaser shall cooperate in good faith in an effort to reach mutual agreement on the calculation of the Closing Accounts Receivable.  If Seller and Purchaser fail to reach mutual agreement on the calculation of Closing Accounts Receivable within 15 days after Seller's delivery of notice of disagreement on the calculation of the Closing Accounts Receivable by Seller, then such disagreement may be submitted for resolution, by either party, to the Accountants; provided, however, that if, for whatever reason, the calculation of the Closing Accounts Receivable is not finalized within 175 days after Closing, then such disagreement may be submitted for resolution, by either party, to the Bankruptcy Court.  Upon agreement on (or other final resolution of) the calculation of the Closing Accounts Receivable, the Purchase Price shall be adjusted as follows:  (i) in the event that the Closing Accounts Receivable is less than the Estimated Accounts Receivable, Seller shall, within 10 Business Days after such agreement or determination, pay to Purchaser the difference between (A) the Closing Accounts Receivable and (B) the Estimated Accounts Receivable; and (ii) in the event that the Closing Accounts Receivable is greater than the Estimated Accounts Receivable, Purchaser shall, within 10 Business Days after such agreement or determination, pay to Seller the difference between (A) the Closing Accounts Receivable and (B) the Estimated Accounts Receivable.

3.7     Proration.  To the extent not prorated at Closing, within 30 days after the Closing Date, Seller and Purchaser shall prorate as of the Effective Time any amounts with respect to: (i) the Purchased Contracts, Purchased Personal Property Leases, Purchased Real Property Leases and any Contract otherwise included in Purchased Intellectual Property, but only to the extent the event giving rise to such obligation occurred prior to the Effective Time, or to the extent that any prepayments have been made with respect to the delivery of goods or services for periods ending on or after the Effective Time; (ii) ad valorem taxes, if any, on the Purchased Assets; (iii) property Taxes, if any, on the Purchased Assets; and (iv) if cut off statements cannot be obtained as of Closing, all utilities servicing any of the Purchased Assets, including water, sewer, telephone, electricity and gas service, except that payments for ad valorem and property Taxes shall initially be determined based on the previous year's Taxes and shall later be adjusted to reflect the current year's Taxes when the Tax bills are finally rendered.  The parties shall cooperate to avoid, to the extent legally possible, the payment of duplicate Taxes, and each party shall furnish, at the request of the other, proof of payment of any Taxes or other documentation which is a prerequisite to avoid payment of a duplicate Tax.  Any such amounts which are not available within 90 days after the Closing Date shall be similarly prorated as soon as practicable thereafter.  Seller shall pay to Purchaser, or Purchaser shall pay to Seller, as the case may be, within 10 days after the determination thereof, any unpaid prorated amount attributable to periods prior to, or following, the Effective Time.

3.8     Indemnity Escrow Agreement.  On the Closing Date, Purchaser, Seller and U.S. Bank, as escrow agent (the "Indemnity Escrow Agent"), shall enter into an Indemnity Escrow Agreement in the form attached as Exhibit A (the "Indemnity Escrow Agreement"), providing for the establishment of an escrow account (the "Indemnity Escrow Account").  At the Closing, Purchaser shall deposit into the Indemnity Escrow Account $3,000,000 of the cash portion of the Purchase Price (the "Indemnity Escrowed Funds").  The Indemnity Escrowed Funds shall be held, invested and disbursed in accordance with the terms, conditions and provisions of the Indemnity Escrow Agreement, which shall provide, among other matters, that $1,000,000 of the Indemnity Escrowed Funds shall be released and disbursed within one (1) Business Day after the final determination of the Closing Net Working Capital pursuant to Section 3.6.  The Indemnity Escrowed Funds shall be used to satisfy any indemnity obligation of Seller under ARTICLE XI.

3.9     Lock Box.  Seller hereby appoints Purchaser, and Purchaser hereby agrees to act, as Seller's collection agent with respect to its Governmental Patient Receivables.  In connection therewith, on or before the Closing Date, Seller shall establish, at Purchaser's expense, a "lock box" at a financial institution selected by Purchaser.  Such lock box shall be the sole and exclusive property of Seller, and after the Effective Date, Purchaser, as agent for Seller, shall deposit in such lock box cash, checks, drafts or other similar items of payment of the Seller's Governmental Patient Receivables.  Seller shall issue a revocable instruction to the financial institution selected by Purchaser to sweep the amounts deposited into the lock box on a daily basis into an account established at such financial institution by Purchaser, which account shall be the sole and exclusive property of Purchaser.  Seller hereby agrees that all such amounts deposited on its behalf into the lock box shall be transferred pursuant to such instruction to Purchaser's account in connection with Seller's obligation to transfer to Purchaser an amount equal to the value of its Governmental Patient Receivables pursuant to Section 2.1(l).  Purchaser acknowledges that Seller's instructions given to the applicable financial institution pursuant to this Section 3.9 shall be revocable at the sole and exclusive discretion of Seller and, to the extent feasible or practicable, that Seller will have electronic access to the lock box account activity, including online review of deposit details, on a daily basis.  In the event that Purchaser receives deposits into the lock box account belonging to Seller, Purchaser shall remit the amount of such deposits to Seller in accordance with Section 8.9.

3.10     Transition Patient Payments.  To compensate Seller for services rendered and medicine, drugs, and supplies provided on or before the Closing Date ("Transitional Patient Services") with respect to individuals who are patients of the Business on or before the Closing Date but who are not discharged until after the Closing Date ("Transition Patients"), the SRHS and Purchaser shall take the following actions:

       (a)    As soon as practicable after the Closing Date, SRHS shall deliver to Purchaser a statement itemizing the Transitional Patient Services provided by Seller on or through the Closing Date to Transition Patients whose care is reimbursed by the Medicare, Medicaid or other healthcare insurance or reimbursement programs on a diagnostic related group ("DRG") or other "all-inclusive" or "global" fee basis ("DRG Transition Patients").  With respect to such DRG Transition Patients, Seller shall, unless otherwise required by Law, be allocated in connection with the determination of Closing Accounts Receivable an amount equal to: the remainder of (i) the global fee/ DRG payments plus the outlier payments, if any, received by Purchaser in respect of a DRG Transition Patient, multiplied by a fraction of which the

numerator shall be the number of inpatient days of the DRG Transition Patient prior to the Effective Time and of which the denominator shall be the total number of days such DRG Transition Patient was an inpatient at the applicable Hospital (as calculated in accordance with Medicare/Medicaid regulations) prior to or after the Effective Time, minus (ii) the sum of any deposits, deductibles or co-payments made by such DRG Transition Patient to Seller; provided, however, that, if the fraction described in the clause (i) of this sentence (which fraction is to be multiplied by the global fee/ DRG payments plus the outlier payments, if any, received by Purchaser in respect of the patient) is greater than 1, then such fraction shall be deemed to be equal to 1. In the event that Purchaser and SRHS are unable to agree on the amount to be credited to Seller under this Section 3.10(a), then such amount shall be determined by the Accountants in accordance with Section 3.6. Purchaser and Seller acknowledge and agree that the intent of this Section 3.10 is to ensure that each party gets properly compensated for services to Transition Patients performed by such party.

(b)     For Transition Patients admitted to Homecare and Hospice (the "Homecare Transition Patients") that are paid pursuant to the Medicare Home Health prospective payment methodology ("Home Health PPS"), Seller shall be entitled to allocated in connection with the determination of Closing Accounts Receivable an amount equal to: (i) the total payments received by Purchaser and Seller in respect of such Homecare Transition Patient multiplied by a fraction of which the numerator shall be the number of days the Homecare Transition Patient received goods or services from the Seller prior to the Effective Time and the denominator of which shall be the actual days of treatment prior to or following the Effective Time, (ii) minus any cash collections received by SRHS prior to the Effective Time; (iii) minus the applicable Homecare Transition Patient accounts receivable as of the Effective Time; (iv) plus the applicable Homecare Transition Patient deferred income as of the Effective Time. If the result of (i) through (iv) is a negative amount, then Seller shall pay to Purchaser such amount, if the result of (i) through (iv) is a positive amount then Purchaser shall pay to Seller such amount. The parties acknowledge and agree that all non-Medicare payments that are paid in similar manner as Medicare will be allocated in a manner consistent with the allocation set forth in this Section 3.10(b).

(c)     If Purchaser receives any amounts from the Medicare, TRICARE or Medicaid (or from any other payor) programs for periodic interim payments ("PIP") or costs paid for on a pass-through basis, such as capital costs, associated with the operation of the Facilities and prior to the Effective Time, Purchaser shall tender the amount applicable to the period prior to the Effective Time to Seller within ten (10) Business Days of receipt. If Seller receives any amounts from the Medicare, TRICARE or Medicaid (or from any other payor) program for PIP or pass-through costs, such as capital costs, associated with the operations of the Facilities relating to periods subsequent to the Effective Time, Seller shall tender the same to Purchaser within ten (10) Business Days of receipt. It is the intent of the parties that Purchaser and Seller shall receive PIP payments and pass-through costs payments (including capital costs) applicable to the period of time the Facilities are owned by such party.

(d)     Immediately prior to the Effective Time, Seller shall prepare cut-off billings for all then patients of the Business not covered by Section 3.10(a) or Section 3.10(b) (which shall include Medicare patients whose care is reimbursed on a cost basis). Seller shall be

entitled to bill for and receive all amounts collected in respect of such cut-off billings and Purchaser shall have no right thereto.

(e)     Except as otherwise directly or indirectly paid in connection with the determination of Closing Net Working Capital or Closing Accounts Receivable pursuant to Section 3.6, all payments required by this Section 3.10 shall be made within 10 Business Days of a party's receipt of payment with respect to a Transition Patient that are due to the other party, accompanied by copies of remittances and other supporting documentation as reasonably required by such other party. In the event that Purchaser and Seller are unable to agree on any amount to be paid or credited pursuant to this Section 3.10, then such disputed amount shall be submitted to the Accountants for computation or verification in accordance with the provisions of this Agreement.  The Accountants shall review the matters in dispute and shall promptly decide the proper amounts of such disputed entries.  The submission of the disputed matter to the Accountants shall be the exclusive remedy for resolving accounting disputes relative to the determination of payments relating to Transition Patients.  The Accountants' determination shall be binding upon Seller and Purchaser.  The Accountants' fees and expenses shall be borne equally by Seller and Purchaser.  Notwithstanding anything in this Agreement to the contrary, in the event that, for whatever reason, any such dispute is not resolved within 150 days after Closing, then either Seller or Purchaser may submit such dispute to the Bankruptcy Court for resolution.

## ARTICLE IV

## CLOSING AND TERMINATION

4.1     Closing Date.  Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 (or the waiver thereof by the party entitled to waive that condition), the closing of the Contemplated Transactions (the "Closing") shall take place at such place as the parties may designate in writing at 10:00 a.m. (Central time) on the last Business Day of the month that includes the satisfaction or waiver of the conditions set forth in ARTICLE X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."  Unless otherwise agreed by the parties in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of Seller to be acquired by Purchaser hereunder, and all risk of loss with respect to the Business, shall be considered to have passed to Purchaser as of 12:00 a.m. (Central time) on the day immediately following the Closing Date (the "Effective Time").

4.2     Deliveries by Seller.  At the Closing, Seller shall deliver to Purchaser:

(a)     one or more duly executed Special Warranty Deed(s) conveying  to Purchaser in the form attached as Exhibit B Seller's fee simple interest in the Owned Properties that are included within Included Real Property;

(b)     one or more duly executed bill(s) of sale in the form of Exhibit C (the "Bill of Sale");

(c)     one or more duly executed assignment and assumption agreement(s) in the form of <u>Exhibit D</u> (the "<u>Assignment and Assumption</u>");

(d)     a duly executed non-compete agreement in the form of <u>Exhibit E</u> (the "<u>Non-Compete Agreement</u>");

(e)     a duly executed Indemnity Escrow Agreement;

(f)     a duly executed transition services agreement in the form of <u>Exhibit F </u>(the "<u>Transition Services Agreement</u>");

(g)     one or more duly executed non-foreign affidavit(s) dated as of the Closing Date in the form of <u>Exhibit G</u>;

(h)     a duly executed stock power or assignment of membership interest with respect to each Joint Venture;

(i)     if reasonably necessary in accordance with the applicable governing documents, copies of resolutions of the respective governing boards and/or equity owners of each Joint Venture approving the Contemplated Transaction and Purchaser as a member or shareholder, as applicable, of the respective Joint Venture;

(j)     copies of resolutions duly adopted by the respective boards of directors of each Seller authorizing and approving each of their respective performance of transactions contemplated hereby and the execution, delivery and performance of this Agreement and the documents described herein to which it is a party, certified as true and of full force as of Closing by an appropriate officer of each Seller;

(k)     the officer's certificate required to be delivered pursuant to <u>Sections 10.1(a)</u> and <u>10.1(b)</u>;

(l)     a certificate of incumbency for the respective officers of each Seller executing this Agreement or the other agreements or certificates to be executed or delivered on behalf of any Seller pursuant hereto dated as of the Closing Date;

(m)     certificates of good standing of each Seller and each Joint Venture from the State of Tennessee, dated the most recent practical date prior to Closing;

(n)     one or more duly executed limited power(s) of attorney for use of Pharmacy License, Drug Enforcement Agency ("<u>DEA</u>") and other registration numbers, and DEA order forms, in the form of <u>Exhibit H</u> (the "<u>Power of Attorney</u>"); and

(o)     all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as Purchaser deems reasonably necessary to convey the Purchased Assets to Purchaser, including certificates of title for the Purchased Vehicles.

