**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SRHS Bankruptcy, Inc. (f/k/a Sumner | ) | Case No. 3:10-bk-04766 |
| Regional Health Systems, Inc.), *et al.*,[1] | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |

**DEBTORS' (I) OBJECTION TO THE EXPEDITED MOTION OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS TO OBJECT TO POST-SALE
COMPENSATION OF NAVIGANT CAPITAL ADVISORS, LLC AND (II) REQUEST
TO MODIFY NAVIGANT CAPITAL ADVISORS, LLC'S RETENTION ORDER**

SRHS Bankruptcy, Inc. (f/k/a Sumner Regional Health Systems, Inc.), together with its
affiliated debtors and debtors in possession (collectively, the "Debtors" or "Sumner"), hereby file
this objection to the Expedited Motion (the "Expedited Motion") [Docket No. 731] of the
Official Committee of Unsecured Creditors (the "Committee") to Object to Post Sale
Compensation of Navigant Capital Advisors, LLC ("Navigant"). The Debtors also request that
the order approving Navigant's retention (the "Retention Order")[Docket No. 225] be modified
as set forth herein. In support of hereof, the Debtors respectfully state:

**Background**

1.    Navigant was engaged by the Debtors approximately 11 months prior to
the filing of these cases. During that time period, Navigant identified and implemented for the
Debtors significant cost-cutting and performance-enhancing initiatives. Those initiatives

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: SRHS Bankruptcy, Inc. (f/k/a Sumner Regional Health Systems, Inc.) (3738), TMC Bankruptcy, Inc.
(f/k/a Trousdale Medical Center, Inc.) (5666), FTRMH Bankruptcy, Inc. (f/k/a Frank T. Rutherford Memorial
Hospital, Inc.) (8987), Holdings Bankruptcy, Inc. (f/k/a SRHS Holdings, LLC) (2680), SHH Bankruptcy, LLC (f/k/a
Sumner Homecare and Hospice, LLC) (4324), FWGMT Bankruptcy, LLC (f/k/a Family Wellness Group of Middle
Tennessee, LLC) (1860) and CC Bankruptcy, LLC (f/k/a ClinicCare, LLC) (6783).

translated into significant improvement in the Debtors' business operations, cash flows and, ultimately, the value of the Debtors' assets. During that same time period, and following the filing of these cases, Navigant managed the business and affairs of the Debtors and led the effort to market, and ultimately sold the Debtors' assets through a competitive process, all under the guildance of the Debtors' board of directors.[2]

2.    Between the filing of these cases and the closing of the sale of the Debtors' assets to LifePoint, Navigant was engaged in most every aspect of operating and managing the Debtors' business and financial affiars. During that time period, Navigant's fixed monthly fee for those services was $340,000. Upon completion of the sale of the Debtors' assets to LifePoint in August 2010, Navigant's monthly fee was reduced to $185,000. Throughout the post-petition period, Navigant has and continues to record time spent on behalf of the Debtors. Based on those time records, in November and December 2010 alone, Navigant recorded 998 hours at an average or blended hourly rate of $493.93. When comparing the value of those services (998 hours x $493.93 blended rate) of $492,971 to the aggregate monthly fee charged by Navigant for November and December 2010, $370,000, it becomes clear that the estate has received value from Navigant of $122,971 more than the Debtors paid Navigant for that time period.

3.    In late January 2011, the Committee indicated to the Debtors that in the Committee's view, Navigant's monthly fee should be reduced further. In response, Navigant

---

[2] Navigant's involvement with the Debtors began in June of 2009 while the Debtors were in the midst of a financial crisis. Fitch Rating had just issued a downgrade report of the Debtors debt to 'B-' from 'BB+' with a 'Negative' watch, citing the Debtors deterioration in operating profitability, accounting problems, a material decline in liquidity, and the Debtors' auditors issuing a going-concern opinion in the 2008 audit. Two days later William T. Sugg, the former CEO of Sumner and a current member of the Committee, resigned along with the resignation or termination of several other members of the Debtors then executive management team. The Sumner Board replaced those individuals with Navigant employees, including Mr. Popejoy who was appointed as the Debtors Chief Restructuring Officer. The Board chose Navigant, and specific individuals within Navigant, because of their extensive expertise in both the health care industry as well as in restructuring financially troubled institutions.