31

4.3 <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser shall deliver to Seller:

(a) the cash portion of the Purchase Price (less the Indemnity Escrowed Funds), in immediately available funds, as set forth in <u>Section 3</u>.3 hereof;

(b) one or more duly executed Assignment and Assumption;

(c) a duly executed Non-Compete Agreement;

(d) a duly executed Indemnity Escrow Agreement;

(e) a duly executed Transition Services Agreement;

(f) copies of resolutions duly adopted by the Board of Directors and sole shareholder of Purchaser authorizing and approving Purchaser's performance of this Agreement and the documents described herein to which it is a party, certified as true and of full force as of Closing by an appropriate officer of Purchaser;

(g) evidence reasonably acceptable to SRHS of Purchaser's delivery of Indemnity Escrowed Funds to the Indemnity Escrow Agent;

(h) the officer's certificate required to be delivered pursuant to <u>Sections 10.2(a)</u> and <u>10.2(b)</u>;

(i) certificates of incumbency for the officers of Purchaser executing this Agreement or the other agreements or certificates to be executed or delivered on behalf of Purchaser pursuant hereto dated as of the Closing Date;

(j) certificates of active status of Purchaser from the Delaware Secretary of State, dated as of the most recent practical date prior to Closing;

(k) evidence of the qualification of Purchaser to do business in the State of Tennessee dated the most recent practicable date prior to Closing;

(l) in order to qualify for the Purchase Price adjustment set forth in <u>Section 3.1</u> related to the Excluded Sumner Station Leases, a Stipulation duly executed by the landlord of the Excluded Sumner Station Leases and filed with the Bankruptcy Court prior to the Closing Date that waives and releases all claims against the Seller related to the Excluded Sumner Station Leases (that is, all amounts owing under the Excluded Sumner Station Leases as of the Petition Date, all amounts owing under the Excluded Sumner Station Leases from the Petition Date through the effective date of rejection, and all rejection damages claims), which Stipulation shall be subject to the Closing of the Contemplated Transactions and reasonably acceptable to Seller; and

(m) such other documents, instruments and certificates as Seller deems reasonably necessary to convey the Purchased Assets to Purchaser.

4348/69444-001 CURRENT/16419511V19

4.4     *Termination of Agreement*.  In respect of the Contemplated Transactions, this Agreement may be terminated prior to the Closing as set forth in this Section 4.4.

        (a)    *Termination by Purchaser or Seller*.  Either Purchaser or Seller may terminate this Agreement upon the occurrence of any of the following:

        (i)    if the Closing shall not have occurred by the close of business on July 31, 2010 (the "Termination Date") (subject to extension by mutual consent of the parties); provided, however, that, if the Closing shall not have occurred due to the failure of the Bankruptcy Court to enter the Sale Order as set forth in Section 10.3(b), and if all other conditions to the respective obligations of the parties to close hereunder that are capable of being fulfilled by the Termination Date shall have been so fulfilled or waived, then no party may terminate this Agreement prior to July 31, 2010; provided, further, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or Seller, then the breaching party may not terminate this Agreement pursuant to this Section 4.4(a)(i);

        (ii)    subject to payment to Purchaser of the Break-Up Fee (as hereinafter defined) and Expense Reimbursement (as hereinafter defined), as provided in the Bidding Procedures Order, in the event a bid from any Person other than Purchaser with respect to the Purchased Assets is presented by Seller to the Bankruptcy Court for approval;

        (iii)    subject to payment to Purchaser of the Break-Up Fee and Expense Reimbursement, as provided in the Bidding Procedures Order, if Seller accepts a bid from any Person other than Purchaser with respect to the Purchased Assets, or enters into an agreement or contract with respect to a bid from any person or entity other than Purchaser with respect to the Purchased Assets;

        (iv)    subject to payment to Purchaser of the Break-Up Fee and Expense Reimbursement, as provided in the Bidding Procedures Order, in the event that the Bankruptcy Court issues any order, writ, judgment, decree or injunction approving or permitting the consummation of the contemplated transactions with any Person other than Purchaser with respect to the Purchased Assets;

        (v)    if any material term or provision of this Agreement with respect to the purchase and sale of the Purchased Assets is, upon review or consideration, rejected or otherwise disapproved by the Bankruptcy Court;

        (vi)    if, after being entered by the Bankruptcy Court, the Sale Order has been reversed, revoked, voided or materially modified or stayed by an order of a court of competent jurisdiction; or

        (vii)    if there shall be in effect an Order of a Governmental Body of competent jurisdiction restraining, enjoining, failing to issue a required consent or approval for or otherwise prohibiting the consummation of the Contemplated Transactions.

(b)    Termination by Mutual Written Consent.    This Agreement may be terminated by mutual written consent of Seller and Purchaser.

(c)    Termination by Purchaser.  Purchaser may terminate this Agreement upon the occurrence of any of the following:

(i)    if any of the conditions to the obligations of Purchaser set forth in Sections 10.1 or 10.3 shall be unfulfilled or shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(ii)    if there shall be a breach by Seller of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 10.1 or 10.3 and which breach cannot be cured or has not been cured by the earlier of (x) twenty (20) Business Days after the giving of written notice by Purchaser to Seller of such breach and (y) the Termination Date;

(iii)    in the event Seller fails to submit to any Governmental Body any applications required for any approval thereof required for the Contemplated Transactions by the date that is 30 days following the date of this Agreement;

(iv)    if a stay pending appeal is granted and the Sale Order does not become final by the Termination Date;

(v)    pursuant to Section 3.4; or

(vi)    in the event Seller's update of any Schedule pursuant to Section 8.15 shall include or reference any item, event or occurrence that would have a Material Adverse Effect.

(d)    Termination by Seller.  Seller may terminate this Agreement upon the occurrence of any of the following:

(i)    if any condition to the obligations of Seller set forth in Sections 10.2 or 10.3 shall be unfulfilled or shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller;

(ii)    if there shall be a breach by Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 10.2 or 10.3 and which breach cannot be cured or has not been cured by the earlier of (x) twenty (20) Business Days after the giving of written notice by Seller to Purchaser of such breach and (y) the Termination Date;

(iii)    pursuant to Section 8.15; or

(iv)     pursuant to Section 8.16.

4.5     Procedure For Termination.  In the event of termination of this Agreement by Purchaser or Seller, or both, pursuant to Section 4.4, written notice thereof shall forthwith be given to the other party or parties, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 4.4), the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 4.6 without further action by Purchaser or Seller.

4.6     Effect of Termination.

(a)     In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to Purchaser or Seller; provided, however, that the obligations of the parties set forth in the Confidentiality Agreement, the Deposit Escrow Agreement and Section 4.6(b), Section 4.6(c) and Section 7.1 and, to the extent necessary to effectuate the foregoing enumerated provisions, ARTICLE I, ARTICLE XI and ARTICLE XIII of this Agreement, shall survive any such termination and shall be enforceable in accordance with their terms.  In addition, if this Agreement is terminated as provided herein, each party shall upon request redeliver as soon as practicable any or all documents, work papers and other material of any other party relating to its business or affairs or the Contemplated Transactions, whether obtained before or after the execution hereof, to the party furnishing the same, other than any material which is of public record.

(b)     Nothing in this Section 4.6 shall relieve Purchaser or Seller of any Liability for a breach of this Agreement prior to the date of termination.  The damages recoverable by the non-breaching party shall include all attorneys' fees reasonably incurred by such party in connection with the Contemplated Transactions.

(c)     The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Section 4.6 shall relieve Purchaser or Seller of their obligations under the Confidentiality Agreement.  If this Agreement is terminated in accordance with Sections 4.4 and 4.5, Purchaser agrees that it shall not, directly or indirectly, solicit any employee of Seller to join the employ of Purchaser or any if its Affiliates for a period of two (2) years following the date of this Agreement; provided that the foregoing limitations shall not apply to any (i) person who resigns voluntarily without any solicitation from or on behalf of Purchaser; (ii) person who is terminated by Seller; (iii) person who responds to an advertisement that is placed in general circulation by Purchaser or its affiliates and which is not targeted at persons to whom this Section would otherwise apply; or (iv) person who contacts Purchaser or its Affiliates on his or her own initiative without any direct solicitation by Purchaser.

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

As of the date hereof and (except in cases where the representation speaks as of another date, such as the date hereof, in which case as of such date) as of the Closing Date, each Seller hereby, jointly and severally, represents and warrants to Purchaser that:

5.1 <u>Organization and Good Standing</u>. Each Seller that is a corporation is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the State of Tennessee and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted. Each Seller that is a limited liability company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Tennessee and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted. Each Seller is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not have a Material Adverse Effect.

5.2 <u>Authorization of Agreement</u>. Except for such authorization as is required by the Bankruptcy Court (as hereinafter provided for) pursuant to the Sale Order or otherwise and subject to the satisfaction of the conditions referred to in clause (a) of <u>Section 5.3</u>, each Seller has all requisite power and authority to execute and deliver, and has taken all corporate or limited liability company, as applicable, action necessary for it to validly execute and deliver, each agreement, document, or instrument or certificate contemplated by this Agreement to be executed by such Seller in connection with the consummation of the Contemplated Transactions (the "<u>Seller Documents</u>") and to perform its obligations hereunder and thereunder and to consummate the Contemplated Transactions. This Agreement and each of the Seller Documents contemplated to be executed and delivered in connection with Seller entering into this Agreement has been, and each other Seller Document will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order**,** and, with respect to Seller's obligations under <u>Section 7.1</u>, the entry of the Bidding Procedures Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms and the terms of the Sale Order and Bid Procedures Order.

5.3 <u>Consents of Third Parties; Contractual Consents</u>.

(a) Except as described on <u>Schedule 5.3(a)</u>, Seller is not required to obtain any consent, waiver, approval, Order, Permit or authorization of, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Seller Documents by Seller, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the Contemplated Transactions or the taking by Seller of any other action contemplated hereby or

thereby, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Sale Order, (iii) the entry of the Bidding Procedures Order with respect to Seller's obligations under Section 7.1, (iv) compliance with the Public Benefit Hospital Sales and Conveyance Act of 2006 ("Conversion Act"), (v) the Healthcare Regulatory Consents, and (vi) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications of which the failure to have obtained or made same would not be reasonably expected to materially and adversely affect the operation of the Business following the Closing by Purchaser.

(b)     The execution, delivery and performance by each Seller of this Agreement and the Seller Documents and the consummation of the Contemplated Transaction will not (i) except as set forth on Schedule 5.3(b), conflict with nor result in any breach or contravention of any agreement, lease or instrument to which any Seller or the Purchased Assets are a party or by which any Seller is bound or (ii) violate any Order to which any Seller or the Purchased Assets may be subject.

5.4     Title to Purchased Assets.  Except as set forth in Schedule 5.4, and other than the real property subject to the Real Property Leases, intellectual property licensed to Seller that is included within the Purchased Intellectual Property and the personal property subject to the Personal Property Leases, Seller owns each of the Purchased Assets, and Purchaser will be vested with good title to such Purchased Assets, free and clear of all Liens, other than Permitted Exceptions, to the extent permissible under section 363(f) of the Bankruptcy Code.

5.5     Taxes.

(a)     SRHS, Trousdale and Rutherford are each exempt from federal income tax under section 501(c)(3) of the Code and, except as set forth on Schedule 5.5(a), from Tennessee property, franchise, and excise Taxes under the Tax Laws of the State of Tennessee.  Holdings, Homecare, Wellness, and ClinicCare are each, and each has been since its inception, disregarded as separate entities and considered a division of SRHS for federal tax purposes under Treasury Regulations section 301.7701-3.  To Seller's Knowledge, no election has ever been made to treat any of Holdings, Homecare, Wellness or ClinicCare as an association, taxable as a corporation for federal tax purposes, under Treasury Regulations section 301.7701-3.

(b)     To Seller's Knowledge, except as set forth on Schedule 5.5(b), each Seller has timely (taking into account extensions of time to file) filed all Tax Returns required to be filed by such Seller through the date of this Agreement and will file all Tax Returns required to be filed by it prior to the Closing Date.

(c)     To Seller's Knowledge, except as set forth on Schedule 5.5(c), there is no audit, examination, investigation, appeal, litigation or other proceeding currently pending with respect to Taxes relating to the Purchased Assets.