1111/69444-017 Current/22184494v5

agreed to provide a detailed analysis of the work yet to be performed to close the estates, together with a modified fee proposal. Rather than wait for Navigant to deliver the promised analysis and modified fee proposal, the Committee filed the Expedited Motion.

4.    The Expedited Motion reflects the Committee's fundamental misunderstanding of the posture, status and liquidation mode of these cases. As detailed herein, the Debtors' largest asset and biggest challenge, for which Navigant is uniquely essential, are the claims by and against LifePoint in connection with the sale transaction, which claims have a value differential to the estates of approximately $9.2 million. If the Debtors successfully defend LifePoint's claims (which the Debtors believe they will) and successfully recover the escrows provided for under the LifePoint asset purchase agreement (which the Debtors believe they will), the unsecured creditors of the Debtors will benefit handsomely. These issues with LifePoint (and not real estate parcels) constitute the primary value remaining in the Debtors' estates. As will be discussed, Navigant is integral to the estates' recoveries from and defenses to claims of LifePoint. [3]

5.    Perhaps more troubling is what the Committee's motion fails to state, but undoubtedly intends to achieve. The largest unsecured claims outstanding against the Debtors[4] belong to the Committee members. Those claims, as asserted, aggregate approximately $12,735,690. In addition, certain members of the Committee have asserted administrative claims in the aggregate amount of approximately $2,516,341. The Debtors contest those claims (as the

---

[3] Based on Navigant's review of the claims filed against the estate, and taking into account the various post closing issues with LifePoint as well as certain other open items, each of which will be discussed in further detail below, there is still the potential for the Debtors to provide a 100% recovery to both the unsecured creditors and the bondholders while having funds remaining to provide an additional distribution to Sumner County. In order to accomplish this, however, the Debtors need to successfully accomplish a number of time intensive tasks. As the Debtors' management team (other than the Board of Directors) now consists of only several members of the Navigant team, the majority of this work falls on Navigant's shoulders.

[4] As the Court may recall, most of the unsecured claims against the Debtors were assumed and paid by LifePoint under the Asset Purchase Agreement.

1111/69444-017 Current/22184494v5

Committee and its counsel well know), and believe those claims need be reduced significantly for the benefit of other unsecured creditors, the bondholders and, to the extent of available funds, Sumner County. The Committee's attempt to limit Navigant's future services to selling off real estate (as suggested in the Motion) appears designed to restrict the Debtors' ability to administer claims, including, of course, objecting to the Committee member claims. If this is the Committee's intent in pressing its Motion, such a result is inconsistent with fiduciary duties and cannot be allowed.[5] The Committee cannot take over the remaining tasks being carried out by the Debtors, not only because of these conflicts, but also because there are numerous constituencies whose interests are at stake; the Committee represents only the unsecured creditors, while the Debtors have fiduciary duties to all constituencies.

6. Nonetheless, following the filing of the Motion and entry of the Court's order scheduling a hearing thereon on February 24, 2011, Navigant provided the Committee and its professionals with (a) a detailed work plan identifying major tasks to be completed and an estimate of hours required to complete those tasks (the "Work Plan"), (b) an estimated recovery analysis that shows estimated recoveries for unsecured creditors if the Debtors do or do not successfully recover from LifePoint, defend against LifePoint claims and defend against claims of the Committee members (the "Estimated Recovery Analsys"), and (c) a reduced monthly fee proposal. Following such deliveries, the Debtors (with Navigant) and the Committee held a call lasting more than 2 hours wherein Navigant explained in detail the Work Plan and Estimated Recovery Analysis. Following that call, however, the Committee rejected Navigant's reduced monthly fee proposal.

---

[5] While the Debtors have a fiduciary obligation to all of the creditors in each of the cases, and intend to propose a plan of liquidation which will substantively consolidate these cases, the Committee does not. The Committee was only appointed in the main case and, therefore, in effect, represents only its own interests.