5.6     Real Property.

(a)     Seller owns fee simple title in and to the Included Real Properties, including all buildings, improvements and fixtures thereon, subject only to the Permitted Exceptions.  Schedule 5.6(a) sets forth a list of (i) all real property and interests in real property

owned in fee by Seller and used in any material degree in the Business (the "Owned Properties"), and (ii) all real property and interests in real property leased or licensed by Seller and used in the Business as lessee or licensee (the "Real Property Leases" and, together with the Owned Properties, the "Seller Properties").

(b)     Seller has a good and valid leasehold interest in all of the Purchased Real Property Leases under which Seller is the licensee or lessee, subject only to the Permitted Exceptions, and there are no agreements or amendments, oral or written, to which Seller is a party, pertaining to any Purchased Real Property Lease other than as set forth in the Purchased Real Property Leases.  Seller has not received any written notice of violation from any Governmental Body of any Law materially and adversely affecting or regulating the use or occupancy of the Real Estate.  Except as set forth in Schedule 5.6(b), (i) Seller has received no written notice of any action to alter the zoning or zoning classification or to condemn, requisition or otherwise take any portion of the Real Estate, (ii) Seller has not received any written notice from a Governmental Body of any violation of any zoning, entitlement and other land use Laws, and (iii) Seller has not received any written notice of default under the Purchased Real Property Leases.

5.7     Tangible Personal Property.  Schedule 5.7 sets forth a list of all Personal Property Leases involving annual payments in excess of $10,000.

5.8     Intellectual Property.  Except as set forth on Schedule 5.8, Seller owns or has licenses to use all Purchased Intellectual Property, except to the extent the failure to be the owner or the licensee would not materially and adversely impact the Purchaser's operation of the Business following the Closing; provided, however, that Seller makes no representation or warranty as to the ownership by the licensor of any intellectual property that is licensed to Seller.

5.9     Material Contracts.  Except as set forth on Schedule 5.9, (A) to Seller's Knowledge, the Purchased Contracts, Contracts included within the Purchased Intellectual Property, Purchased Real Property Leases and Purchased Personal Property Leases (collectively, the "Material Contracts") (i) are in full force and effect and (ii) constitute valid and legally binding obligations of the parties thereto and are enforceable in accordance with their terms against the parties thereto except as enforceability may be limited, restricted or delayed by applicable bankruptcy or other applicable Law affecting creditor's rights and debtor's relief generally and except as enforceability may be subject to general principles of equity, and (B) Seller has not given or received a written notice of default under any Material Contract, which default remains outstanding.

5.10    Employees; Employee Benefits.

(a)     Except as described in Schedule 5.10(a), Seller is not a party to any labor, collective bargaining, employee association or other agreement which contains provisions governing the terms and conditions of employment of any Employee, and no labor union or employee association has been certified as exclusive bargaining agent for any group of Employees.  Prior to the date hereof, Seller has delivered to Purchaser a list of all its Employees as of a recent date, indicating their position, current annual rate of compensation or current hourly wage rate or other basis of compensation and date of hire by Seller.  Schedule 5.10(a) also

38

lists: (i) all material "employee benefit plans", as defined in section 3(3) of ERISA, and all other material employee benefit arrangements or payroll practices, including, without limitation, bonus plans, consulting or other compensation agreements, incentive, or deferred compensation arrangements, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs maintained by Seller or to which Seller contributed or is obligated to contribute thereunder for current or former Employees; and (ii) all "employee pension plans", as defined in section 3(2) of ERISA, subject to Title IV of ERISA or section 412 of the Code, maintained by Seller in which any current or former Employees participated ((i) and (ii), collectively, the "Employee Benefit Plans"). No Employee Benefit Plan is a multiemployer plan as defined in section 3(37) of ERISA ("Multiemployer Plans"), or has been subject to sections 4063 or 4064 of ERISA ("Multiple Employer Plans").

(b)     Schedule 5.10(b) lists all current and former employees of Seller and their beneficiaries who are eligible for and/or have elected continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").

5.11     Labor.  Seller is not a party to any labor or collective bargaining agreement. Except as set forth on Schedule 5.11, Seller has not experienced within the past six (6) months a "plant closing" or "mass layoff" within the meaning of the Workers Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 et seq. (the "WARN Act").  Except as set forth on Schedule 5.11, no full-time employee of Seller has, during the 90 day period prior to the date of this Agreement, suffered an employment loss as defined by the WARN Act.

5.12     Compliance with Laws; Permits.

(a)     Schedule 5.12(a) sets forth a list of all material licenses, registrations, permits, certificates, Certificates of Need, clearances and other authorizations, consents and approvals of any Governmental Body required for the lawful existing operation of the Purchased Assets or the Business by Seller (the "Material Licenses").  All Material Licenses are now and as of Closing shall be in good standing, and in full force and effect.

(b)     Except as set forth on Schedule 5.12(b), no application for any Certificate of Need, Exemption Certificate (each as defined below) or declaratory ruling has been made by Seller with the HSDA or other applicable agency which is currently pending or open before such agency (collectively, the "Applications"). Seller has not received any written notice indicating that it has failed to file all required Applications with respect to any and all material improvements, projects, changes in services, zoning requirements, construction and equipment purchases, and other changes for which approval is required under any applicable Laws.  As used herein, "Certificate of Need" means a written statement issued by the Agency evidencing community need for a new, converted, expanded, relocated, or otherwise significantly modified healthcare facility or health service, and "Exemption Certificate" means a written statement from the Agency stating that a healthcare project is not subject to the Certificate of Need requirements under applicable state Law.

(c)     Except as described on Schedule 5.12(c), (i) each Seller is eligible to receive payment under Titles XVIII and XIX of the Social Security Act and is a "provider" under

39

existing provider agreements (the "Program Agreements") with the Medicare and Medicaid programs (collectively, the "Healthcare Programs") through the applicable intermediaries, (ii) to Seller's Knowledge, each Seller and the Business are in substantial compliance with the conditions of participation in the Healthcare Programs and with the terms, conditions and provisions of the Program Agreements, (iii) to Seller's Knowledge, all billing practices of Seller to all third party payors, including the Healthcare Programs and private insurance companies, are conducted in substantial compliance with all Laws and/or billing guidelines of such third party payors and the Healthcare Programs, (iv) to Seller's Knowledge, there is no proceeding, audit, review, investigation, survey, or other action pending or threatened involving any of the Healthcare Programs or any other third party payor programs, and (v) each Hospital is duly accredited by The Joint Commission. Seller has delivered to Purchaser a true and complete copy of Seller's most recent Joint Commission accreditation survey reports pertaining to the Hospitals.

(d) Except as described on Schedule 5.12(d), Seller has received no written notice from a Governmental Body that either Seller or the Business is not or has not been during the one (1) year preceding the date of this Agreement, in compliance with applicable healthcare Laws, including the false claims, false representations, anti-kickback, and other provisions of the Medicare and Medicaid fraud and abuse provisions of the Social Security Act and the physician self-referral provisions of the federal Stark Law.

5.13    Litigation.  Except as set forth on Schedule 5.13, to the Knowledge of Seller, there are no Legal Proceedings pending or threatened against Seller, or to which Seller is otherwise a party before any Governmental Body.  Except as set forth on Schedule 5.13, Seller is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a Material Adverse Effect.

5.14    Financial Statements.    Schedule 5.14 contains copies of the following consolidated financial statements of Seller (collectively, the "Financial Statements"): (a) unaudited balance sheet dated as of November 30, 2009 (the "Balance Sheet Date"); (b) unaudited income statement dated as of the Balance Sheet Date; and (c) audited financial statements for the years ended May 31, 2008 and May 31, 2009.  The Financial Statements fairly present (and the Financial Statements delivered pursuant to Section 8.8 will fairly present) in all material respects the financial condition and results of operations of Seller as of the dates indicated thereon and for the periods referred to therein.

5.15    Post Balance Sheet Results.  Except as set forth in Schedule 5.15, since the Balance Sheet Date, there has not been any action, event, occurrence, development, transaction, commitment, dispute, change, violation, or other condition (financial or otherwise) of any character (whether or not in the Ordinary Course of Business) that can reasonably be expected to have a Material Adverse Effect, nor has there been any transaction or occurrence in which Seller has: (a) suffered any material damage, destruction or loss with respect to or affecting any of the Purchased Assets; (b) sold, transferred or otherwise disposed of any of the Purchased Assets except in the Ordinary Course of Business; (c) suffered any material adverse change in the operations, financial condition, assets, income or business of or related to the Business; (d) adopted or amended any Employee Benefit Plan; (e) made any material increase in the wages or other compensation due to Employees; or (f) taken any other action neither in the Ordinary Course of Business nor provided for in this Agreement.

40

5.16     Financial Advisors.  Except as set forth on Schedule 5.16, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the Contemplated Transactions and no Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

5.17     Environmental Matters.  Except as disclosed on Schedule 5.17:

(a)     Seller's operation of the Business is and, to Seller's Knowledge, at all times has been in material compliance with applicable Environmental Laws.

(b)     Neither Seller, nor to Seller's Knowledge any third party, has treated, stored, managed, disposed of, transported, handled, released or used any Materials of Environmental Concern at the Business except in the Ordinary Course of Business and in material compliance with Environmental Laws.

(c)     Seller has not received any written notice that there are any present or past actions, activities, circumstances, conditions, event or incidents, including any release of any Materials of Environmental Concern, that form the basis for any material Environmental Claim against Seller, Purchaser, the Business or any property used therein.

(d)     To Seller's Knowledge and except in material compliance with applicable Environmental Laws or as would not reasonably be expected to form the basis for a material Environmental Claim, (i) there are no underground storage tanks located on the Real Estate; (ii) there is no friable asbestos-containing material contained in or forming part of any building, building component, structure or office space on the Real Estate; and (iii) there are no polychlorinated biphenyls ("PCBs") or PCB-containing items contained in or forming part of any building, building component, structure or office space on the Real Estate in quantities or amounts that are regulated under applicable Environmental Laws.

(e)     The operations and properties of Seller are and, to Seller's Knowledge, at all times during Seller's operation thereof, have been in material compliance with applicable Medical Waste Laws.

The representations and warranties in this Section 5.17 are the sole and exclusive representations and warranties of Seller concerning environmental matters, including any matters arising under Environmental Laws or Medical Waste Laws.

5.18     Medical Staff Matters.  With regard to the medical staffs at the Business and except as set forth on Schedule 5.18, there are no pending or, to Seller's Knowledge, threatened, adverse actions with respect to any medical staff members of the Business or any applicant thereto.

5.19     No Exclusion.  Except as set forth on Schedule 5.19, (i) to Seller's Knowledge, no employee or independent contractor of Seller (whether an individual or entity) at the Business has been excluded from participating in any federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and (ii) neither Seller nor to Seller's Knowledge any of the officers, directors, agents or managing employees (as such term is defined in 42 U.S.C. § 1320a-5(b)) of Seller has been excluded from participating in Medicare or any federal health care program (as defined in

41

42 U.S.C. § 1320a-7b(f)) or been subject to sanction pursuant to 42 U.S.C. § 1320a-7a or 1320a-8 or been convicted of a crime described at 42 U.S.C. § 1320a-7b.

5.20    Third Party Payor Cost Reports.  Except as would not have a Material Adverse Effect, Seller has timely filed all required Seller Cost Reports (as hereinafter defined) for all the fiscal years through and including the fiscal year ended September 30, 2009.  Except as set forth on Schedule 5.20, to Seller's Knowledge, all of the Seller Cost Reports accurately reflect the information required to be included thereon.

5.21    JV Interests.  Except as otherwise set forth on Schedule 5.21, the purchase and sale of the JV Interests as contemplated by this Agreement are not subject to any contract, preemptive rights, right of first refusal, right of first offer or other right or restriction. Upon delivery of the instruments of transfer described in Section 2.1(a), Purchaser will acquire record and beneficial ownership of each of the JV Interests, free and clear of any Liens.  Except as set forth on Schedule 5.21, no Seller owns, directly or indirectly, any capital stock or other equity interest in any corporation, partnership, limited partnership, limited liability company or other entity or association nor does any Seller own or hold any right of first refusal or other rights with respect thereto.  Except as set forth on Schedule 5.21, to Seller's Knowledge, each Joint Venture is operated in substantial compliance with applicable material Laws and Orders.