1111/69444-017 Current/22184494v5

4

7.     At this juncture, the Debtors request that Navigant charge fees based on its standard hourly rates and serve fee statements, containing adequate detail as to the tasks performed and time spent on each, on the same parties served by other professionals in the case. In the event any of those parties, including the Committee, objects to a monthly fee statement, and such dispute cannot be resolved among Navigant, the Debtors and the objecting party, such dispute shall be submitted to the Court for resolution. Navigant is agreeable to this approach. The Debtors believe that, given all that remains with respect to the LifePoint claims and escrows, the Committee member claims and the bookkeeping, filings and claims administration, together with probable litigation support for several of these matters, an hourly fee will be a simpler method than attempting to predict the time Navigant must necessarily spend to properly administer these estates for purposes of a flat fee.

## The Work Plan

8.     The Work Plan divides the post-LifePoint sale work into the following categories: Claims Reconciliation; Cost Reports; Tax Returns; Benefit Audits and Returns; Purchase Price/Working Capital Adjustment; General Ledger Closing; Monthly Operating Reports; Cash Receipts and Disbursements; Collection of Vendor Deposits; Cost Report Audits; Preference Analysis; Disclosure Statement; Non Core Asset Management and Sales; Investment Realization; Workers Compensation Matters; and Coordinate with UCC Professional.

9.     While certain of these tasks are administrative in nature, several of these categories entail significant amounts of work, with high level reviews of technical and complicated issues.  In order to demonstrate to the Court the work that still needs to be done, and the potential benefits to the estate of doing it successfully, we will review certain of those categories here.

a. **Claims Reconciliation**

10.    There were approximately 370 claims filed in these chapter 11 cases.  In order to reconcile these claims, a process which could not begin in earnest until mid November (after the passage of the bar date and the closing of the Sale), Navigant personnel needed to manually pull the records associated with each claim and compare it to each creditor's assertions. This time consuming and tedious process is further complicated by a provision in the Asset Purchase Agreement pursuant to which LifePoint paid certain of the Debtors' pre and post petition claims.  Navigant only recently received this claims payment information from LifePoint and is still working to reconcile and verify its accuracy.  This information needs to be reconciled not only with the filed claims but with the approximatley 8,000 scheduled claim amounts as well. Moreover, this process requires access to the Debtors' records, all of which are at the hospital in the possession and control of LifePoint, and many of which cannot be removed from the premises, to conduct a review.

11.    While Navigant has made significant progress in this initial stage of the claims review process there are a number of large claims which will require a substantial amount of work to reconcile.  Moreover, while Navigant is hopeful that the Debtors will be able to resolve some of these larger claims consensually, it is likely that certain of these matters will ultimately result in litigation.

12.    The majority of these disputed matters relate directly to the claims filed by members of the Committee.  Each of the Committee members have filed substantial claims against the estate: William T. Sugg (filed a $698,615.55 claim for severance amounts); Janice L. Hallmark (filed a $162,310.77 claim for severance amounts); James and Nancy Hodges (filed a $1,013,623.30 claim for rejection damages and administrative expenses); Citadel Properties V, L.L.C. (Citadel's lenders filed a $11,917,665.44 claim for cure payment, rejection damages, and

administrative amounts); and the Center for Comprehensive Services (filed a $434,766.23 claim based on disputes under a management services agreement). Based on Navigant's review of these claims, no less than $9 million dollars of those claims are in dispute. Navigant will necessarily play a substantial and substantive role in resolving those disputes, the outcome of which will have a material impact on the recovery for all other unsecured creditors in these cases, as well as the bondholders and potentially Sumner County. To grant the Motion and effectively restrict the Debtors from objecting to and, if necessary, litigate to resolution the Committee member claims, smacks of improper self-dealing and cannot be allowed.