5.22    No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this ARTICLE V (as modified by the Article V Schedules (or any Schedule item cross-referenced in any Article V Schedule) hereto), no Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller, the Business, the Purchased Assets, the Assumed Liabilities or the Contemplated Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of their respective officers, directors, employees, agents or representatives.  Except for the representations and warranties contained in ARTICLE V hereof (as modified by the Article V Schedule (or any Schedule item cross-referenced in any Article V Schedule) hereto), Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent, consultant, or representative of Seller or any of its Affiliates).  Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business.  The disclosure of any matter or item in any Article V Schedule (or any Schedule item cross-referenced in any Article V Schedule) hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

4348/69444-001 CURRENT/16419511V19

# ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As of the date hereof and (except in cases where the representation speaks as of another date, such as the date hereof, in which case as of such date) as of the Closing Date, Purchaser hereby represents and warrants to Seller that:

6.1     Organization and Good Standing.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

6.2     Authorization of Agreement.  Purchaser has full corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the Contemplated Transactions (the "Purchaser Documents"), and to consummate the Contemplated Transactions.  The execution, delivery and performance by Purchaser of this Agreement has been, and of each Purchaser Document will be at or prior to Closing, duly authorized by all necessary corporate action on behalf of Purchaser.  This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms.

6.3     Conflicts; Consents of Third Parties.

(a)     Except as described on Schedule 6.3(a), Purchaser is not required to obtain any consent, approval, authorization, waiver, Order, license or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the Contemplated Transactions or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act and (ii) the Healthcare Regulatory Consents.

(b)     Except as set forth on Schedule 6.3(b), none of the execution and delivery by Purchaser of this Agreement or any of the Purchaser Documents, the consummation of the Contemplated Transactions by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the Contemplated Transactions.

43

6.4 <u>Litigation</u>. There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the Contemplated Transactions. Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the Contemplated Transactions.

6.5 <u>Financial Advisors</u>. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the Contemplated Transactions and no Person is entitled to any fee or commission or like payment in respect thereof.

6.6 <u>Financial Capability</u>. Purchaser (i) has, and at the Closing will have, sufficient funds available to pay the cash portion of the Purchase Price and any expenses incurred by Purchaser in connection with the Contemplated Transactions, (ii) has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder, and (iii) has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

6.7 <u>Healthcare Regulatory Compliance Status</u>.

(a) To the knowledge of Purchaser, except as described on <u>Schedule 6.7</u>, neither Purchaser nor any of its Affiliates is involved in any litigation, proceeding, or investigation by or with any Governmental Authority which, if determined or resolved adversely, would have an adverse impact on the ability of Purchaser to obtain or maintain any governmental qualifications, registrations, filings, licenses, permits, orders, approvals or authorizations necessary for Purchaser to conduct the Business and to own or use the Purchased Assets, as the Business is conducted and the Purchased Assets are owned and used on the date hereof, where the failure to have such qualifications, registrations, filings, licenses, permits, orders, approvals or authorizations could reasonably be expected to prevent or materially delay the consummation of the Contemplated Transactions or the performance by Purchaser of any of its obligations under this Agreement.

(b) Except as set forth on <u>Schedule 6.7</u>, (i) to the knowledge of Purchaser, no employee or independent contractor of Purchaser (whether an individual or entity) has been excluded from participating in any federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and (ii) neither Purchaser nor to Purchaser's knowledge any of the officers, directors, agents or managing employees (as such term is defined in 42 U.S.C. § 1320a-5(b)) of Purchaser has been excluded from participating in Medicare or any federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)) or been subject to sanction pursuant to 42 U.S.C. § 1320a-7a or 1320a-8 or been convicted of a crime described at 42 U.S.C. § 1320a-7b. As of the date hereof, Purchaser does not know of any reason why the approvals or Permits required for Purchaser to consummate the Contemplated Transactions would be delayed or rejected.

6.8 <u>Acknowledgement Regarding Condition of the Business</u>. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that

Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly made in <u>ARTICLE V</u> hereof (as modified by the <u>Article V Schedules</u> (or any Schedule item cross-referenced in any <u>Article V Schedule</u>) hereto as supplemented or amended), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred to and accepted by Purchaser in an "as is," "where is" and "with all faults" condition, free of any warranties or representations whatsoever, and Seller EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, LATENT OR PATENT, WITH RESPECT THERETO.  Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of Seller set forth in <u>ARTICLE V</u> hereof (as modified by the <u>Article V Schedules</u> (or any Schedule item cross-referenced in any <u>Article V Schedule</u>) hereto as supplemented or amended).  Purchaser further represents that neither Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller, the Business or the Contemplated Transactions not expressly set forth in this Agreement, and none of Seller, any of its Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its representatives or Purchaser's use of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its representatives, or any other document or information in any form provided to Purchaser or its representatives in connection with the sale of the Business and the Contemplated Transactions other than for the liability for such party's fraudulent conduct.  Purchaser acknowledges that it has conducted to its satisfaction, its own independent investigation of the Business and, in making the determination to proceed with the Contemplated Transactions, Purchaser has relied on the results of its own independent investigation and the representations and warranties of Seller herein.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PURCHASER ACKNOWLEDGES THAT SELLER HAS NOT MADE ANY REPRESENTATION RELATING TO THE OWNED PROPERTY OR ANY PROPERTY THAT IS THE SUBJECT OF A REAL PROPERTY LEASE REGARDING SOIL CONDITIONS, AVAILABILITY OF UTILITIES, DRAINAGE, COMPLIANCE WITH ZONING LAWS, ENVIRONMENTAL LAWS, OR ANY OTHER FEDERAL, STATE OR LOCAL STATUTES, CODES, REGULATIONS OR ORDINANCES RELATING TO THE USE THEREOF, EXCEPT AS EXPRESSLY STATED HEREIN.  PURCHASER ALSO ACKNOWLEDGES AND AGREES THAT THE INSPECTION AND INVESTIGATION OF THE PURCHASED ASSETS BY PURCHASER AND ITS REPRESENTATIVES HAS BEEN ADEQUATE TO ENABLE PURCHASER TO MAKE PURCHASER'S OWN DETERMINATION WITH RESPECT TO THE SUITABILITY OR FITNESS OF THE LAND, INCLUDING WITH RESPECT TO SOIL CONDITIONS, AVAILABILITY OF UTILITIES, DRAINAGE, ZONING LAWS, ENVIRONMENTAL LAWS, AND ANY OTHER FEDERAL, STATE OR LOCAL STATUTES, CODES REGULATIONS OR ORDINANCES. PURCHASER ACKNOWLEDGES THAT THE DISCLAIMERS, AGREEMENTS AND OTHER STATEMENTS SET FORTH IN THIS PARAGRAPH ARE AN INTEGRAL PORTION OF THIS AGREEMENT.

45

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

7.1 <u>Approval of Break-Up Fee and Expense Reimbursement</u>.  Seller hereby confirms that it is critical to the process of arranging an orderly sale of the Purchased Assets to proceed by selecting Purchaser to enter into this Agreement in order to present the Bankruptcy Court with arrangements for obtaining the highest and best offer for the Purchased Assets and that, without Purchaser having committed considerable time and expense in connection with such process, Seller would have to employ a less orderly process of sale and thereby both incur higher costs and risk attracting lower prices.  Accordingly, the contributions of Purchaser to the process have indisputably provided very substantial benefit to Seller.  In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Seller, Seller shall pay Purchaser (i) a break up fee in an amount equal to $2,500,000 (the "<u>Break-Up Fee</u>") and (ii) reimbursement of actual out-of-pocket expenses incurred in negotiating this Agreement and performing due diligence, in an amount not to exceed $1,000,000 (the "<u>Expense Reimbursement</u>"), on the first Business Day following the date of consummation of a transaction pursuant to a Competing Bid (as hereinafter defined) if no material breach by Purchaser of this Agreement has occurred.  Seller shall file with and seek the approval of the Bankruptcy Court of the Sale Motion, including the Break-Up Fee and Expense Reimbursement, and the entry by the Bankruptcy Court of the Bidding Procedures Order.

7.2 <u>Competing Transaction</u>.

(a)      This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each a "<u>Competing Bid</u>").  From the date hereof (and any prior time) and until the Sale Order is approved by the Bankruptcy Court, Seller is permitted to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) in connection with any sale or other disposition of all or any part of the Purchased Assets, alone or in connection with the sale or other disposition of any other asset of Seller.  In addition, until the Sale Order is approved by the Bankruptcy Court, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto which are required by the Bidding Procedures Order or under the Bankruptcy Code or other applicable Law, including supplying information relating to the Business and the assets of Seller to prospective purchasers.

(b)      Seller shall not withdraw or modify, or propose to withdraw or modify, in a manner adverse to Purchaser the approval and recommendation of the Contemplated Transactions, except in the event that a Qualified Bidder makes a Successful Bid.  A Successful Bid shall be defined in the Bidding Procedures Order as a bid by a Qualified Bidder which is approved by the Bankruptcy Court as the winning bidder.

(c)      On or prior to the date of the auction respecting the Purchased Assets on which Seller intends to make the final selection of a purchaser for the Purchased Assets, Seller

shall advise Purchaser of each Person that has submitted a Qualified Bid (as defined in the Bidding Procedures Order) along with the terms and conditions thereof.

7.3     Bankruptcy Court Filings.

(a)     As promptly as practicable following the execution of this Agreement, Seller shall file with the Bankruptcy Court the Sale Motion, such motion to be in form and substance reasonably satisfactory to Purchaser.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and the Bidding Procedures Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  Purchaser shall not, without the prior written consent of Seller (which consent shall not be unreasonably withheld), file, formally join in, or otherwise support any motion or other pleading relating to the sale of the Purchased Assets hereunder.  With respect to each Purchased Contract, Purchased Personal Property Lease, Purchased Real Property Lease or Contract included in the Purchased Intellectual Property, the Purchaser shall provide adequate assurance of future performance of each such agreement as required by section 365 of the Bankruptcy Code.

(b)     Seller shall promptly make any filings, take all actions and use commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the transactions contemplated hereby, subject to its obligations to comply with any and all orders of the Bankruptcy Court.

(c)     In the event an appeal is taken, or a stay pending appeal is requested or reconsideration is sought, from either the Bidding Procedures Order or the Sale Order, Seller shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser within one (1) Business Day a copy of the related notice of appeal or order of stay or application for reconsideration.  Seller shall also provide Purchaser with written notice, and copies of any other or further notice of appeal, motion or application filed in connection with any appeal from, or application for reconsideration of, either of such orders and any related briefs.

(d)     Seller shall comply with the Bankruptcy Code and all other Laws and Orders promulgated thereunder in obtaining the Bidding Procedures Order and the Sale Order. Between the date of this Agreement and the Closing Date, Seller shall not, directly or indirectly, subject to Orders of the Bankruptcy Court, enter into any transaction, take any action, or knowingly by inaction permit an event to occur, which would result in any of the representations or warranties of Seller herein contained not being true and correct at and as of the Closing.

(e)     From and after the date hereof, Seller shall not take any action which is intended, or fail to take any action the intent of which failure to act would be, (i) to prevent or materially impede the vesting, upon the Closing, of the Purchased Assets in Purchaser free and clear of all Liens and claims and interests of all creditors, claimants and interest holders having claims against or interests in Seller; or (ii) to result in the reversal, voiding, modification or staying of the Bidding Procedures Order or the Sale Order.

47

(f)  Notwithstanding the foregoing, the Sale Order shall require Seller to set aside and/or dedicate a portion of the Purchase Price reasonably sufficient to pay any and all expenses or amounts arising from or in connection with the following:  (i) any cure costs pursuant to Section 2.5; (ii) any post-Closing Purchase Price adjustments pursuant to Section 3.6; (iii) any prorations pursuant to Section 3.7; (iv) the filing of terminating Seller Cost Reports pursuant to Section 8.13; and (v) the fees, expenses and disbursements of Seller and its respective brokers, agents, advisors, attorneys and accountants and other amounts incurred in connection with the transactions contemplated hereby.

## ARTICLE VIII

## COVENANTS

8.1  Access to Information.  Subject to this Section 8.1, and subject to compliance with applicable Antitrust Laws, Seller agrees that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the assets, properties and operations of the Business and such examination of the books and records of Seller pertaining to the Business, the Purchased Assets, and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records at Purchaser's sole expense; it being understood, however, that the foregoing shall not entitle Purchaser to access (i) any books, records or documents access to which by Purchaser Seller reasonably determines would be competitively disadvantageous to Seller in any material respect or (ii) any books, records or documents the disclosure of which by Seller to Purchaser would (A) violate any patient confidentiality obligation of Seller or (B) any other agreement or any obligation of confidentiality to which Seller is a party or is bound prior to the date hereof or (C) any obligation of confidentiality to which Seller is bound under applicable Law.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to any restrictions on disclosure by Seller to Purchaser or use of the information contained therein by Purchaser applicable pursuant to any agreement to which Seller is a party or is bound prior to the date hereof or under applicable Law.  Seller shall cause its officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives shall cooperate with Seller and its representatives and shall use their reasonable efforts to minimize any disruption to Seller's business and operations, including the Business. Notwithstanding anything herein to the contrary, Seller shall not be required to permit any such investigation or examination if, and to the extent that, Seller, upon advice of counsel, determines that such investigation or examination by Purchaser would or is reasonably likely to result in a loss of any attorney-client or attorney work product privilege available to Seller.