13. The Debtors need Navigant to be able to properly prosecute these claims, which will have a sizeable potential effect on the distributions these estates will be able to make to all constituents. Accordingly, so as to be fair to everyone, Navigant's compensation should be based on actual time worked at their standard billing rates.

b. **Purchase Price/Working Capital Adjustment and Escrow Reserves**

14. As the Court may recall, the Asset Purchase Agreement provided for a post closing purchase price adjustment based on changes in working capital. This process is an accounting and diligence-intensive process that could be, and unfortunately has become, subject to significant dispute, notwithstanding the detailed nature of the applicable provisions of the Asset Purchase Agreement. After months of trading information and discussions, the Debtors and LifePoint are still millions of dollars apart in their respective positions regarding this adjustment. These disputes include, among other things, issues related to duplication of expenses by LifePoint, disbursement credits claimed in LifePoint's calculations but not made by LifePoint, disbursements made by LifePoint for post closing liabilities to which it is not entitled to credits, sales tax liabilities, mathematical errors and discrepancies, and other substantive

issues. This adjustment represents a dollar for dollar increase or decrease in the amount the estates will have for distribution purposes. If Navigant is successful on these and certain other issues with LifePoint the estate stands to gain as much as $2.3 million but if LifePoint prevails on its asserted claims, the Debtors may be required to pay LifePoint up to approximately $3.9 million. As such, a substantial portion of Navigant's time has been, and will continue to be, devoted to this project.

15.    At the time of the closing neither the Debtors nor Navigant expected the working capital adjustment to be as time intensive as it has become. The Debtors and LifePoint have been through several rounds of incremental information exchanges. Navigant has reviewed over 1,500 invoices and receiving reports and more than 4,000 pages of patient activity reports produced, sometimes after an initial non-production, by LifePoint (much of which was provided in binders of unorganized PDF documents). In addition, Navigant pulled additional invoices and receipts relating to more than $300,000 of disbursements, which it would not have been able to do had it not been present on the hospital campus. Moreover, Navigant has prepared preliminary calculations which it has provided to LifePoint in connection with this analysis. A copy of this memorandum has been provided to the professionals for the Committee as well.

16.    While there is still a substantial amount of work to be done in connection with finalizing the purchase price adjustment, and despite the difficulties Navigant has faced in dealing with LifePoint, Navigant continues to make every effort to consensually resolve the working capital disputes. Nonetheless, it is likley that absent a change from LifePoint, these issues will ultimately be submitted to the Court for resolution. As stated above, if Navigant is successful in this process the purchase price could be adjusted by approximately $2.3 million to the benefit of the Debtors' estates.

17.     It is important to note that the purchase price adjustment is separate and apart from the $3.0 million indemnification reserve established in connection with the Sale.  That is a separate matter that is also subject to an ongoing dispute with LifePoint that may, absent consensual resolution, be submitted to this Court.  In addition to LifePoint's claim to the $3.0 million reserve (which the Debtors dispute), LifePoint has asserted millions of dollars of purported additional claims against the Debtors (which the Debtors dispute) that, if allowed, would have a materially adverse effect on creditor recoveries in these cases.  Navigant has identified further issues with LifePoint that it is trying to resolve.  Those additional issues represent nearly a million dollars to these estates and, without action, may continue to increase.[6]

18.     As with the claims reconciliation process, the issues that Navigant is handling with respect to LifePoint represent millions of dollars that could potentially be available for distributions to all of the Debtors' constituents.   Completion of this work is in the best interest of these estates.  Given Navigant's historical context and experience in these cases, this work could not be adequately or efficiently handled by any other party.

c. **Administrative Items and Legal Support**

19.     In addition to the foregoing contested issues, there are a number of administrative items that need to be completed on a rolling basis.  These items vary in their degree of complexity and some, like the monthly closing of the general ledgers, have been made increasingly more complicated and time consuming simply because they have become manual processes.  Other tasks involve working with or contacting third parties (who may or may not be cooperative).  While Navigant attempted to estimate the time associated with these tasks in order

---

[6] For instance, LifePoint has collected cash receipts that belong to the Debtors and has, to date, refused to acknowledge such or turn such funds over to the Debtors.  The Debtors will pursue these funds from LifePoint with Navigant's assistance.