8.2  Conduct of the Business Pending the Closing.  Prior to the Closing, except (1) as set forth on Schedule 8.2, (2) as required by applicable Law, (3) as otherwise expressly contemplated by this Agreement or the Sale Order, or (4) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall conduct the Business only in the Ordinary Course of Business. Seller will use its commercially reasonable efforts to notify Purchaser immediately upon (i) the occurrence of any event, fact or

48

circumstance that is reasonably likely to result in the breach or inaccuracy of any representation or warranty of Seller contained in this Agreement, or (ii) the discovery of any event, fact or circumstance from which a reasonable person would conclude that any representation or warranty of Seller contained in this Agreement was inaccurate or incomplete when made.

8.3     Seller's Negative Covenants.  Except as disclosed on Schedule 8.3 and subject to applicable Law and any requirements of the Bankruptcy Court in connection with the Bankruptcy Case, between the date of this Agreement and the earlier of the Closing Date or the termination of this Agreement, Seller will not, without the prior written consent of Purchaser (a) amend or terminate any of the Purchased Contracts, Purchased Real Property Leases, Contracts included in the Purchased Intellectual Property, or Purchased Personal Property Leases, other than amendments to or renewals of those Purchased Contracts, Purchased Real Property Leases, Contracts included in the Purchased Intellectual Property, or Purchased Personal Property Leases that provide Seller with the right to terminate upon sixty (60) or fewer days' notice; (b) increase compensation payable or to become payable or make a bonus payment to (other than pursuant to Seller's obligations under current agreements) or otherwise enter into one or more bonus agreements with any employee or agent; (c) make offers or renewals of employment at the Business to any person other than on an at-will basis and in the Ordinary Course of Business; or (d) take any action outside the Ordinary Course of Business.

8.4     Consents.

(a)     Seller shall use its commercially reasonable efforts, and Purchaser shall cooperate with Seller, including by taking the actions referred to in Section 8.6, to obtain at the earliest practicable date all consents, approvals, authorizations, waiver and Orders required to be obtained by Seller, and to give at the earliest practicable date any notices required to be given by Seller, in order for Seller to consummate the Contemplated Transactions on the terms and in the manner provided hereby; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than any cure amounts required by Section 2.5 or filing or application fees payable to any Governmental Body) or to initiate any litigation or legal proceedings to obtain any such item except as otherwise provided by Section 8.6.  Seller shall communicate with Purchaser and provide Purchaser with copies of documents related to the Contemplated Transactions to be submitted to any Governmental Body.

(b)     Purchaser shall use its commercially reasonable efforts, and Seller shall cooperate with Purchaser, including by taking the actions referred to in Section 8.6, to obtain at the earliest practicable date all consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Purchaser, and to give at the earliest practicable date any notices required to be given by Purchaser, in order for Purchaser to consummate the Contemplated Transactions on the terms and in the manner provided hereby and to operate the Business after the Closing.  Purchaser shall communicate with Seller and provide Seller with copies of documents related to the Contemplated Transactions to be submitted to any Governmental Body.

(c)     Other than the amounts to be paid pursuant to Section 2.5, if any, nothing contained herein shall require Seller to expend any funds in order to remove or eliminate any

Lien on any Purchased Asset in order to deliver such Purchased Asset to Purchaser pursuant to this Agreement free of such Lien; provided, however, in respect of any such Lien, Purchaser nevertheless shall not be required to consummate the Contemplated Transactions unless the conditions referred to in Sections 10.1 are satisfied or waived by Purchaser.

8.5     Insurance.    As of the Closing, Purchaser shall have appropriate insurance coverage in place for the Business consistent with what would be maintained under good industry business practices.

8.6     Regulatory Approvals.

(a)     Purchaser, at its own cost and expense, shall, within fifteen (15) Business Days after the date of this Agreement, seek to obtain from applicable Governmental Bodies all Healthcare Regulatory Consents required in order for Purchaser to consummate the Contemplated Transactions and to operate the Business in accordance with Law (collectively, the "Healthcare Applications").  Purchaser shall provide SRHS with an opportunity to review the Healthcare Applications in advance of filing; provided that, as long as Purchaser has given Seller the opportunity to review the Healthcare Applications at least two (2) Business Days in advance of filing, then Seller's review shall not delay or hinder the timely filing of such Healthcare Applications.  SRHS or its designee shall provide timely and complete information to Purchaser and its agents in connection with the preparation and filing of Healthcare Applications. Purchaser shall diligently pursue the Healthcare Applications and shall timely submit all information and documents requested in connection therewith by any Governmental Body. Within five (5) Business Days of its submission or receipt, Purchaser shall deliver to Seller a complete copy of all correspondence to or from any applicable Governmental Body having jurisdiction concerning a Healthcare Application.  Purchaser shall provide Seller with monthly reports of Purchaser's efforts to obtain all Healthcare Regulatory Approvals.  In addition, Purchaser shall provide Seller with prompt notice of its receipt of approval, contingent approval or a rejection of Purchaser's Healthcare Applications, along with a copy of any documentation related thereto.  Purchaser shall not take any action prior to the Closing that would reasonably be expected to disqualify Purchaser as an established and licensed operator of the Business.

(b)     If necessary, Purchaser and Seller shall (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under the HSR Act or the Conversion Act with respect to the Contemplated Transactions as promptly as practicable and, in any event, within ten (10) Business Days after the date of this Agreement in the case of the initial filings required under the HSR Act, and within ten (10) Business Days in connection with the initial filings with respect to the Conversion Act, (ii) comply at the earliest practicable date with any request under the HSR Act or the Conversion Act for additional information, documents, or other materials received by each of them or any of their respective Affiliates from the Federal Trade Commission (the "FTC"), the Antitrust Division of the United States Department of Justice (the "Antitrust Division"), the Office of Attorney General Consumer Protection and Antitrust Bureau (the "Antitrust Bureau") or any other Governmental Body in respect of such filings or the Contemplated Transactions, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any

investigation or other inquiry of any of the FTC, the Antitrust Division, the Antitrust Bureau or any other Governmental Body under any Antitrust Laws with respect to any such filing or any such transaction.

(c)     If necessary, Purchaser and Seller shall (a) make or cause to be made all filings required of each of them or any of their respective Affiliates in respect of the Contemplated Transactions under any applicable Law, other than those referred to in <u>Section 8.6(a)</u> or <u>Section 8.6(b),</u> including such filings as are required to obtain the consents, approvals, authorizations, waivers, Orders, licenses or Permits or to provide the notices specified in <u>Schedule 5.3</u> or <u>Schedule 6.3(b),</u> as promptly as practicable, (b) comply at the earliest practicable date with any request for additional information, documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Body in respect of such filings or the Contemplated Transactions, and (c) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any Governmental Body under such Laws with respect to any such filing or any such transaction.

(d)     Each such party shall use commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the Contemplated Transactions.  Each such party shall promptly inform the other parties hereto of any material oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction.  No party hereto shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.

(e)     Subject to applicable Law, the parties hereto will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or other Antitrust Laws.  Seller and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this <u>Section 8.6</u> as "outside counsel only."  Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Seller or Purchaser, as the case may be).

(f)     Each of Purchaser and Seller shall use commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to such transactions as promptly as possible after the execution of this Agreement.

4348/69444-001 CURRENT/16419511V19

8.7     Phase I.

(a)     Purchaser has requested that Gobbel Hays Partners (the "Environmental Consultant") perform a Phase I environmental assessment of the Real Estate in accordance with the U.S. Environmental Protection Agency Standards and Practices for All Appropriate Inquiries as required under section 101(35)(B) of the Comprehensive Environmental Response, Compensation, and Liability Act and referenced in 40 CFR Part 312, and the ASTM E 1527-05 "Standard Practice for Environmental Site Assessments" (collectively, "Phase I"). Purchaser shall provide to Seller a copy of the final report issued by Environmental Consultant in connection with the Phase I.

(b)     Purchaser has requested that the Environmental Consultant perform certain additional due diligence environmental assessment activities related to RRMC-South (the "Additional Environmental Due Diligence").  Seller consents to such Additional Environmental Due Diligence, provided that Purchaser, Seller and Environmental Consultant enter into a limited access agreement in the form reasonably acceptable to Seller.  As soon as reasonably practical following Purchaser's receipt and analysis of the results of the Additional Environmental Due Diligence, but in no event later than June 1, 2010, Purchaser shall notify Seller whether or not the results of the Additional Environmental Due Diligence is reasonably satisfactory to Purchaser.

(c)     In the event that the results of the Additional Environmental Due Diligence are reasonably satisfactory to Purchaser, then the parties shall proceed to consummate the transactions as contemplated by and subject to the other terms and conditions of this Agreement; provided that Purchaser may, but shall not be obligated to, remediate or incur any costs in connection with the remediation of any matters identified in the Additional Environmental Due Diligence or otherwise at RRMC-South (the "Remediation Costs").

(d)     In the event that Purchaser informs Seller on or before June 1, 2010 that the results of the Additional Environmental Due Diligence are not reasonably satisfactory, then Purchaser shall, on or before June 1, 2010, notify Seller which of the following options Purchase elects (the "RRMC Election"):

(i)     proceed to consummate the transactions without any modification to and as contemplated by and subject to the other terms and conditions of this Agreement; or

(ii)     designate any or all of the assets primarily associated with the business or operations of RRMC-South as Excluded Assets (the "Excluded Choice") and consummate the transactions as otherwise contemplated by this Agreement with respect to the remaining Purchased Assets.  xxx

(e)     In the event that the RRMC Election specifies the Excluded Choice, Purchaser and Seller would at Closing enter into an agreement pursuant to which (i) Purchaser would agree to provide, at its sole costs and expense, services to Seller in connection with RRMC winding down its licensed operations as an acute care hospital and would agree, to the extent permitted by applicable law, to bear the economic risk and receive the economic benefit,

if any, from the operations of RRMC during the post Closing wind down period (collectively, the "Wind Down Costs") (provided in no such event would Purchaser be obligated to incur any Remediation Costs); (ii) Seller would agree to file at Closing in the applicable governmental records a use restriction, in form and substance satisfactory to the parties, that would prevent the land and buildings used solely in the operation of RRMC from being utilized (other than during the wind down period) as an acute care hospital for 20 years following the Closing without the consent of Purchaser.

(f)     In the event that Purchaser incurs, whether prior to or following Closing, Remediation Costs such that the sum of the Remediation Costs plus the Update Costs exceeds $1,000,000, the Purchaser shall have an unsecured claim against the Seller for the amount of such excess.

8.8     Financial Information.  Promptly when available following the end of each calendar month prior to the Closing Date, Seller shall deliver to Purchaser copies of the unaudited balance sheets and related unaudited statements of revenue and expenses of the Business for the month then ended.

8.9     Further Assurances.  Each of Seller and Purchaser shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Contemplated Transactions, (ii) cooperate with one another with respect to Purchaser's transition planning in order to facilitate the Closing of the Contemplated Transactions, and (iii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Contemplated Transactions.  In addition, if Seller after the Closing receives payment on any account receivable that is a Purchased Asset it shall as soon as practicable remit such amount received to Purchaser, together will such information identifying the account to which such payment relates as is reasonably available to Seller, and, if Purchaser after the Closing receives payment related to any Excluded Asset it shall as soon as practicable remit such amount received to Seller, together will such information identifying the account to which such payment relates as is reasonably available to Purchaser.  If at any time after the Closing, Purchaser receives funds that Purchaser reasonably believes may have been intended to be a charitable contribution to Seller with respect to the Business, Purchaser shall provide Seller with written notice.  In such event, Purchaser shall contact the potential donor to confirm whether such funds were intended for the Purchaser.  If the funds were not intended for the Purchaser, then Purchaser shall forward the funds to Seller or its designee or as otherwise directed by the potential donor.  The provisions of this Section 8.9 shall survive the Closing.

8.10     Confidentiality.  Purchaser acknowledges that the Confidential Information provided to it in connection with this Agreement, including under Section 8.1, and the consummation of the Contemplated Transactions, is subject to the terms of the Non-Disclosure Agreement between Purchaser, Navigant Capital Advisors, LLC and SRHS dated December 21, 2009 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference and, to the extent applicable, supersede any conflicting or inconsistent provisions contained in this Agreement.  Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information relating solely to the Business or otherwise included in the Purchased Assets; provided, however, that Purchaser acknowledges that any and all other Confidential Information provided to it by Seller or its representatives concerning Seller shall

remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. For purposes of this Section 8.10, "Confidential Information" means any confidential information with respect to the Business, including, methods of operation, customers, customer lists, prices, fees, costs, Technology, inventions, trade secrets, know-how, Software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters.