Case 3:10-bk-04766    Doc 755    Filed 02/21/11    Entered 02/21/11 13:53:16    Desc Main
Document      Page 9 of 12

to provide the Committee with a reduced fix fee proposal, those estimates could be high or low depending on any number of factors outside of Navigant's control.

20. In addition, Navigant is regularly called upon by Counsel to the Debtors to verify factual information related to issues as they arise. Navigant also reviews court documents before they are filed, and provides other support as needed and requested. As these chapter 11 proceedings enter their final stage, Navigant will likely be called upon on a regular basis to provide litigation support as matters require the Court's intervention to reach resolution.

## The Proposal

21. While not required to do so, Navigant has kept and distributed time records in connection with its monthly invoices since the commencement of these cases. In addition to sending such invoices to the distribution list required under the Retention Order, the Debtors' board is copied on each invoice as well. According to those contemporaneous time records, over the past three months Navigant personnel worked approximately 1,549 hours at an average billing rate of $489.30. Had Navigant billed the estate for such work on an hourly basis, Navigant would have been entitled to $757,974 for this three month period. However, at its current fixed fee (an approximate 45% discount to the agreed fixed fee prior to the closing of the sale), Navigant only received $555,000 for that period, resulting in a net benefit to the Debtors' Estates for the months of November through January of approximately $202,974.

22. Despite its monthly losses, Navigant has continued to work under the fixed fee arrangement without objection. While Navigant has again expressed its willingness to continue working under the current fixed fee structure, in light of the Committee's objection the Debtors propose that Navignat work with the estates on a standard hourly rather than a fixed fee

Case 3:10-bk-04766    Doc 755    Filed 02/21/11    Entered 02/21/11 13:53:16    Desc Main
Document    Page 10 of 12

basis.  Navigant would charge the estates at its standard hourly rates, would keep track of its time, and would submit fee statements to the same parties as the other professionals in the case.

23.     Such an arrangement obviates the need for guess work associated with a fixed fee arrangement ensuring that neither the Debtors' estates nor Navigant receive a windfall or suffer unnecessary losses as these cases continue towards their ultimate conclusion. Accordingly, the Debtors believe it is in the best interest of these estates, and all of their stakeholders, for Navigant to be compensated prospectively in accordance with its standard hourly rates.

WHEREFORE, the Debtors respectfully request that this Court (i) overrule the Committee Objection to Navigant's fees, (ii) authorize the Debtors on a prospective basis to compensate Navigant on an hourly basis in accordance with its standard hourly rates; (iii) modify the Order approving Navigant's retention to the extent necessary to be consistent with the relief requested herein, and (iv) grant such other and further relief as is just and appropriate under the circumstances.

Dated:      February 21, 2011               Respectfully submitted,

/s/ Robert A. Guy, Jr.
FROST BROWN TODD LLC
Robert A. Guy, Jr., Esq.
Robin Bicket White, Esq.
424 Church Street, Suite 1600
Nashville, Tennessee 37219
Telephone: 615.251.5550
Facsimile: 615.251.5551
E-mail: bguy@fbtlaw.com
E-mail: rwhite@fbtlaw.com

- and -

Ronald E. Gold, Esq.*
Joseph B. Wells, Esq.*

201 East Fifth Street, Suite 2200
Cincinnati, Ohio 45202
Telephone: 513.651.6800
Facsimile: 513.651.6981
E-mail: rgold@fbtlaw.com
E-mail: jbwells@fbtlaw.com

- and -

PROSKAUER ROSE LLP
Jeff J. Marwil, Esq.*
Three First National Plaza
70 West Madison, Suite 3800
Chicago, IL 60602-4342
Telephone:  312-962-3550

- and –

Jeffrey W. Levitan, Esq.*
Adam T. Berkowitz, Esq.*
1585 Broadway
New York, NY  10036-8299
Telephone:  212-969-3000

*Admitted *Pro Hac Vice*

Counsel for Debtors and Debtors in Possession

1111/69444-017 Current/22184494v5