8.11     Preservation of Records.  Seller and Purchaser agree that each of them shall preserve and keep the records held by it or their respective Affiliates relating to the Business for a period of seven (7) years from the Closing Date or the maximum period of time required by law, whichever is longer, and shall make such records and personnel available to the other as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or Tax audits against or other governmental or healthcare payor investigations or audits of Seller or Purchaser or any of their respective Affiliates or in order to enable Seller or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event Seller or Purchaser wishes to destroy such records before that time, such party shall first give ninety (90) days prior written notice to the other party and such other party shall have the right at its option and expense, upon prior written notice given to such party within such ninety (90) day period, to take possession of the records within one hundred and eighty (180) days after the date of such notice.

8.12     Post-Closing Access to Information.

(a)     Seller and Purchaser each acknowledge that, subsequent to the Closing, each may need access to the Purchased Assets or the Business and to information, documents or computer data in the control or possession of the other for purposes of concluding the Contemplated Transactions and for audits, investigations, compliance with governmental requirements, regulations and requests, and the prosecution or defense of third party claims. Accordingly, Purchaser and Seller each agrees that it will make available to the other and its agents, independent auditors and/or Governmental Bodies such documents and information as may be available relating to the Purchased Assets and the Business in respect of periods prior to Closing and will permit the other to make copies of such documents and information.

(b)     Seller shall submit all quality data required for the Business under the Healthcare Programs to CMS or its agent, and all quality data required for the Business by The Joint Commission, for any calendar quarter with reporting deadlines between the date of this Agreement and the Closing Date.  If the reporting deadline for submitting quality data for any calendar quarter during which the Business was owned by Seller falls after the Closing Date, then Seller shall cooperate with Purchaser to enable Purchaser to submit such quality data required for the Business for such quarter(s) under the Healthcare Programs and as may be required by The Joint Commission in accordance with the applicable filing deadlines and in the form and manner required by CMS and The Joint Commission, respectively.  Such cooperation by Seller shall include executing any necessary documents required to submit such filings and transmitting such quality data to Purchaser in a form required by Purchaser and/or allowing Purchaser to access such quality data in its current form.

54

8.13     Cost Reports.  After the Closing, as soon as required by applicable Law, Seller shall file or cause to be filed the final cost reports relating to the Business for the period prior to the Closing required to be filed with the Medicare or Medicaid programs or any other third party payor or Governmental Body ("Seller Cost Reports").  Such Seller Cost Reports shall be prepared in accordance with applicable Law and consistent with past practices.  Seller shall provide Purchaser with copies of the Seller Cost Reports within a reasonable period of time prior to the filing thereof in order for Purchaser to review and provide Seller with comments thereon solely regarding reimbursement issues for periods after the Closing.  Seller shall consider, but not be required to make, Purchaser's changes and shall determine in its reasonable discretion whether or not to incorporate Purchaser's comments into any Seller Cost Reports, by amendment or otherwise.  Seller shall provide to Purchaser copies of all such documents promptly after filing.  Seller shall not open, re-file, or amend any Seller Cost Reports that would materially and adversely effect Purchaser without the prior written consent of Purchaser, which consent shall not be unreasonably withheld or delayed.

8.14     Publicity.  Neither Seller nor Purchaser shall issue any press release or public announcement concerning this Agreement or the Contemplated Transactions without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the judgment of Purchaser or Seller upon advice of counsel, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock market on which Purchaser's securities are listed, provided that the party intending to make such release shall use commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

8.15     Supplementation and Amendment of Schedules.  Seller may, at its option, include in the Article V Schedules (or any Schedule item cross-referenced in any Article V Schedule) items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement.  Information disclosed in the Article V Schedules (or any Schedule item cross-referenced in any Article V Schedule) shall constitute a disclosure for all purposes of ARTICLE V notwithstanding any reference to a specific Section in an Article V Schedule, and all such information shall be deemed to qualify the entire ARTICLE V and not just such Section.  From time to time prior to the Closing, Seller shall have the right to supplement or amend the Article V Schedules (or any Schedule item cross-referenced in any Article V Schedule) with respect to any matter hereafter arising or discovered after the delivery of the Article V Schedules pursuant to this Agreement.  No such supplement or amendment shall have any effect on the satisfaction of the condition to closing set forth in Section 10.1(a).  If such supplement or amendment results, or would reasonably be expected following the Closing to, result in Losses (collectively, "Update Costs") by Purchaser in an aggregate amount in excess of $1,000,000 that is not otherwise satisfied by Seller, then Purchaser shall have the right to notify Seller in writing prior to the Closing Date of such Update Costs and request a reduction of the Purchase Price in the amount that such Update Costs exceed, or are reasonably anticipated to exceed, $1,000,000 all as reasonably determined by Purchaser on a good faith basis ("Notice of Update Claims").  If Purchaser submits a Notice of Update Claims, then Seller may, within 10

days of such Notice of Update Claims, terminate the Agreement.  After submitting a Notice of Update Claims, Purchaser shall have no obligation to consummate the Contemplated Transactions until Seller (i) agrees to the requested or otherwise approved reduction of the Purchase Price in the amount that such Update Costs exceed $1,000,000 or (ii) cures that portion of the Update Costs that exceeds $1,000,000, at which point, in either case, the claims set forth in the Notice of Update Claims shall not be subject to the provisions of ARTICLE XI hereof.  If the Closing shall occur without Purchaser having submitted a Notice of Update Claims, then any supplement or amendment to the Article V Schedules pursuant to this Section 8.15 shall not have any effect on the rights of the Purchaser Indemnified Parties pursuant to ARTICLE XI hereof, with respect to any matter set forth in such supplement or amendment, and Seller shall indemnify the Purchaser Indemnified Parties with respect to any new matter hereafter arising or discovered set forth in such supplement or amendment, subject to the Seller's Deductible and the Seller's Limit set forth in Section 11.2(c).

8.16    Title Commitment and Survey.

(a)    Subject to the provisions of Section 8.16(k), Purchaser acknowledges that any Liens set forth in any title policies or surveys of the Owned Properties that are included within Included Real Property from Seller are acceptable to Purchaser and are deemed to be Permitted Exceptions for all purposes.

(b)    Seller has ordered an updated title commitment (the "Title Commitment") from First American Title Insurance Company (the "Title Company"), showing Seller as the record title owner in fee, of the Owned Properties that are included within Included Real Property, pursuant to the terms of which the Title Company agrees to issue to or for the benefit of Purchaser (an extended coverage ALTA Owner's Policy (2006 form) of Title Insurance (the "Title Policy") at Closing in an amount allocable to the value of the Owned Properties that are included within Included Real Property as determined by Purchaser, to be good and marketable subject only to the Permitted Exceptions.

(c)    The expense of obtaining the Title Commitment shall be paid by Purchaser, including any usual and customary title search fees imposed by the Title Company. Purchaser shall be responsible for determining which, if any, title endorsements to the Title Policy it may desire to obtain at Closing and shall coordinate directly with the Title Company in regard to such determination.  Seller shall grant its good faith, reasonable cooperation to the Title Company and Purchaser to facilitate the issuance of such endorsements as Purchaser may require.

(d)    Seller has ordered an updated ALTA survey of the land, improvements, and appurtenances constituting the Owned Properties that are included within Included Real Property (the "Survey"), which Survey shall plot in a customary manner the matters reflected as exceptions in the Title Commitment.  The expense of obtaining the Survey shall be paid by Purchaser.

(e)    Purchaser shall have a period of time ending on the date which is five (5) Business Days after the later of Purchaser's receipt of the Title Commitment (together with copies of all exception documents specified therein) or Survey in which to notify Seller of any

objections Purchaser has to any matter shown on the Title Commitment and the Survey which is not a Permitted Exception (the "Title/Survey Review Period"). All objections raised by Purchaser in the manner herein provided are hereafter called "Purchaser's Objections".

(f)     During the period of time (the "Cure Period") ending on the fifth (5th) Business Day after Seller's receipt of notice of Purchaser's Objections, Seller may elect to either:

(i)     cure Purchaser's Objections or agree in writing to cure such Objections at or prior to Closing (so that the Title Company agrees to remove the exception forming the basis of Purchaser's Objection from the Title Policy or insure or endorse over (by endorsement reasonably satisfactory to Purchaser) such matter in the Title Policy, or if the basis of Purchaser's Objection is not contained in the Title Commitment, otherwise to Purchaser's reasonable satisfaction); or

(ii)     agree with Purchaser to a reduction in the Purchase Price in an amount reasonably determined in good faith by the parties to be equal to the amount required to cure Purchaser's Objections or, if Purchaser's Objections are incapable of cure, in an amount reasonably determined in good faith by the parties to be equal to the diminution in fair market value of the Owned Properties that are included within the Included Real Property resulting from such matter; or

(iii)     terminate the Agreement.

(g)     In the event Seller elects clause (i) of Section 8.16(f), but does not, on or prior to the Closing, cure Purchaser's Objections, then at the Closing, Purchaser may waive Purchaser's Objections and proceed with the Closing or terminate the Agreement. If Purchaser proceeds with the Closing, then Purchaser will be deemed to have waived Purchaser's Objections.

(h)     In the event Seller elects clause (ii) of Section 8.16(f) but does not reach agreement with Purchaser as to the amount of the Purchase Price reduction, then at the Closing, Purchaser shall escrow with the Title Company, pursuant to an escrow agreement reasonably acceptable to Purchaser and Seller, the difference between the Purchaser's and the Seller's proposed reduction in the Purchase Price and the Closing shall occur. Following the Closing, the parties shall cooperate with one another to reach agreement as to the amount of the Purchase Price reduction; provided, however, that if, for whatever reason, the amount of the Purchase Price reduction is not finalized within 30 days after Closing, then such disagreement may be submitted for resolution, by either party, to the Bankruptcy Court. If Purchaser fails to escrow such amount at Closing, then Seller may terminate the Agreement.

(i)     In the event Seller elects clause (iii) of Section 8.16(f) or fails to respond to Purchaser's Objections within the Cure Period (which failure to respond will be deemed to be an election to terminate pursuant to clause (iii) of Section 8.16(f)), then Purchaser shall have three (3) Business Days following the expiration of the Cure Period to waive in writing Purchaser's Objections. If Purchaser gives such written waiver, the notice of termination given by Seller in accordance with this Section 8.16(f)(iii) shall be rescinded and deemed null and void and this Agreement shall be fully reinstated and enforceable in accordance with its terms. If

Purchaser fails to respond within three (3) Business Days then Purchaser will be deemed to have waived Purchaser's Objections.

(j)       Any Liens or exceptions (other than Permitted Exceptions) which are set forth as exceptions in the Title Commitment or shown on the Survey and to which Purchaser does not object on or prior to the last day of the Title/Survey Review Period (or which are thereafter waived by Purchaser) shall be deemed to be Permitted Exceptions.  In no event may Purchaser object to a Permitted Exception.

(k)       Notwithstanding anything in this <u>Section 8.16</u> to the contrary, Seller shall be obligated to cure, whether directly by payment, bonding or otherwise pursuant to this <u>Section 8.16(k)</u> or pursuant to the Sale Order (so that the Title Company agrees to remove the exception forming the basis of Purchaser's Objection from the Title Policy or insure or endorse over by endorsement reasonably satisfactory to Purchaser) or satisfy to the reasonable satisfaction of Purchaser (i) any Indebtedness lien or mortgage liens, (ii) any judgment lien or valid mechanic's and materialman's lien, (iii) any consensual liens or encumbrances agreed to by Seller without Purchaser's consent on or after the date of this Agreement; (iv) any real estate Taxes or special assessments due and payable prior to the Closing, subject to any adjustment thereof between the parties; and (v) the restrictions in favor of Sumner County, Tennessee in that Agreement of record in Book 1934, Page 527, Register's Office for Sumner County, Tennessee and in that Warranty Deed of record in Book 1934, Page 547, Register's Office for Sumner County, Tennessee (collectively, the "<u>Mandatory Cure Issues</u>").  Except for (A) Mandatory Cure Issues and (B) Purchaser's Objections which Seller cures or agrees to cure on or prior to Closing, all exceptions to title shown by the Title Commitment, any revised Title Commitment or the Survey shall be deemed Permitted Exceptions for all purposes hereunder.

(l)       At Closing, Seller will convey to Purchaser good and valid leasehold interests in the Purchased Real Property Leases and Purchased Personal Property Leases, free and clear of all Liens, other than Permitted Exceptions, to the extent permissible under section 363(f) of the Bankruptcy Code.

(m)       Except as set forth in <u>Section 8.16(i)</u>, if the Agreement is terminated pursuant to this <u>Section 8.16</u>, the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by <u>Section 4.6</u>, without further action by Purchaser or Seller.

## ARTICLE IX

## EMPLOYEES AND EMPLOYEE BENEFITS

9.1       <u>Offers of Employment</u>.  Not later than ten Business Days prior to the Closing, Purchaser or an Affiliate of Purchaser ("<u>Purchaser Employer</u>") shall deliver an offer of employment by Purchaser Employer to each of the Employees other than those set forth on <u>Schedule 9.1</u> who remain employed by Seller as of a recent date, as Seller shall have advised Purchaser of at least three Business Days in advance of Purchaser Employer commencing delivery of such offers of employment.  Such offers of employment shall be on an "at-will" basis, except that the provisions of <u>Section 9.2</u> below shall apply to each offer with such

employment to commence immediately following the Closing. Further, individuals shall be placed on Schedule 9.1 (and not receive offers of employment) only as a result of not satisfying Purchaser's customary employee screening procedures, and, under no circumstances shall the number of individuals identified on Schedule 9.1 be enough to result in any Liability to Seller under the WARN Act or similar Law. Seller shall deliver to Purchaser with such listing of Employees as of such date a reconciliation of such list with the list of Employees delivered to Purchaser pursuant to Section 5.10. Purchaser Employer shall likewise deliver as soon as practicable such an offer to any individual not included on such list but who is an Employee as of the Closing Date, subject to Purchaser Employer's customary employee screening and employment practices, policies and procedures. Each such offer of employment shall be at the same salary or hourly wage rate and position in effect immediately prior to the Closing, and, within 90 days following the Closing, a 2.5% increase in the salary or hourly wage rate paid to such Employee immediately prior to the Closing. Such individuals who accept such offer of employment are hereinafter referred to as the "Transferred Employees". Pursuant to the "Standard Procedure" provided in section 4 of Revenue Procedure 2004-53, (i) Purchaser Employer and Seller shall report on a predecessor/successor basis as set forth therein, (ii) Seller will not be relieved from filing a Form W-2 with respect to any Transferred Employees, and (iii) Purchaser Employer will undertake to file (or cause to be filed) a Form W-2 for each such Transferred Employee with respect to the portion of the year during which such Employees are employed by Purchaser Employer that includes the Closing Date, excluding the portion of such year that such Employee was employed by Seller.

9.2    Employment Terms; Employee Benefits.

(a)    Purchaser Employer shall provide, or cause to be provided, for a period not earlier than the end of the third month following the Closing Date or such longer period of time required to avoid liability under the WARN Act, to each of the Transferred Employees (i) compensation (including salary, wages and opportunities for commissions, bonuses, incentive pay, overtime and premium pay) in accordance with the provisions of Section 9.1 and (ii) location of employment and a position of employment that are, in each case, substantially equivalent to those provided to such Transferred Employee immediately prior to the Closing. Subject to the provisions of Section 9.2(b), Purchaser Employer shall provide, or cause to be provided, for a period ending not earlier than the end of the third month following the Closing Date or such longer period of time required to avoid liability under the WARN Act, to each of the Transferred Employees employee benefits consistent with those provided by Affiliates of Purchaser Employer to other employees of businesses operated by Affiliates of Purchaser Employer similar to the Business in the State of Tennessee.

(b)    For purposes of eligibility and vesting (but not benefit accrual) under the employee benefit plans of Purchaser Employer providing benefits to Transferred Employees (the "Purchaser Plans"), Purchaser Employer shall credit each such Transferred Employee with his or her years of service with Seller and any predecessor entities, to the same extent as such Transferred Employee was entitled immediately prior to the Closing to credit for such service under any similar Employee Benefit Plan. The Purchaser Plans shall not deny any such Transferred Employees coverage on the basis of pre-existing conditions and shall credit against any deductibles provided by such Purchaser Plan in respect of a Transferred Employee's

59

participation in the Purchaser Plans for the year in which the Closing occurs for any out-of-pocket expenses paid by the Transferred Employee before the Closing during such year.

(c)     Subject to Seller's compliance with Section 9.1 and except as provided in Section 9.2(a), nothing contained in this Agreement shall be construed to prevent the termination of employment of any individual Transferred Employee or any change in the employee benefits available to any individual Transferred Employee.

(d)     As between Purchaser and Seller, and solely to the extent included in the calculation of Net Working Capital, Purchaser shall be responsible for all Liabilities with respect to the Transferred Employees referred to in Section 9.1 attributable to their accrued and unused vacation, sick days and personal days through the Closing Date.  Purchaser or Purchaser Employer shall be responsible for providing COBRA (or other applicable health plan continuation coverage law) coverage to all employees and former employees of Seller or the Business who are or become eligible therefor under any Employee Benefit Plan.

9.3     Board of Trustees.  During the period that Purchaser (or an affiliate of Purchaser) operates a Hospital, Purchaser shall appoint and maintain an advisory board (each, a "Board of Trustees") for such Hospital.  Subject to modification by Purchaser in its sole discretion, each Board of Trustees would consist of nine members.  The members of each Board of Trustees would be physicians who are members of the medical staff of the Hospital, the Chief Executive Officer of the Hospital, and business leaders from the community served by the Hospital.  In addition to those specific responsibilities of the Board of Trustees required by The Joint Commission, the Board of Trustees would adopt a vision, mission and values statement for the Hospital, participate in the development and review of strategic plans and budgets for the Hospital and oversee medical staff issues and quality of patient care.

9.4     Capital Fund.  During each of the five years following the Closing, Purchaser would dedicate 0.50% of the net patient revenues of each Hospital with respect to the preceding 12 month period to be spent on capital and/or recruiting expenditures during the following 12 month period as determined by the Medical Staff of each Hospital in the event that certain predetermined quality and service benchmarks to be agreed upon by the medical staff(s) and the applicable Hospital are satisfied.

9.5     Capital Commitment.  During the 10 years following the Closing, Purchaser shall make capital expenditures in connection with the operation of the Hospitals of no less than $60,000,000 in the aggregate.

# ARTICLE X

# CONDITIONS TO CLOSING

10.1     Conditions Precedent to Obligations of Purchaser.  The obligation of Purchaser to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part):

(a)     the representations and warranties of Seller set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date) and Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect; provided, however, that in the event any such representation or warranty has been breached the condition set forth in this Section 10.1(a) shall nevertheless be deemed satisfied unless the effect of all such breaches of representations and warranties taken together result in a Material Adverse Effect;

(b)     Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the forgoing effect; provided, however, that the condition set forth in this Section 10.1(b) shall be deemed satisfied unless all such failures to so perform or comply taken together result in a Material Adverse Effect;

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2;

(d)     Purchaser shall have received all consents, approvals, licenses or Permits, or waivers thereof, of the Governmental Bodies identified in Schedule 10.1(d) and the parties shall have given all notices required by Schedule 10.1(d); and

(e)     Subject to Purchaser paying the title premiums and cost of endorsements, the Title Company shall be irrevocably committed to issue the Title Policy insuring Purchaser's good and marketable fee title to the Owned Properties that are included within the Included Real Property, showing no exceptions other than the Permitted Exceptions together with such endorsements to such Title Policy as Purchaser reasonably deems necessary and are available. Seller shall have executed and delivered the Title Company's required form of "Owner's Affidavit" so that the Title Company may issue an "extended coverage" Title Policy free of the so-called Schedule B-2 pre-printed exceptions except for matters shown on the Survey.

10.2     Conditions Precedent to Obligations of Seller.    The obligation of Seller to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part):

(a)     the representations and warranties of Purchaser set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier

61

date), and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(c)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 4.3.

10.3     Conditions Precedent to Obligations of Purchaser and Seller.  The respective obligations of Purchaser and Seller to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions;

(b)     the Bankruptcy Court shall have entered the Sale Order and such Sale Order shall not have been stayed, modified, reversed or amended, dissolved, revoked or rescinded;

(c)     the waiting period applicable to the Contemplated Transactions by this Agreement under the HSR Act shall have expired or early termination in respect thereof shall have been granted; and

(d)     the parties shall have received the consents or approvals required by Section 5.3(a), if applicable, and the consents, approvals, licenses or Permits, or waivers thereof, of the Governmental Bodies identified in Schedule 10.3(d) and shall have given the notices required by Schedule 10.3(d).

10.4     Frustration of Closing Conditions.  Neither Seller nor Purchaser may rely on the failure of any condition set forth in Section 10.1, Section 10.2 or Section 10.3, as the case may be, to excuse it from consummating the Contemplated Transactions if such failure was caused by such party's failure to comply with any provision of this Agreement.

## ARTICLE XI

## INDEMNIFICATION

11.1     Survival of Representations and Warranties.  The parties hereto agree that the representations and warranties contained in this Agreement shall continue to be fully effective and enforceable following the Closing for six (6) months and shall thereafter be of no further force and effect, except with respect to claims for a breach previously made during such period that remains unresolved.  The parties hereto agree that the covenants contained in this Agreement

to be performed or otherwise adhered to at or after the Closing shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing for any breach thereof.

11.2    Indemnification.

(a)    Subject to the provisions of this ARTICLE XI, Purchaser shall indemnify and hold harmless Seller and its Affiliates, agents, successors and permitted assigns (the "Seller Indemnified Parties"), and will reimburse such Seller Indemnified Parties, from, against and for any damages, claims, costs, loss, liabilities, expenses or obligations (including reasonable attorney's fees and associated expenses, but not including time spent by employers of such party), whether or not involving a third party claim (collectively, "Losses") from and against:

(i)    any breach of, or any inaccuracy in, any representation or warranty made by Purchaser in this Agreement;

(ii)    any breach of any covenant or other agreement on the part of Purchaser under this Agreement;

(iii)    any and all Losses actually sustained by a Seller Indemnified Party based upon or arising from any Assumed Liability or Purchaser's operation of the Business or the Purchased Assets after the Effective Time, other than Losses that arise from or in connection with Excluded Liabilities; and

(iv)    any expenses sustained or reasonably incurred by a Seller Indemnified Party incident to investigating, responding to or defending against any claim, investigation, action, suit or proceeding relating to or arising out of a matter referred to in the foregoing clause (i), (ii) or (iii) of this sentence.

(b)    Subject to the provisions of this ARTICLE XI, each Seller shall (on a joint and several basis) indemnify and hold Purchaser and its Affiliates, agents, successors and permitted assigns (the "Purchaser Indemnified Parties" and, collectively with the Seller Indemnified Parties, the "Indemnified Parties") harmless and will reimburse such Purchaser Indemnified Parties, from, against and for any Losses, from and against:

(i)    any breach of, or any inaccuracy in, any representation or warranty made by Seller in this Agreement;

(ii)    any breach of any covenant or other agreement on the part of Seller under this Agreement;

(iii)    any Excluded Asset or any Excluded Liability or Seller's operation of the Business or the Purchased Assets prior to the Effective Time, other than Losses that arise from or in connection with Assumed Liabilities; and

(iv)    any expenses sustained or reasonably incurred by a Purchaser Indemnified Party incident to investigating, responding to or defending against any claim,

investigation, action, suit or proceeding relating to or arising out of a matter referred to in the foregoing clause (i), (ii) or (iii) of this sentence.

(c)     Seller shall have no Liability with respect to Losses arising pursuant to Section 11.2(b)(i) unless and until the aggregate amount of such Losses exceeds $250,000 (the "Seller's Deductible"), at which time, Seller shall be responsible for all aggregate Losses in excess of the Seller's Deductible up to the Seller's Limit, provided that the amount of any such single Loss exceeds $10,000.  The maximum aggregate liability of Seller for Losses arising pursuant to Section 11.2(b) shall be limited to the Indemnity Escrowed Funds (the "Seller's Limit").  Seller shall have no liability for Losses arising pursuant to Section 11.2(b) in excess of the Seller's Limit nor shall Seller have any obligation to make any payment to any Purchaser Indemnified Parties other than from the Indemnity Escrowed Funds, except as otherwise set forth in this Agreement.  Under no circumstances shall Seller be liable to Purchaser or to any other Purchaser Indemnified Parties beyond the Indemnity Escrowed Funds, for any reason whatsoever, whether for breach of this Agreement, or for other indemnification obligations under this ARTICLE XI, except for obligations of Seller, if any, to pay the Break-Up Fee and Expense Reimbursement or any amounts required by Section 7.3(f).  Notwithstanding anything contained herein to the contrary, for the sole purpose of calculating Losses (and not for determining whether any breach of Seller's representations and warranties has occurred), the representations and warranties of Seller shall be read without giving effect to the phrase "Material Adverse Effect," "in all material respects," "substantial" and similar words or phrases qualifying any of the Seller's representations or warranties.

(d)     Purchaser shall have no liability with respect to Losses arising pursuant to Section 11.2(a)(i) unless and until the aggregate amount of such Losses exceeds $250,000 (the "Purchaser's Deductible"), at which time, Purchaser shall be responsible for all aggregate Losses in excess of the Purchaser's Deductible up to the Purchaser's Limit, provided that the amount of such Losses exceeds $10,000.  The maximum aggregate liability of Purchaser for Losses arising pursuant to Section 11.2(a)(i) shall be an amount equal to the Indemnity Escrowed Funds the "Purchaser's Limit") and Purchaser shall have no liability for Losses arising pursuant to Section 11.2(a)(i) in excess of the Purchaser's Limit.  Notwithstanding anything contained herein to the contrary, for the sole purpose of calculating Losses, (and not for determining whether any breach of Purchaser's representations and warranties has occurred), the representations and warranties of Purchaser shall be read without giving effect to the phrase "Material Adverse Effect," "in all material respects," "substantial" and similar words or phrases qualifying any of the Purchaser's representations or warranties.

11.3     Indemnification Procedures.

(a)     In the event that any Legal Proceedings shall be instituted or that any claim or demand shall be asserted by any Person in respect of which payment may be sought under Section 11.2 hereof (an "Indemnification Claim"), the Indemnified Party shall reasonably and promptly cause written notice of the assertion of any Indemnification Claim of which it has knowledge which is covered by this indemnity to be forwarded to the indemnifying party, but the failure to notify the indemnifying party will not relieve the indemnifying party of any liability that it may have to the Indemnified Party, except to the extent that the indemnifying party demonstrates that the defense of such action is prejudiced by the Indemnified Party's failure to

64

provide such notice.  The indemnifying party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the Indemnified Party, and to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder.  If the indemnifying party elects to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, it shall within 15 days after receiving written notice from the Indemnified Party notify the Indemnified Party of its intent to do so.  If the indemnifying Party elects not to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder or fails to provide notice of its election within such 15 day time period, the Indemnified Party may defend against, negotiate, settle or otherwise deal with such Indemnification Claim.  If the indemnifying party shall assume the defense of any Indemnification Claim, the Indemnified Party may participate, at his or its own expense, in the defense of such Indemnification Claim; provided, however, that the Indemnified Party shall be entitled to participate in any such defense with separate counsel at the expense of the indemnifying party if (i) so requested by the indemnifying party to participate or (ii) in the reasonable opinion of counsel to the Indemnified Party a conflict or potential conflict exists between the Indemnified Party and the indemnifying party that would make such separate representation advisable; and provided, further, that the indemnifying party shall not be required to pay for more than one such counsel for all Indemnified Parties in connection with any Indemnification Claim.  The parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Indemnification Claim.  Notwithstanding anything in this Section 11.2 to the contrary, neither the indemnifying party nor the Indemnified Party shall, without the written consent of the other party, settle or compromise any Indemnification Claim or permit a default or consent to entry of any judgment unless the claimant and such party provide to such other party an unqualified release from all liability in respect of the Indemnification Claim.  Notwithstanding the foregoing, if a settlement offer solely for money damages is made by the applicable third party claimant, and the indemnifying party notifies the Indemnified Party in writing of the indemnifying party's willingness to accept the settlement offer and pay the amount called for by such offer, and the Indemnified Party declines to accept such offer, the Indemnified Party may continue to contest such Indemnification Claim, free of any participation by the indemnifying party, and the amount of any ultimate liability with respect to such Indemnification Claim that the indemnifying party has an obligation to pay hereunder shall be limited to the lesser of (A) the amount of the settlement offer that the Indemnified Party declined to accept plus the Losses of the Indemnified Party relating to such Indemnification Claim through the date of its rejection of the settlement offer or (B) the aggregate Losses of the Indemnified Party with respect to such Indemnification Claim.  If the indemnifying party makes any payment on any Indemnification Claim, the indemnifying party shall be subrogated, to the extent of such payment, to all rights and remedies of the Indemnified Party to any insurance benefits or other claims of the Indemnified Party with respect to such Indemnification Claim.

(b)     After any final decision, judgment or award shall have been rendered by a Governmental Body of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the Indemnified Party and the indemnifying party shall have arrived at a mutually binding agreement with respect to an Indemnification Claim hereunder, the Indemnified Party shall forward to the indemnifying party

notice of any sums due and owing by the indemnifying party pursuant to this Agreement with respect to such matter.

(c)     Whenever any claim shall arise for indemnification hereunder not involving a demand, claim, action or proceeding made or brought by a third party, including a Governmental Body (a "Proceeding"), the Indemnified Party shall notify the indemnifying party promptly after such Indemnified Party has actual knowledge of the facts constituting the basis for such claim, but the failure to notify the indemnifying party will not relieve the indemnifying party of any liability that it may have to the Indemnified Party.  The notice to the indemnifying party shall specify (i) the nature of any Losses asserted by or against the Indemnified Party for which the Indemnified Party intends to seek indemnity hereunder ("Claims") and (ii) the amount or an estimate of the amount of such Losses.  If the indemnifying party does not, within 15 days after receipt of the Claims, object to such Claims, the indemnifying party shall be deemed to have agreed to be responsible for the nature of and the amounts set forth in the claim.

11.4     Calculation of Losses.  The amount of any Losses for which indemnification is provided under this ARTICLE XI shall be net of any amounts actually recovered or recoverable by the Indemnified Party under insurance policies or otherwise with respect to such Losses (net of any Tax or expenses incurred in connection with such recovery).

11.5     Tax Treatment of Indemnity Payments.  Seller and Purchaser agree to treat any indemnity payment made pursuant to this ARTICLE XI as an adjustment to the Purchase Price solely for federal, state, local and foreign income Tax purposes.

11.6     No Consequential Damages.  Notwithstanding anything to the contrary elsewhere in this Agreement, no party shall, in any event, be liable to any other Person for any consequential, incidental, indirect, special or punitive damages of such other Person, including loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof (provided that such limitation with respect to lost profits shall not limit Seller's or Purchaser's right to recover contract damages in connection with Purchaser's or Seller's, as applicable, failure to close in violation of this Agreement).

## ARTICLE XII

## TAXES

12.1     Transfer Taxes.  Purchaser shall be responsible for (and shall indemnify and hold harmless Seller and its directors, officers, employees, Affiliates, agents, successors and permitted assigns against) any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges (including any interest and penalty thereon) payable in connection with the Contemplated Transactions ("Transfer Taxes").  To the extent that any Transfer Taxes are required to be paid by Seller (or such Transfer Taxes are assessed against Seller), Purchaser shall promptly reimburse Seller, as applicable, for such Transfer Taxes.  Seller and Purchaser shall cooperate and consult with each other prior to filing any Tax Returns in respect of Transfer Taxes.  Seller and Purchaser shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds to Transfer Taxes.

66

12.2    Taxes.  Purchaser shall be responsible for all real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date.  If any Taxes subject to this Section 12.2 are paid prospectively by Seller, the amount of such Taxes paid shall be paid promptly by Purchaser to Seller or otherwise included in the calculation of Closing Net Working Capital.

12.3    Purchase Price Allocation.  For Tax purposes only, within 90 days of Closing, Seller and Purchaser shall allocate the Purchase Price (including the Assumed Liabilities) among the Purchased Assets in accordance with Section 1060 of the Code and, in accordance with such allocation, Purchaser shall prepare and deliver to Seller copies of Form 8594 and any required exhibits thereto (the "Asset Acquisition Statement").  Purchaser shall prepare and deliver to Seller from time to time revised copies of the Asset Acquisition Statement (the "Revised Statements") so as to report any matters on the Asset Acquisition Statement that need updating (including Purchase Price adjustments, if any) consistent with the agreed upon allocation.  The Purchase Price for the Purchased Assets shall be allocated in accordance with the Asset Acquisition Statement or, if applicable, the last Revised Statements, provided by Purchaser to Seller, and all income Tax Returns and reports filed by Purchaser and Seller shall be prepared consistently with such allocation.

12.4    Pre-Closing Taxes.  Except as provided in Section 12.1 and Section 12.2, Seller shall be responsible for all Taxes relating to the Business or the Purchased Assets for any Tax periods (or portions thereof) ending on or before the Closing Date ("Pre-Closing Taxes"), provided such Pre-Closing Taxes are not included in Net Working Capital.  To the extent any Pre-Closing Taxes are required to be paid by Purchaser (or such Pre-Closing Taxes are assessed against Purchaser), Seller shall promptly reimburse Purchaser or pay the assessment for such Pre-Closing Taxes.

## ARTICLE XIII

## MISCELLANEOUS

13.1    Expenses.  Except as otherwise provided in this Agreement, each of Seller and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.  Purchaser shall pay the costs of the Phase I, Survey and Title Policy.

13.2    Injunctive Relief.  Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including without limitation specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this Section 13.2 shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

13.3    Submission to Jurisdiction; Consent to Service of Process.  Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 13.7 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Middle District of Tennessee sitting in Nashville Tennessee or any court of the State of Tennessee sitting in Davidson County, Tennessee and any appellate court from any thereof, for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 13.7.

13.4    Waiver of Right to Trial by Jury.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

13.5    Entire Agreement; Amendments and Waivers.  This Agreement (including the Schedules and Exhibits hereto and the items delivered in connection therewith) and the Confidentiality Agreement represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

13.6    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee applicable to contracts made and performed in such State.

4348/69444-001 CURRENT/16419511V19

13.7 Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller, to:

Sumner Regional Health Systems, Inc.
555 Hartsville Pike
Gallatin, TN 37066
Fax:    615.328.6621
Attn:

With a copy to:

Proskauer Rose LLP
70 West Madison
Suite 3800
Chicago, Illinois 60602-4342
Fax:    312.962.3551
Attn:   Monte I. Dube, Esq.

If to Purchaser, to:

LifePoint Acquisition Corp.
c/o LifePoint Hospitals, Inc.
103 Powell Court, Suite 200
Brentwood, TN 37027
Fax No. 615.372.8572
Attention:  General Counsel

With a copy to:

Waller Lansden Dortch & Davis, LLP
Nashville City Center
511 Union Street, Suite 2700
Nashville, TN 37219
Fax No. 615.244.6804
Attention:  Brian R. Browder, Esq.

If to Affiliate Indemnitor, to:

Historic LifePoint Hospitals, Inc.
c/o LifePoint Hospitals, Inc.
103 Powell Court, Suite 200
Brentwood, TN 37027
Fax No. 615.372.8572
Attention:  General Counsel

4348/69444-001 CURRENT/16419511V19

<pre>
                    With a copy to:                Waller Lansden Dortch & Davis, LLP
                                                    Nashville City Center
                                                    511 Union Street, Suite 2700
                                                    Nashville, TN 37219
                                                    Fax No. 615.244.6804
                                                    Attention:  Brian R. Browder, Esq.
</pre>

13.8    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Contemplated Transactions is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the Contemplated Transactions are consummated as originally contemplated to the greatest extent possible.

13.9    Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other party hereto and any attempted assignment without the required consents shall be void; provided, however, that Purchaser may assign its right to acquire any or all of the Purchased Assets and its other rights hereunder to an entity wholly owned by it that also assumes all of Purchaser's obligations hereunder (but such assumption shall not relieve Purchaser of its obligations hereunder), with the consent of Seller, which shall not be unreasonably withheld.  No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations.  Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

13.10    No Personal Liability.  In entering into this Agreement, the parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any party hereto shall be personally liable or responsible to any other party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named parties only (but nothing contained herein shall limit the liability of any person for his or her fraudulent acts).

4348/69444-001 CURRENT/16419511V19

13.11   Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

SELLER:

Sumner Regional Health Systems, Inc.

By: _____

Name: Roger Kaiser, M.D.

Its:    President/CEO

Trousdale Medical Center, Inc.

By: _____

Name: Roger Kaiser, M.D.

Its:    President/CEO

Frank T. Rutherford Memorial Hospital, Inc.

By: _____

Name: Roger Kaiser, M.D.

Its:    President/CEO

SRHS Holdings, LLC

By: _____

Name: Roger Kaiser, M.D.

Its:    Chief Manager

Sumner Homecare and Hospice, LLC

By: _____

Name: Roger Kaiser, M.D.

Its:    Chief Manager

Family Wellness Group of Middle Tennessee, LLC

By: _____

Name: Roger Kaiser, M.D.

Its:    Chief Operating Officer

ClinicCare, LLC

By: _____

Name: Roger Kaiser, M.D.

Its:    Chief Manager

PURCHASER:

LifePoint Acquisition Corp.

By: _____

Name: Paul R. Hannah

Its:     Senior Vice President

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and adequacy of which is acknowledged and confessed and as an inducement to Seller to execute, deliver and perform its obligations pursuant to this Agreement, Affiliate Indemnitor executes this Agreement solely for the purpose of agreeing to be bound by and to indemnify and hold harmless Seller for the obligations of Purchaser arising pursuant to ARTICLE XI of this Agreement as well as the obligation, if any, of Purchaser to pay Seller the cash portion of the Purchase Price. Affiliate Indemnitor represents and warrants to each Seller that (i) Affiliate Indemnitor has full corporate power, legal capacity and authority to execute and deliver this Agreement and to perform its obligations hereunder and (ii) all consents, approvals and filings necessary for the delivery of this Agreement by Affiliate Indemnitor have been obtained or made.

Affiliate Indemnitor:

Historic LifePoint Hospitals, Inc.

By: _____

Name: Paul D. Gilbert

Its:     Executive Vice President

**EXHIBIT F**

**PROPOSED SALE ORDER**

7653/69444-001 Current/18532299v23

**[TO BE SUPPLIED]**